# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| COINBASE FINANCIAL MARKETS, INC., | Case No. 25-cv-14092-SDK-KGA |
| *Plaintiff,* | Hon. Shalina D. Kumar |
| v. | |
| DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board, | |
| *Defendants.* | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Under Federal Rule of Civil Procedure 65(a), Plaintiff respectfully moves this Court for a preliminary injunction enjoining Defendants from regulating under Michigan law Plaintiff's offer of event contracts traded on federally registered exchanges. In support of its motion, Plaintiff relies on the accompanying brief.

Pursuant to LR 7.1(a), on December 18, 2025, Plaintiff's counsel sent an email to attorneys Mark G. Sands, James P. Kennedy, Felepe Hassen Hall, Gerald A. Whalen, and Donald McGehee (the "State Attorneys"), with the Michigan Attorney General's office, who, upon information and belief, represent the Defendants in this case. That email explained the basis for Plaintiff's claim in this case and for this motion. No response to that email has been received. Plaintiff's counsel also contacted the State Attorneys by telephone on December 18. Concurrence was not obtained.

WHEREFORE, Plaintiff asks the Court to issue a preliminary injunction enjoining Defendants from regulating under Michigan law Plaintiff's offer of event contracts traded on federally registered exchanges.

Dated: December 19, 2025

Respectfully submitted,

By: */s/ Matthew P. Allen*
Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
840 W. Long Lake Rd., Ste. 150
Troy, MI 48009
Tel: 248-879-2000
cranmer@millercanfield.com
allen@millercanfield.com

Benjamin R. Walker
Yaira Dubin
Akash M. Toprani
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
walkerb@sullcrom.com
dubiny@sullcrom.com
toprania@sullcrom.com

Jeffrey B. Wall
James M. McDonald
Rishabh Bhandari
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
Tel:  (202) 956-7500
wallj@sullcrom.com
mcdonaldj@sullcrom.com
bhandarir@sullcrom.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

COINBASE FINANCIAL MARKETS, INC.,

*Plaintiff,*

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board,

*Defendants.*

Case No. 25-cv-14092-SDK-KGA

Hon. Shalina D. Kumar

## BRIEF IN SUPPORT OF
## <u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

Page

Preliminary Statement ..................................................................................... 1

Background .......................................................................................................... 4

A.    Coinbase, A Federally Registered Intermediary, Partners With
      Kalshi, A Federally Registered Exchange, To Offer Customers
      Access To Event Contracts Through Coinbase's Platform. ..................... 4

B.    Event Contracts Have Become Widespread, As Market
      Participants And Stakeholders Have Recognized Their
      Investment Value And Information-Generating Function. ...................... 5

C.    Congress Grants The CFTC "Exclusive Jurisdiction" Over
      Derivatives Traded On Federally Registered Exchanges, Including
      "Swaps." ............................................................................................... 9

D.    Because Event Contracts Are "Swaps," The Entities That Offer
      Event Contracts For Public Trading Must Comply With A
      Comprehensive Federal Regulatory Framework. ................................... 11

E.    Michigan Regulators Target Federally Registered Entities That
      Offer Access To Event Contracts For Allegedly Violating State
      Gambling Laws. .................................................................................... 13

Legal Standard ................................................................................................. 15

Argument .......................................................................................................... 15

I.    Coinbase Is Likely To Succeed On The Merits Because The CEA
      Preempts Michigan's Attempt To Regulate Event Contracts Traded On
      Federally Registered Exchanges Under State Law. .................................. 15

      A.    The CEA Expressly Preempts Michigan's Gambling Laws ................... 16

            1.    The CFTC's "exclusive jurisdiction" over swaps traded on
                  federally registered exchanges preempts state law that purports to
                  regulate the same transactions. ....................................................... 17

            2.    The event contracts at issue here are (i) swaps (ii) traded on
                  federally registered exchanges. ...................................................... 20

      B.     The CEA Impliedly Preempts Michigan's Gambling Laws. ..................... 28

          1.     The CEA's text, structure, and history indicate that Congress intended to occupy the field. ........................... 29

          2.     Michigan's gambling laws are also conflict-preempted. ................ 32

II.    Coinbase Will Suffer Irreparable Harm Without A Preliminary Injunction. ..................................................................................................... 36

III.   The Balance Of The Equities And Public Interest Favor Injunctive Relief. ........................................................................................................... 38

Conclusion ........................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Ag. Movement* v. *Board of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ...............................................................1, 32-34

*Am. Libraries Ass'n* v. *Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997) ................................................................ 36

*Arizona* v. *United States*,
567 U.S. 387 (2012) .......................................................................*passim*

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ..................................................................................... 16

*Basicomputer Corp.* v. *Scott*,
973 F.2d 507 (6th Cir. 1992) ....................................................................... 39

*Bd. of Trade of Chi.* v. *Christie Grain & Stock Co.*,
198 U.S. 236 (1905) ..................................................................................... 10

*Bibbo* v. *Dean Witter Reynolds, Inc.*,
151 F.3d 559 (6th Cir. 1998) ....................................................................... 17

*Chicago Mercantile Exch.* v. *SEC*,
883 F.2d 537 (7th Cir. 1989) ....................................................................... 19

*City of Pontiac Retired Emps. Ass'n* v. *Schimmel*,
751 F.3d 427 (6th Cir. 2014) ....................................................................... 40

*Clarke* v. *CFTC*,
74 F.4th 627 (5th Cir. 2023) ....................................................................... 41

*Cothran* v. *Ellis*,
16 N.E. 646 (Ill. 1888)................................................................................. 10

*Curran* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
622 F.2d 216 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ..................... 19, 31

*Felder* v. *Casey*,
487 U.S. 131 (1988) ..................................................................................... 40

*INS* v. *Cardoza-Fonseca*,
480 U.S. 421 (1987) ........................................................................ 21

*Int'l Trading, Ltd.* v. *Bell*,
262 Ark. 244 (1977) ......................................................................... 19

*Irwin* v. *Williar*,
110 U.S. 499 (1884) ......................................................................... 10

*Jones* v. *B.C. Christopher & Co.*,
466 F. Supp. 213 (D. Kan. 1979) ...................................................... 19

*Jones* v. *Rath Packing Co.*,
430 U.S. 519 (1977) ......................................................................... 18

*KalshiEX LLC* v. *Flaherty*,
2025 WL 1218313 (D.N.J. Apr. 28, 2025) ....................................19-20

*KalshiEX LLC* v. *Flaherty*,
No. 24-cv-4037 (3d Cir. June 17, 2025) ........................................... 14

*KalshiEX LLC* v. *Flaherty*,
No. 25-cv-2152 (D.N.J. Apr. 18, 2025), Dkt. No. 15 ......................... 25

*KalshiEX LLC* v. *Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) .................................................. 20

*KalshiEX LLC* v. *Schuler*,
No. 25-cv-1165 (S.D. Ohio Nov. 7, 2025), Dkt. No. 31 ..................... 25

*KalshiEx, LLC* v. *CFTC*,
119 F.4th 58 (D.C. Cir. 2024) .......................................................... 23

*KalshiEX, LLC* v. *Hendrick*,
2025 WL 3286282 (D. Nev. Nov. 24, 2025) ...................................... 28

*Kansas* v. *Garcia*,
589 U.S. 191 (2020) ......................................................................... 16

*Leist* v. *Simplot*,
638 F.2d 283 (2d Cir. 1980) ............................................................. 19

*Martin-Marietta Corp.* v. *Bendix Corp.*,
690 F.2d 558 (6th Cir. 1982) ........................................................... 40

*MedImmune, Inc.* v. *Genentech, Inc.,*
    549 U.S. 118 (2007) ........................................................................... 37

*Morales* v. *Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ........................................................................... 38

*N. Am. Derivatives Exch., Inc.* v. *Nev. Gaming Control Bd.,*
    2025 WL 2916151 (Oct. 14, 2025) ............................................ 24, 25, 27-28

*NLRB* v. *SW Gen., Inc.,*
    580 U.S. 288 (2017) ........................................................................... 24

*Oneok, Inc.* v. *Learjet, Inc.,*
    575 U.S. 373 (2015) ....................................................................... 16, 29

*Pulsifer* v. *United States,*
    601 U.S. 124 (2024) ........................................................................... 24

*Rice* v. *Bd. of Trade of Chi.,*
    331 U.S. 247 (1947) ........................................................................... 20

*Spicer* v. *Chi. Bd. of Options Exch., Inc.,*
    977 F.2d 255 (7th Cir. 1992) ................................................................. 9

*Tennessee* v. *Dep't of Educ.,*
    104 F.4th 577 (6th Cir. 2024) ............................................................... 38

*Texas* v. *Monex Int'l, Ltd.,*
    527 S.W. 2d 804 (Tex. 1975) ................................................................ 19

*Transcontinental Gas Pipeline Co.* v. *Pa. Env't Hearing Bd.,*
    108 F.4th 144 (3d Cir. 2024) ................................................................ 18

*Winter* v. *NRDC,*
    555 U.S. 7 (2008) ............................................................................. 16

*Ex parte Young,*
    209 U.S. 123 (1908) ........................................................................... 37

**Statutes**

7 U.S.C. § 1a(9) ................................................................................... 11, 23

7 U.S.C. § 1a(47)(A) ............................................................................... 23

7 U.S.C. § 1a(47)(A)(ii) ................................................................... 11, 12, 22

7 U.S.C. § 2(a)(1)(A) ................................................................................ *passim*

7 U.S.C. § 2(e), 6(a)(1) ................................................................... 12, 25

7 U.S.C. § 6(a)(1) ..................................................................................... 25

7 U.S.C. § 7b-3(a)(1) ............................................................................... 12

7 U.S.C. § 7(d) ........................................................................................ 12

7 U.S.C. § 7(d)(2) .................................................................................... 32

7 U.S.C. § 7(d)(3) .................................................................................... 32

7 U.S.C. § 7(d)(4) .................................................................................... 32

7 U.S.C. § 7a-2(c) .................................................................................... 24

7 U.S.C. § 7a-2(c)(1) ............................................................................... 13

7 U.S.C. § 7a-2(c)(4)(A) .......................................................................... 13

7 U.S.C. § 7a-2(c)(5)(B) .......................................................................... 13

7 U.S.C. § 7a-2(c)(5)(C)(i) ............................................................... 12, 22, 36

7 U.S.C. § 7a-2(c)(5)(C)(ii) .............................................................. 12, 2

7 U.S.C. § 9a ........................................................................................... 32

7 U.S.C. § 12c .......................................................................................... 32

7 U.S.C. § 13 ............................................................................................ 32

7 U.S.C. § 13a .......................................................................................... 32

7 U.S.C. § 13a-1 ...................................................................................... 32

7 U.S.C. § 13a-2(1) ................................................................................... 0

7 U.S.C. § 16(e)(1) ................................................................................... 32

Commodity Exchange Act, Pub. L. No. 675, 49 Stat. 1491, 1492-99 ......................... 11

Mich. Comp. Laws §§ 432.403(cc), 432.404(7) ................................................ 36

Mich. Comp. Laws § 432.403(w) (2025) ........................................................ 16

Mich. Comp. Laws § 432.404(7) (2025) ......................................................... 15

Mich. Comp. Laws § 432.413 (2025) ............................................................ 16

Mich. Comp. Laws § 750.301 (2025) ............................................................ 16

Ohio Rev. Code Ann. §§ 3775.11(A), 3775.12(A) ............................................ 36

Pub. L. No. 111-203, 124 Stat. 1376 ........................................................... 11

Pub. L. No. 675, 49 Stat. 1491, 1494 (1936) .................................................. 11

**Other Authorities**

17 C.F.R. 1.10(b), 1.10(d), 1.12, 1.14, 1.17, 1.18, 1.55, 17.00 ........................... 13

17 C.F.R. 37.3(a)(1) ............................................................................... 26

17 C.F.R. 38.3(a)(2) ............................................................................... 13

17 C.F.R. 38.4, 40.2 ............................................................................... 13

17 C.F.R. 38.150 ................................................................................... 36

17 C.F.R. 38.151(b) ........................................................................... 36, 39

17 C.F.R. 38.950 ................................................................................... 33

17 C.F.R. 40.2(a), 40.3(a), 40.11(c) ............................................................ 13

120 Cong. Rec. 30,418 (Sep. 9, 1974) .......................................................... 21

120 Cong. Rec. H34,736 (Oct. 9, 1974) ........................................................ 34

156 Cong. Rec. S5869 (daily ed. July 15, 2010) ............................................... 29

73 Fed. Reg. 25669, 25670 (May 7, 2008) ...................................................... 23

77 Fed. Reg. 48208, 48211-12 (Aug. 13, 2012) ................................................ 27

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, Chi.-Kent
    L. Rev. 657, 708 (1982) ................................................................ 32

*CME Group's Profit Rises as Hedging Demand Lifts Trading Volume*, Reuters
    (Feb. 12, 2025) ............................................................................ 1

*Concept Release on Regulatory Treatment of Event Contracts,* 73 Fed. Reg.
    25669, 25670 (May 7, 2008) ...................................................... 23

*Exclusive*, Black's Law Dictionary (5th ed. 1979) .................................... 18

*Exclusive Jurisdiction*, Black's Law Dictionary (5th ed. 1979) .................... 18

H.R. Rep. No. 93-975 (1974) ...................................................................... 11

H.R. Rep. No. 93-1383 (1973) .............................................................. 21, 34

*In re Blockratize (d/b/a Polymarket.com)*,
    CFTC No. 22-09 (Jan. 3, 2022) ............................................. 12, 23

*In re Trade Exchange Network*,
    CFTC No. 05-14 (Sep. 29, 2005) ................................................ 23

## PRELIMINARY STATEMENT

The federal government has long assumed responsibility for regulating and supporting the Nation's derivatives markets.  Comprehensive federal regulation has enabled these markets to develop as engines of growth and innovation, while forestalling a dysfunctional regime where 50 different States jostle to impose 50 different policy views on nationwide markets.

Congress cemented that federal primacy in 1974, when it granted the CFTC "exclusive jurisdiction" to regulate derivatives transactions on federally registered exchanges.  7 U.S.C. § 2(a)(1)(A).  Derivatives markets have flourished under federal jurisdiction, with innovative products backed by sensible regulation.  The Chicago Mercantile Exchange reports a daily trading volume of over 25 million contracts; the average daily futures turnover globally surpasses $12.83 *trillion*.  Courts have honored Congress's mandate that futures be federally regulated, recognizing that any state law that "directly affect[s] trading on or the operation of a futures market" is preempted. *Am. Ag. Movement* v. *Board of Trade of City of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992).

But Michigan has not heeded that warning.  Defendants seek to carve out from the CFTC's exclusive jurisdiction—and subject to Michigan law—core derivative instruments traded on federally regulated exchanges, known as event contracts.  Event contracts enable parties to trade on their predictions about whether a future event will occur.  Will the President impose tariffs?  Will the Democrats take the House in the midterms?  What will be the high temperature in Ann Arbor on Christmas Day 2026?

Will the Lions win the Super Bowl?  Event contracts harness the power of markets to shed light on the likelihood of such events occurring.

In keeping with its mission to advance financial freedom through innovative digital assets, while maintaining a first-in-class compliance regime, Coinbase Financial Markets ("Coinbase") will now offer its customers (including those in Michigan) access to event contracts that fully comply with the comprehensive federal derivatives regulation scheme.  But rather than let these products continue to be offered under the CFTC's aegis, Michigan seeks to end-run the CFTC by characterizing a particular type of event contract—sports-related event contracts—as gambling that is subject to state regulation.  On that view, the fact that an event contract relates to sports transforms derivatives into garden-variety wagers and federally regulated derivatives exchanges into criminal enterprises.

Michigan is wrong.  The Commodity Exchange Act's ("CEA" or the "Act") text, structure, and history—and every other marker of congressional intent—demonstrate that Michigan law is preempted.  Event contracts are textbook "swaps," as defined by the Act, and subject to the CFTC's "exclusive" jurisdiction, because they are contracts that pay out depending on whether a financially significant event occurs.  That includes sports-related event contracts:  There can be no serious debate that college and professional sports are hugely important industries with substantial financial consequences for cities, sponsors, businesses, and investors.  The Act offers no principled basis to treat "sports-related" swaps differently from all other swaps, which

-2-

are regulated exclusively by the CFTC.

Exchange-traded event contracts are fundamentally distinct from sportsbooks traditionally regulated by state law.   An event-contract exchange—like any other derivatives exchange—serves as a neutral market operator that is indifferent to the price of any event contract it hosts or whether any given customer wins or loses. Sportsbooks, on the other hand, set the terms of each wager and act as the counterparty to every bettor.   The federal derivatives framework—which governs exchange-traded event contracts—focuses on preserving fair, transparent trading in nationwide markets and ensuring the liquidity of centralized exchanges.   By contrast, state gambling laws focus on protecting consumers from manipulative behavior by sportsbooks that are economically incentivized to ensure their customers *lose* money.

On Michigan's view, each of the 50 States could alter the CFTC's jurisdiction simply by choosing when and how to regulate particular swap underliers.   After all, if Michigan is correct that it may prohibit entities from offering sports-related event contracts on federally registered exchanges, there is no reason why another State could not pass similar laws restricting contracts related to the price of cars, politics, weather, and more.   That is precisely the mischief that the Supremacy Clause is designed to prevent.   The States have no authority to dictate what transactions are covered by the CEA; Congress—not the States—determines the CFTC's jurisdiction.

Michigan's mistaken view places Coinbase in an intolerable bind.   Coinbase must either refrain from offering customers in the State access to CFTC-regulated event

contracts and lose market share, the company's substantial investments in building this technology in reliance on federal law, and the goodwill of customers who trust Coinbase as a one-stop shop—or go ahead with providing this valuable technology, risking it all in the face of criminal and civil sanctions under squarely preempted state laws. Absent this Court's intervention, Coinbase faces potential criminal liability, business disruption, economic harm, and reputational injury. This is a textbook case for injunctive relief.

After long-negotiated partnership agreements, months of careful planning, and the expenditure of significant resources, Coinbase intends to offer users access to event contracts in January 2026. Therefore, Coinbase respectfully requests that this Court grant expedited relief.

## BACKGROUND

### A. Coinbase, A Federally Registered Intermediary, Partners With Kalshi, A Federally Registered Exchange, To Offer Customers Access To Event Contracts Through Coinbase's Platform.

Coinbase and its affiliated exchange, Coinbase, Inc., offer its customers a trusted, user-friendly platform to trade and transfer digital assets. Coinbase's mission is as ambitious as it is simple: to create an open financial system that proliferates economic freedom around the world. Because maintaining top-notch security protocols are critical to accomplishing that goal, Coinbase has steadfastly advocated for effective regulation of the digital-asset space, establishing a track record as an industry leader in compliance.

On December 17, 2025, Coinbase announced that it would begin offering its

customers the ability to trade event contracts on Coinbase's platform through a partnership with KalshiEx, LLC ("Kalshi"), a CFTC-registered exchange that lists event contracts for trading. Ex. 2, Declaration of Andrew Sears ("Sears Decl.") ¶ 15. Kalshi-listed event contracts run the gamut from politics to music to climate to movies to sports. Kalshi began listing its sports event contracts in January 2025, after complying with applicable federal requirements. *See* Ex. 1, Dubin Decl. ¶ 2 & Ex. A.

Coinbase Financial Markets is a CFTC-registered futures commission merchant ("FCM") that will serve as the intermediary between Coinbase customers and Kalshi's exchange. Ex. 2, Sears Decl. ¶ 18. Beginning in early 2026, the Coinbase-Kalshi partnership will give Coinbase's customers access to the array of contracts listed on Kalshi's exchange while using Coinbase's simple, familiar, and user-friendly interface, *id.* ¶¶ 7, 14. And by virtue of using Coinbase's trusted platform, users can be confident they are trading on a secure platform that fully complies with all relevant laws. *Id.* ¶¶ 15-20. They can likewise rely on Coinbase to perform the core functions of an FCM—*i.e.*, to hold customer funds in segregated accounts, to reconcile positions and trade data, and to provide customers with daily statements and regulatory reporting. *Id.*

### B. Event Contracts Have Become Widespread, As Market Participants And Stakeholders Have Recognized Their Investment Value And Information-Generating Function.

1. An event contract is a type of derivatives instrument that enables parties to trade on their predictions about "a specified event, occurrence, or value," "such as the value of a macroeconomic indicator, corporate earnings, level of snowfall, or dollar

value of damages caused by a hurricane."[1]  Event contracts are typically structured as binary, yes-or-no questions in which each "yes" position corresponds to an opposing "no" position.  When the contract expires, the party who correctly predicted the occurrence or nonoccurrence of the underlying event receives a payout.

For example, an event contract may ask whether the President will impose new tariffs on Europe by the end of 2026.  Once the defined occurrence has taken place, the contract settles accordingly:  The party who purchased the position representing the occurrence (*i.e.*, "tariffs imposed") receives the contract's payout, and the party representing the non-occurrence (*i.e.*, "tariffs are not imposed") receives nothing.  Thus, the event contract will always settle with one side receiving $1 and the other $0.

Importantly, parties can exit their positions before the contract expires, so an event contract's price will fluctuate as parties trade positions based on, among other things, new information.  Because of these price-discovery dynamics, event contracts generate valuable predictive data about local, national, and world events.  Compl. ¶¶ 33-36.  Take the tariffs example.  If the "tariffs imposed" position is trading at 70 cents, that means market participants predict there is a 70% chance that the defined occurrence (tariffs imposed) will take place, and a corresponding 30% chance of non-occurrence (tariffs not imposed).  But the contract price may go down if diplomatic ties between the U.S. and Europe improve; conversely, the price may go up if the President

---

[1] *Contracts & Products*, CFTC, https://tinyurl.com/bdmrjfew.

announces that reviving U.S. manufacturing is a top priority.  The contract price thus reflects the market's real-time view of the probability that new tariffs will be imposed.

As in other markets, the aggregated views of a diverse crowd with skin in the game often prove more accurate than an expert's opinion.  Most famously, event contracts proved far superior to conventional polls in predicting recent U.S. elections, including both the 2024 presidential election and the 2025 New York City mayoral election.  Compl. ¶ 34.  Likewise, in a sign of event contracts' growing role as a real-time measure of market expectations and public sentiment, major financial and media platforms—including Google, Bloomberg, and CNN—have begun integrating prediction-market data alongside traditional news indicators.  Compl. ¶ 36.

At the same time, event contracts serve as a means for market participants to mitigate risk by offsetting underlying exposure.  Suppose, for instance, that a hotel in Ann Arbor wants to hedge against the risk that Michigan does not host a college playoff game (and the hotel then loses the tourism revenue that comes with it).  The hotel could purchase an event contract associated with the "no" position on the question "will the Wolverines host a College Football playoff game?"  The hotel would either (1) receive a contract payout if Michigan is knocked out (or has to play an away game), to offset the corresponding loss of tourism revenues, or (2) receive no contract payout if the team hosts a playoff game and tourism revenue pours in.  This sports-related event contract thus serves as a valuable financial tool for the hotel to hedge against the risk of significant financial loss regardless of Michigan's prospects.  Moreover, as is the case

in any derivatives market, even those who trade sports event contracts purely for idiosyncratic personal reasons—like a die-hard football fan predicting whether the Lions will win their next game—still contribute to the depth and liquidity of the market and thereby facilitate hedging by others.

Given their predictive value and hedging utility, prediction-market platforms involving all sorts of underlying events have become widespread, reporting billions of dollars in transaction volume in 2025.  Compl. ¶ 35.  Indeed, in the final months of 2024 alone, millions of people traded more than $3 billion dollars on these markets to predict the winner of the presidential election.  *Id.*

2.    Much like the market for political event contracts, the market for sports-related event contracts has also grown substantially.  Compl. ¶ 92.  Although such event contracts sometimes concern the same underlying events as state-regulated sportsbooks, the financial products themselves are markedly different.   Unlike traditional sportsbooks, sports-related event contracts are derivative instruments listed on centralized exchanges pursuant to extensive federal product-certification, registration, and approval procedures.  Event-contract prices are formed by matching buyers and sellers on these national exchanges, much like a public company's stock price is set at a stock exchange through the buying and selling of its securities.

In other words, like all other derivative exchanges, an event-contract exchange serves as a neutral market operator; it does not choose prices or act as a counterparty

to its members' trades.[2]  And intermediaries, like Coinbase, likewise do not take the other side of their customers' trades but instead act as execution and clearing agents that facilitate access to these markets.  Event-contract prices therefore reflect the collective judgment of a competitive market, producing efficient price discovery and minimizing informational and pricing asymmetries.

A traditional state-regulated sportsbook, by contrast, sets the terms of its wagers and acts as the counterparty to each bettor, who bets against the house.  Compl. ¶ 83.  Unlike event-contract exchanges, the sportsbook's interest is directly adverse to each bettor's.  And the odds (price) offered by a sportsbook are determined not by transparent competition across a unified market but by the operator's own risk exposure and revenue objectives within a limited geographic customer base.  Bookmaker odds can thus vary significantly across jurisdictions because odds are directly responsive not to broader market forces but rather to local distribution of bets.

### C.  Congress Grants The CFTC "Exclusive Jurisdiction" Over Derivatives Traded On Federally Registered Exchanges, Including "Swaps."

Until the early 20th century, many States held commodities futures contracts in

---

[2] Kalshi, like other DCMs, administers a market-maker program through which a Kalshi subsidiary can participate in the market.  But DCMs commonly rely on market makers "to maintain [] fair, orderly and liquid market[s]" and facilitate price discovery by supplying baseline depth and liquidity that enables efficient entry and exit.  *Spicer* v. *Chi. Bd. of Options Exch., Inc.*, 977 F.2d 255, 256 (7th Cir. 1992).  Critically, Kalshi's subsidiary enjoys no special privileges relative to any other trader on the exchange; Kalshi maintains "strict information barriers" between its DCM and subsidiary.  *See* Kalshi, *Who are you trading with?*, Kalshi Help Center, https://tinyurl.com/yc6wkt2c.

low regard, viewing such contracts as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and "nothing more than a wager," *Irwin* v. *Williar*, 110 U.S. 499, 508-09 (1884).  Accordingly, States sought to prohibit—or at least restrict—their use.  But the value of these derivatives as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want" became better appreciated over time, as derivative markets developed and matured.  *Bd. of Trade of Chi.* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 246-49 (1905) (Holmes, J.).

Congress responded in 1936 by enacting the Commodity Exchange Act, Pub. L. No. 675, 49 Stat. 1491, 1492-99, to introduce federal regulation of the derivatives market.  The CEA originally permitted parallel state regulation of derivatives markets; a savings clause ensured that the Act would not "impair any State law applicable to any transaction" regulated by the Act.  Pub. L. No. 675, 49 Stat. 1491, 1494 (1936).

But four decades later, Congress changed course.  In 1974, Congress created the CFTC, a federal agency responsible for overseeing trading on derivatives exchanges and administering the Act's regulatory framework.  7 U.S.C. § 2(a)(1)(A).  And this time, with the benefit of hindsight, Congress granted the CFTC "*exclusive jurisdiction*" over transactions involving derivative instruments that are listed and traded on federally registered exchanges.  *Id.* (emphasis added).

Congress also expanded the CEA's definition of "commodity" to include "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9).  That

-10-

amendment extended the CFTC's jurisdiction to "all futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 76 (1974).

In 2010, as part of the Dodd-Frank Act, Congress expanded the CFTC's "exclusive jurisdiction" to specifically include transactions "involving swaps" on a federally regulated exchange. *See* Pub. L. No. 111-203, 124 Stat. 1376; 7 U.S.C. § 2(a)(1)(A). Congress defined a "swap" to include "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," as well as any "agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(ii), (iv).

## D.     Because Event Contracts Are "Swaps," The Entities That Offer Event Contracts For Public Trading Must Comply With A Comprehensive Federal Regulatory Framework.

As the CFTC has consistently recognized, event contracts—including those that Coinbase intends to offer—are "swaps," subject to the CFTC's exclusive jurisdiction. *See, e.g.*, *In re Blockratize (d/b/a Polymarket.com)*, CFTC No. 22-09 (Jan. 3, 2022) (event contracts "constitute swaps under the CFTC's jurisdiction, and therefore can only be offered on a registered exchange in accordance with the Act and Regulations"). That is because event contracts are binary instruments that pay out depending on the "occurrence [or] nonoccurrence" of a future "event or contingency," and that underlying event is "associated with a potential financial, economic, or commercial

-11-

consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

To offer event contracts (like other derivatives) for trading, an exchange must be designated by the CFTC as a contract market ("designated contract market" or "DCM"). 7 U.S.C. §§ 2(e), 7b-3(a)(1). To be designated, an exchange must comply with a comprehensive federal oversight regime, including a reticulated set of 23 "Core Principles"—which require an exchange to maintain market manipulation and risk-minimization measures, extensive recordkeeping procedures, and adequate capital reserves. 7 U.S.C. § 7(d); 17 C.F.R. 38.3(a)(2). Similarly extensive federal regulations govern FCMs like Coinbase, which serve as intermediaries between parties trading derivatives on a DCM. *See* 17 C.F.R. 1.10(b), 1.10(d), 1.12, 1.14, 1.17, 1.18, 1.55, 17.00.

Exchanges must also comply with federal law and regulations when listing event contracts. *See* 17 C.F.R. 38.4, 40.2. To list new event contracts on a DCM, an exchange may either submit the event contract for CFTC approval before listing or certify that the contract complies with the CEA and the Commission's requirements. 7 U.S.C. §§ 7a-2(c)(1), (4)(A); 17 C.F.R. 40.2(a), 40.3(a), 40.11(c). The CFTC "shall approve a new contract . . . unless the Commission finds that the new contract . . . would violate" the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). And the CFTC has 10 business days, upon receiving notice that an exchange self-certified a new contract, to review the contract. *Id.* § 7a-2(c)(2). If the Commission does not act, the new contract is deemed

approved by operation of law and "shall become effective." *Id.*

Kalshi began offering event contracts in July 2021.  In January 2025, the company added sports-related event contracts after certifying that the contracts complied with applicable requirements under the CEA and federal regulations.  *See* Ex. 1, Dubin Decl. ¶ 2 & Ex. A.  As event-contract markets have matured into a multi-billion-dollar industry, the CFTC has never prohibited any of Kalshi's sports-related contracts.

### E.   Michigan Regulators Target Federally Registered Entities That Offer Access To Event Contracts For Allegedly Violating State Gambling Laws.

On April 11, 2025, the Michigan Gaming Control Board initiated investigations into entities offering sports-related event contracts that operate in the State.  Ex. 1, Dubin Decl. ¶ 3 & Ex. B at 1.  The Board threatened to take "all necessary steps" against these entities, alleging that those event contracts are a "form of unlicensed sports betting" that seek to "sidestep[] the regulatory protections of Michigan's legal sports betting market." *Id.* at 1-2.

A few weeks later, the Board's Executive Director wrote to the CFTC to express "concern[]" that sports-related event contracts "place[] Michigan citizens at undue risk." *Id.* ¶ 4 & Ex. C at 1.  The Director asserted that these contracts "offered by CFTC-regulated entities in Michigan are not operating pursuant to or in accordance with" Michigan law governing sports wagers.  *Id.*  The Director also threatened "[e]ntities offering sporting event contracts without a sports betting operator license

-13-

issued by the MGCB" that their conduct may "violat[e] Michigan law." *Id.* ¶ 4 & Ex. C at 5.

Michigan reiterated its position in a multi-state amicus brief filed this year in the Third Circuit. Brief of *Amici Curiae* of Nevada et al., Supporting Appellants at 14, 34, *KalshiEX LLC* v. *Flaherty*, No. 24-cv-4037 (3d Cir. June 17, 2025). Michigan, joined by other States, argued that the CEA "does not preempt States from regulating sports betting via event contracts." *Id.* at 3. The States also argued that DCMs are "indistinguishable from . . . a Las Vegas poker room that simply operates as the venue" for a "card game." *Id.* at 15. The States declared that they "are in the best position to implement innovative regulatory schemes," rather than the CFTC. *Id.* at 25.

On October 3, 2025, the Board expanded its initial threats to all "Internet Gaming Operators," "Sports Betting Operators," and "Licensees" in the State, threatening enforcement against any party who "operate[s], offer[s], or facilitate[s] access to prediction markets." Ex. 1, Dubin Decl. ¶ 5 & Ex. D at 1. Once again, the Board emphasized that prediction markets offering sports event contracts do "not operate in accordance with state gaming laws or pursuant to state-issued gaming licenses." *Id.* And the Board clarified that its threat encompassed parties "associating with an entity that . . . facilitates access to sporting event contracts in *any* jurisdiction . . . in which a regulatory body, law enforcement agency, or other governmental authority has expressly objected to" such event contracts. *Id.* at 2 (emphasis added).

State officials invoked a broad array of Michigan laws to support those threats.

-14-

For example, the Board repeatedly invoked the Michigan Lawful Sports Betting Act, which provides that only sports-betting licensees "may process, accept, offer, or solicit internet sports betting wagers." Mich. Comp. Laws § 432.404(7) (2025); *see also id.* § 432.403(cc); Ex. 1, Dubin Decl. ¶ 5 & Ex. D at 1. The law defines "internet sports betting wagers" as "cash, or cash equivalent . . . risked by an authorized participant on sports betting through the internet." Mich. Comp. Laws § 432.403(w) (2025). Violators are guilty of a felony punishable by imprisonment or a fine. Mich. Comp. Laws § 432.413 (2025). And the Michigan Penal Code further penalizes any party that accepts money "contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain." Mich. Comp. Laws § 750.301 (2025).

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party "must establish that [it] is likely to success on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter* v. *NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

**I.   COINBASE IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE CEA PREEMPTS MICHIGAN'S ATTEMPT TO REGULATE EVENT CONTRACTS TRADED ON FEDERALLY REGISTERED EXCHANGES UNDER STATE LAW.**

"The Supremacy Clause provides that the Constitution, federal statutes, and

-15-

treaties constitute the supreme Law of the Land." *Kansas* v. *Garcia*, 589 U.S. 191, 202 (2020) (cleaned up).   "[W]hen state and federal law clash," federal law must prevail. *Armstrong* v. *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015).   Federal law may preempt state law either expressly or impliedly.   *Oneok, Inc.* v. *Learjet, Inc.*, 575 U.S. 373, 377 (2015).   And implied preemption, in turn, may come in the form of "either . . . field preemption or conflict preemption."   *Id.* (internal quotation marks omitted).

Under any and all of these rubrics, Michigan's gambling laws are preempted as applied to the event contracts that Coinbase will offer its customers.   Michigan's laws are expressly preempted by Section 2 of the CEA, which grants the CFTC "*exclusive jurisdiction*" over all "transactions involving swaps" that are "traded or executed" on a DCM, 7 U.S.C. § 2(a)(1)(A) (emphasis added), and event contracts fall squarely within the Act's definition of "swap."   Michigan's laws are also impliedly preempted.   As the CEA's text, context, and history confirm, Congress intended federal law to occupy the field for swaps traded on CFTC-regulated trading platforms, accessed through CFTC-regulated intermediaries.   Michigan's laws also impermissibly conflict with federal law because they stand as an obstacle to the accomplishment and execution of the CEA's objectives, and it is impracticable for Coinbase to comply with both sets of laws.

## A.   The CEA Expressly Preempts Michigan's Gambling Laws.

"Express pre-emption exists when Congress expresses a clear intent to pre-empt state law in the language of the statute." *Bibbo* v. *Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562 (6th Cir. 1998).   Here, Congress expressly preempted state regulation of swaps

traded on DCMs by granting the CFTC "exclusive jurisdiction" over those transactions.

> **1.**   **The CFTC's "exclusive jurisdiction" over swaps traded on federally registered exchanges preempts state law that purports to regulate the same transactions.**

"There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona* v. *United States*, 567 U.S. 387, 399 (2012).  Congress did precisely that here.

a.   The CEA grants the CFTC "*exclusive jurisdiction*" to regulate "transactions involving swaps . . . traded or executed on a [federally designated] contract market." 7 U.S.C. § 2(a)(1)(A) (emphasis added).   The ordinary meaning of "exclusive" is "debarring from interference or participation; vested in one [entity] alone." *Exclusive*, Black's Law Dictionary (5th ed. 1979).  Likewise, "exclusive jurisdiction" is defined as "power . . . over a[n entity] to the exclusion of all other[s]." *Exclusive Jurisdiction*, Black's Law Dictionary (5th ed. 1979).  Most naturally read, the CFTC's "exclusive jurisdiction" over swaps traded on DCMs thus precludes State interference in those transactions. Where, as here, Congress's intent to preclude state regulation is "explicitly stated in the statute's language," courts must honor the statute's text and hold state law preempted. *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 525 (1977).

b.   Courts routinely construe phrases like "exclusive jurisdiction" in federal statutes to broadly displace state law.  For example, the Supreme Court held that the Federal Power Act's grant of "exclusive jurisdiction" to the Federal Energy Regulatory Commission over the appropriate rates for interstate wholesale energy sales precluded

state law from "invad[ing] FERC's regulatory turf." *Hughes*, 578 U.S. at 163. In *Slaney* v. *IAAF*, the Seventh Circuit held that the Amateur Sports Act's grant of "exclusive jurisdiction" to the U.S. Olympic Committee reflected Congress's decision to preempt state-law claims that "pertain[] to United States participation in the Olympic Games." 244 F.3d 580, 595 (2001). The Third Circuit likewise recognized that "the explicit statutory conferral of exclusive jurisdiction to a federal court over a particular subject matter is a form of express preemption." *Transcontinental Gas Pipeline Co.* v. *Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024).

That logic applies with equal force to Congress's explicit grant of exclusive jurisdiction to the CFTC here. Indeed, virtually every court to consider Section 2(a)(1)(A)'s grant of exclusive jurisdiction has interpreted that provision to preempt state laws that purport to regulate transactions on CFTC-regulated exchanges. As the Second Circuit explained without qualification, "[Section 2(a)(1)] preempts the application of state law." *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). The Seventh Circuit has likewise recognized that the CFTC is "the sole lawful regulator" where "its jurisdiction is exclusive"—*i.e.*, if the at-issue derivative falls within Section 2's reach. *Chicago Mercantile Exch.* v. *SEC*, 883 F.2d 537, 548 (7th Cir. 1989). And the Sixth Circuit has emphasized that "the thrust of the [CEA's exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation." *Curran* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982).

-18-

Other courts have similarly found that Section 2 preempts state laws that purport to regulate commodities transactions on federal exchanges. *See, e.g., Jones* v. *B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("[S]tate regulatory agencies are . . . preempted by the 'exclusive jurisdiction' of the CFTC."); *Int'l Trading, Ltd.* v. *Bell*, 262 Ark. 244, 251 (1977) (same); *Texas* v. *Monex Int'l, Ltd.*, 527 S.W. 2d 804, 806 (Tex. 1975) ("it is clear" that the CFTC "now has exclusive jurisdiction to regulate . . . margin account sales"). Another district court has already determined that Section 2 preempts state-law attempts to regulate sports-related event-contract transactions on DCMs. *See KalshiEX LLC* v. *Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).[3]

c.      The CEA's history buttresses this conclusion, confirming that Congress intended the grant of "exclusive jurisdiction" to the CFTC to preempt state regulation of derivatives traded on federally regulated exchanges. The CEA, as originally enacted, did not "impair any State law applicable to any transaction" regulated by the Act. *See supra* p. 10. That provision "serv[ed] the function of preventing supersedure and preserving state control." *Rice* v. *Bd. of Trade of City of Chi.*, 331 U.S. 247, 255 (1947).

When amending the Act to create the CFTC in 1974, however, Congress

---

[3] To be sure, a Maryland district court recently refused to recognize the preemptive effect of Section 2, holding that Congress did not "clearly and manifestly intend[] to strip states of their authority to regulate gambling." *KalshiEX LLC* v. *Martin*, 793 F. Supp. 3d 667, 677 (2025). But Section 2 of the CEA does reflect Congress's "clear[] and manifest[] inten[t] to strip states of their authority to regulate" swaps listed on federally registered exchanges. *Id.* That some States have incorrectly labeled these federally regulated transactions as "gambling" does not alter their status as "swaps"— or Section 2's preemptive force.

eliminated this provision to "assure that Federal preemption is complete."  120 Cong. Rec. 30,418, 30,464 (Sep. 9, 1974) (statement of Sen. Curtis).  Congress instead enacted a far more limited clause that preserves the jurisdiction of state "regulatory authorities"—but only "*[e]xcept as hereinabove provided*."  7 U.S.C. § 2(a)(1)(A) (emphasis added).  Because the immediately preceding sentence in Section 2(a)(1)(A) grants the CFTC "exclusive jurisdiction" over "swap[s]" traded on federal exchanges, state regulation is not preserved as to those transactions.  Instead, the 1974 amendments "preempt[ed] the field insofar as futures regulation is concerned."  H.R. Rep. No. 93-1383, at 35-36.

There are "[f]ew principles of statutory construction . . . more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded."  *INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (internal quotation marks and citation omitted).  A holding that state laws like Michigan's gambling laws apply to transactions within the CFTC's exclusive jurisdiction would run headlong into that principle by resurrecting the since-discarded 1936 regime.

### 2.    The event contracts at issue here are (i) swaps (ii) traded on federally registered exchanges.

The CEA makes clear that event contracts traded on federally registered exchanges qualify as swaps; state laws that purport to regulate those transactions are thus preempted.  And contrary to Michigan's view, there is no justification to carve out sports-related event contracts from that rule.

a.      Since 2010, the CFTC's "exclusive jurisdiction" has encompassed all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC (a DCM). 7 U.S.C. § 2(a)(1)(A) (emphasis added).  Congress defined a "swap," in part, as "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1(a)(47)(A)(ii).

The event contracts that Coinbase plans to offer fall squarely within the statutory "swap" definition, and thus within the CFTC's exclusive jurisdiction.  The contracts at issue here will be executed on Kalshi's exchange, a DCM that is registered with and regulated by the CFTC, in compliance with the CEA's robust regulatory requirements. *See* Ex. 1, Dubin Decl. ¶ 6 & Ex. E.  And event contracts are binary "contract[s]" that pay out depending on the "occurrence [or] nonoccurrence" of a future "event or contingency" that carries potential economic consequences. *Id.* § 1(a)(47)(A)(ii).  Take an event contract that asks whether a hurricane will make landfall in Florida during the 2026 hurricane season; that weather event is of enormous financial consequence to landlords in Tampa and insurance providers in the State. *See* Compl. ¶ 32.

That event contracts qualify as "swaps" within the CFTC's exclusive jurisdiction is further confirmed by Congress's simultaneous enactment in 2010 of a "Special Rule" governing the CFTC's "approval of event contracts."  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

This express congressional decision to vest the CFTC with authority to review "event contracts" underscores that these instruments are "swaps" falling within the CFTC's "exclusive jurisdiction," consistent with the "swap" definition itself.

Indeed, the CFTC has repeatedly recognized that event contracts are swaps, observing that "event contracts are a form of options, typically known as binary options," and that those "binary options fall within the definition of a swap." Appellant CFTC's Brief at 12 & n.11, *KalshiEx, LLC* v. *CFTC*, 119 F.4th 58 (D.C. Cir. 2024).[4] The CFTC has consistently maintained this position across administrations.[5]

b.     In attempting to justify the application of state law to event contracts traded on federally registered exchanges, several States—including Michigan here in its flurry of enforcement activity—have attempted to isolate *sports-related* event contracts alone as uniquely outside federal control.  But the CEA offers no plausible basis for carving out sports-related event contracts—or any other topic- or industry-specific event contract—from the CFTC's exclusive jurisdiction.

To start, whether transactions constitute "swaps" under the CEA does not

---

[4] Depending on how a particular event contract is structured, it could also meet other definitions of a swap, including "any agreement, contract, or transaction" that is an "option of any kind" based on the value of one or more "quantitative measures."  7. U.S.C. § 1a(47)(A).  Also, as the CFTC has recognized, event contracts may be structured as futures contracts, Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25670 (May 7, 2008), which likewise fall under the CFTC's exclusive jurisdiction when traded or executed on DCMs.

[5] *See, e.g.*, *In re Trade Exchange Network*, CFTC No. 05-14 (Sep. 29, 2005); *Concept Release on Regulatory Treatment of Event Contracts,* 73 Fed. Reg. 25669, 25670 (May 7, 2008); *In re Blockratize (d/b/a Polymarket.com)*, CFTC No. 22-09 (Jan. 3, 2022); Compl. ¶ 45.

generally turn on the subject matter of the underlying events to which the transactions relate (here, sports).  Instead, Congress broadly defined the universe of "commodit[ies]" that can serve as underliers for derivative instruments to extend the CFTC's jurisdiction to "all futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 79 (1974); *see* 7 U.S.C. § 1a(9), (19), (47)(A).  Congress excluded only a handful of specific underliers—including "onions" and "motion picture box office receipts"—from the definition of "commodity," *id.* § 1a(9), making clear that all other underliers (such as sporting events) fall within the CEA's scope.  *See NLRB* v. *SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (express references to particular items imply the exclusion of others that were not singled out).

Certain States have contended that sports-related event contracts cannot be "swaps" because these contracts constitute "gaming."[6]  But the 2010 Special Rule expressly authorizes the CFTC to "review" certain event contracts, including those involving "gaming," to determine if such contracts should be approved or prohibited. 7 U.S.C. § 7a-2(c); *see supra* p. 12.  The Rule is thus predicated on the premise that event contracts involving "gaming" *are* swaps within the CFTC's remit.  But on the State's logic, event contracts involving gaming would fall categorically outside the CFTC's jurisdiction, leaving no gaming-related contracts for the CFTC to review in the first

---

[6] *See, e.g.*, Ohio's Opposition to Preliminary Injunction Motion at 11, 16, *KalshiEX LLC* v. *Schuler*, No. 25-cv-1165 (S.D. Ohio Nov. 7, 2025) Dkt. No. 31; Nevada's Opposition to Preliminary Injunction Motion at 9, *N. Am. Derivatives Exch., Inc.* v. *Nev. Gaming Control Bd.*, 2025 WL 2916151 (Oct. 14, 2025) (No. 25-cv-00978).

instance—this provision of the Special Rule would cover a null set.  There is no basis to read the Special Rule's language out of the statute.  *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) ("the canon against surplusage applies with special force" when a proposed statutory construction "renders an entire subparagraph meaningless").

Several States have also argued that if the "swap" definition covers sports-related event contracts, the definition would also necessarily cover traditional sports betting, turning sportsbooks into federal lawbreakers because they are facilitating swap transactions outside of federal exchanges in violation of 7 U.S.C. §§ 2(e) and 6(a)(1), and 17 C.F.R. 37.3(a)(1).[7]  But exchange-traded event contracts are fundamentally distinct from sportsbooks traditionally regulated by state law.  As explained above, *see supra* pp. 3, 8-10, a federally regulated event-contract exchange operates as a neutral market operator.  In that capacity, the exchange is indifferent to the price of any event contract that it hosts, much like the New York Stock Exchange does not have a stake in whether a public security's price rises or falls on any given day.

In traditional sports wagering, by contrast, a sportsbook's interests are directly adverse to the bettor's; the sportsbook sets the terms of its wagers and acts as the counterparty to every bettor.  Thus, traditional sportsbooks are economically incentivized to ensure that their customers *lose* money.  Indeed, for that reason, some

---

[7] *See, e.g.*, Nevada's Opposition to Preliminary Injunction Motion at 10, *N. Am. Derivatives Exch., Inc.* v. *Nev. Gaming Control Bd.*, 2025 WL 2916151 (Oct. 14, 2025) (No. 25-cv-00978); New Jersey's Opposition to Preliminary Injunction Motion at 16, *KalshiEX LLC* v. *Flaherty*, No. 25-cv-2152 (D.N.J. Apr. 18, 2025).

casinos go as far as to block wagers from bettors who win too much (known as "sharps"). Compl. ¶ 83. The same cannot be said for prediction-market platforms, who have no economic interest in any customer losing money and celebrate customers who are particularly skilled at predicting the future. State gambling laws are thus geared toward stress-testing solvency and protecting the consumer from conflicts of interest and asymmetric pricing inherent in the sportsbook model. By contrast, the federal derivatives framework focuses on preserving fair, transparent trading in national markets and ensuring the integrity of centralized exchanges. *See* Compl. ¶¶ 81-83.

The CFTC has long recognized that swap classification must account for the transactional and structural characteristics of the at-issue product, along with how market participants are traditionally regulated; two products that generally provide the same economic exposure do not necessarily rise and fall together. For example, when promulgating regulations to implement Dodd-Frank in 2012, the CFTC clarified that certain insurance products should not "be included within the swap . . . definition"— even though those products functionally mirror the economics of derivatives that are regulated as swaps. 77 Fed. Reg. 48208, 48211-12 (Aug. 13, 2012).[8] The CFTC explained that those insurance products were not "historically treated" or "regulated"

---

[8] The same thing is true throughout the U.S. markets; economic resemblance does not dictate regulatory classification. Synthetic equity exposure does not transform a total return swap into a stock. Weather derivatives that hedge weather risks are not treated as insurance contracts. And a credit-default swap can offer exposure to a bond issuer's solvency without becoming a bond. Compl. ¶ 48.

as swaps, "are subject to different regulatory regimes" under state law, including "supervision" by state regulatory agencies, and nothing in the CEA "suggest[s] that Congress intended for traditional insurance products to be regulated as swaps." *Id.* That reasoning—that Congress did not intend the swap definition to displace established regulatory frameworks governing products with distinct risk profiles— applies with equal force to state-regulated sportsbooks. The CFTC's exclusive authority over exchange-traded event contracts thus by no means displaces the States' longstanding role in regulating wagers on sportsbooks.

On the States' view, moreover, *the States* can toggle CFTC jurisdiction on and off by regulating particular underliers, at their sole discretion. Today, the States may object to the offering of sports-related event contracts, but tomorrow States may object to, for instance, event contracts that relate to election results, weather, or car prices. *See* Compl. ¶ 79. And States could go further and prohibit all event contracts they deem gambling—or even all futures contracts. What then? It cannot be that States are the ultimate arbiters of what constitutes a "swap," or that States can pick and choose which subject matters or derivative instruments fall in or out of the CFTC's exclusive jurisdiction. The CFTC's jurisdiction is determined by Congress—not the States.

c.     Despite all that, a Nevada district court recently declined to enjoin Nevada's gambling laws with respect to specific sports-related event contracts offered by Crypto.com and Kalshi, holding that such contracts are not "swaps" because they turn on the "outcome of [a] live event," rather than the "occurrence [or] nonoccurrence

[of the] event." *See N. Am. Derivatives Exch. Inc.* v. *Nevada*, 2025 WL 2916151, at \*9 (D. Nev. Oct. 14, 2025); *KalshiEX, LLC* v. *Hendrick*, 2025 WL 3286282, at \*3 (D. Nev. Nov. 24, 2025).  But that distinction is illusory.  Consider, for example, a contract asking, "Will there be a Game 6 in the World Series?" versus a contract asking, "Will the Tigers win Game 5?"  Under the court's reasoning, the former would be a swap (because it depends on the occurrence or non-occurrence of Game 6), while the latter would not (because it depends on the "outcome" of Game 5).  This approach would treat contracts differently based on labels or semantics, rather than any differences of substance, running counter to Congress's intent in crafting "a broad and expansive definition of the term 'swap'" to prevent market participants from "'gam[ing] the system' by labeling or structuring transactions" to appear outside the CEA's reach.  156 Cong. Rec. S5869, S5923 (daily ed. July 15, 2010) (statement of Sen. Lincoln).

The Nevada district court also believed that the "potential financial, economic, or commercial consequence[s]" of sports-related event-contracts are only "downstream financial consequence[s]," rather than consequences "inherently associated" with the sports event.  *Hendrick*, 2025 WL 3286282, at \*7.  But Coinbase's event contracts fall comfortably within the CEA's definition of a "swap" because those contracts plainly track events with significant, predictable, and measurable economic ramifications. Whether a team makes the College Football Playoff, for example, can make all the difference for a college town's economy.  More than 100,000 people flock to Ann Arbor every Saturday when the Wolverines are playing at home, and those gamedays keep

many retail stores or hotels in the area afloat for the whole year.  Compl. ¶ 46.  For these businesses, Michigan's prospects of winning the next game can have huge economic consequences.  Likewise, when Major League Baseball decided to move its All-Star game from Atlanta in 2021, some analysts estimated that the relocation would cost Atlanta more than $100 million in "lost economic impact."  *Id.*

And it is not only "downstream" consequences at stake; the success of sporting events and team franchises directly impacts a broad and ever-expanding range of major financial institutions.  Numerous NFL teams have accepted private equity investments this year, and those firms raise money from a range of other investors, including pension funds, college endowments, and hedge funds, among others.  Compl. ¶ 47. The Arizona Public Safety Personnel Retirement System, for instance, is one of the largest investors in a British soccer team, Ipswich Town FC.  *Id.*  College sports conferences have signed multi-year broadcasting contracts with media companies; those contracts are worth billions of dollars and will undoubtedly be impacted by the relative success of the teams in those conferences.  *Id.*  Sports have thus become synonymous with investing.

**B.     The CEA Impliedly Preempts Michigan's Gambling Laws.**

Federal law also displaces state law if the federal scheme evinces Congress's intent to occupy the field or if state and federal law irreconcilably conflict.  *See Oneok*, 575 U.S. at 377.  The CEA preempts Michigan's gambling laws as applied to event contracts traded on DCMs for both reasons.

1.     **The CEA's text, structure, and history indicate that Congress intended to occupy the field.**

When Congress enacts a comprehensive scheme of "federal statutory directives" over a particular subject matter that "provide a full set of standards . . . designed [to function] as a 'harmonious whole,'" "complementary state regulation" has no role to play.  *See Arizona*, 567 U.S. at 401 (citation omitted).  Here, the CEA's text, structure, and history all confirm that Congress intended to create a uniform, comprehensive set of federal rules to occupy the field with respect to derivatives, including event contracts, traded on DCMs.

a.     To start, the CEA's grant of "exclusive jurisdiction" over swaps traded on DCMs evinces Congress's intent to oust the States from this field.  7 U.S.C. § 2(a)(1)(A); *see supra* pp. 17-20.  Whether characterized as express or field preemption, the upshot is the same:  Congress intended the CFTC alone to regulate these transactions.

Other CEA provisions confirm Congress's intent.  The CEA's savings clause, 7 U.S.C. § 2(a)(1)(A), preserves state-law regulation *except* for transactions that fall within the scope of the exclusive-jurisdiction provision.  *See supra* pp. 20-21.  Section 13a-2(1) authorizes state officials to sue over "any act or practice constituting a violation of any provision of [the CEA] or any [CFTC] rule," but they cannot sue federally registered exchanges.  7 U.S.C. § 13a-2(1).  The CEA further states that it shall not "supersede or preempt" the application of state law to transactions "not conducted" on a DCM or to unregistered entities who are "required to be registered" as DCMs, 7

U.S.C. § 16(e)(1)—indicating that state law *is* preempted as to transactions conducted on DCMs.

These provisions reflect Congress's careful division of labor.  The CFTC is responsible for "enforc[ing] the CEA with respect to [federally regulated] exchanges" and the transactions that the Act requires to be conducted on such exchanges, while States are permitted to regulate off-exchange conduct under State law.  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 708 (1982).

b.    The CEA's structure evinces a "comprehensive regulatory scheme" governing event contracts, DCMs, and FCMs, from start to finish—further demonstrating Congress's intent to preempt state regulation of the field of event contracts traded on DCMs.  *Curran*, 622 F.2d at 232.  Indeed, federal law governs the entire life cycle of an event contract, as well as the DCMs and FCMs that facilitate trading of such contracts, leaving no room for supplementation by state law.

An exchange like Kalshi attains DCM status only if it demonstrates compliance with the full panoply of relevant federal laws and regulations.  Registered exchanges must, among other requirements, adopt surveillance and enforcement measures to combat market manipulation and price distortion; implement system safeguards to minimize risk; issue required disclosures; keep extensive trading records that are available for federal inspection; maintain adequate capital reserves; offer "impartial access"; and refrain from listing contracts that are ripe for manipulation.  *See* 7 U.S.C. § 7(d)(2), (3), (4); 17 C.F.R. 38.950, *id.* 38.450; *id.* 38.1101(a)(1).

-30-

FCMs like Coinbase that serve as intermediaries to facilitate trading on DCMs must likewise register with the CFTC and adhere to comprehensive federal requirements, Compl. ¶ 51; and exchanges cannot list event contracts without either seeking approval from the CFTC or certifying that the new product complies with the CEA's strictures.  Compl. ¶ 53.  Even after a new event contract is listed on a DCM, moreover, any future transaction remains subject to the CFTC's continuing oversight. 7 U.S.C. § 7(d)(2), (3), (4).  This "comprehensive regulatory structure" leaves no room for assistance or supplementation by state law. *Am. Ag. Movement*, 977 F.2d at 1155.

Congress has given teeth to these rules by charging the CFTC and the Department of Justice with enforcing the CEA's requirements.  The CFTC may initiate an investigation, pursue enforcement actions in administrative proceedings, or sue in federal court to enforce the CEA.  CFTC, Div. of Enforcement, Enforcement Manual § 3.3 (2020).  The CFTC may also pursue a full range of sanctions, including monetary penalties, injunctive relief, cease-and-desist orders, restitution, disgorgement, or the "suspension, denial, or restriction of registration and trading privileges." *Id.*; *see* 7 U.S.C. §§ 9a, 12c, 13, 13a, 13a-1.  And if the CFTC suspects potential criminal violations, it may refer the matter to the proper authority for prosecution.  *Id.*  Congress thus ensured not only that federal law would govern this space, but that federal actors would primarily enforce its rules.  *See Am. Ag. Movement*, 977 F.2d at 1155 (explaining that the CEA established a "*comprehensive* regulatory structure" that was "broadened" by Congress through a series of amendments, including, "most important[ly]," "creat[ing]

-31-

the [CFTC]" with "broad powers to administer and enforce" the statute).

c.     As the D.C. Circuit recognized in *FTC* v. *Ken Roberts Co.*, the CEA's "history repeatedly emphasizes that the CFTC's jurisdiction was to be exclusive with regard to the trading of futures on organized contract markets." 276 F.3d 583, 590-91 (D.C. Cir. 2001) (citation omitted). The conference report accompanying the 1974 amendments made clear that the amendments were designed to "*preempt the field* insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35-36 (emphasis added). House Agriculture Committee Chairman Poage explained that the amendments were enacted to "avoid unnecessary, overlapping and duplicative regulation." 120 Cong. Rec. H34,736 (Oct. 9, 1974). Congress effectuated that goal by conferring "exclusive jurisdiction" on the CFTC over derivatives traded on federal exchanges, and eliminating concurrent state-law jurisdiction, *see supra* pp. 10-11, 17-21; thus, States that would otherwise regulate derivatives trading on a DCM must retreat from the field.

### 2.     Michigan's gambling laws are also conflict-preempted.

A state law is also preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399-400. Michigan's gambling laws are preempted because they frustrate Congress's efforts to create a uniform federal regulatory scheme governing derivatives transactions while circumscribing the CFTC's discretion to permit certain event contracts.

a.     Michigan's gambling laws, when applied to event contracts traded on DCMs, pose an untenable obstacle to effectuating Congress's goals in amending the

-32-

CEA.  As the Seventh Circuit recognized, Congress's grant of "exclusive jurisdiction" to the CFTC preempts state laws that "would directly affect trading on or the operation of a futures market" because such laws "stand as an obstacle to the accomplishment and execution" of the CEA's "purposes and objectives." *Am. Ag. Movement*, 977 F.2d at 1156-57.  Defendants seek to apply Michigan's laws directly to event-contract trading on a DCM, but such claims are preempted because they "would frustrate Congress's intent to bring the[se] markets under a *uniform* set of regulations." *Id.* at 1156.

As discussed above, *see supra* p. 33, one of Congress's aims in amending the CEA in 1974 was to prevent States from "step[ping] in to regulate the futures markets themselves," *Am. Ag. Movement*, 977 F.2d at 1156, and to ensure that "all exchanges and all persons in the industry" would operate "under the same set of rules and regulations," H.R. Rep. No. 93-975, at 41-42 (1974).  The proliferation of 50 different state regulatory schemes would require market participants, who already operate under the CFTC's careful supervision, to either navigate "varying and potentially contradictory legal standards" or leave the market altogether. *Am. Ag. Movement*, 977 F.2d at 1156.  Either prospect would undercut Congress's goal of bringing "all futures trading . . . under a single regulatory umbrella" to avoid the "total chaos" that would ensue if derivatives trading were subject to "different State laws."  H.R. Rep. No. 93-975, at 45 (1974).

b.      Defendants also seek to subject Coinbase to legal requirements that are fundamentally inconsistent with the company's status as a nationwide FCM.  For example, if Michigan's gambling laws applied to event contracts listed on DCMs,

Coinbase would need to obtain a gambling license to facilitate those transactions. *See* Mich. Comp. Laws §§ 432.403(cc), 432.404(7). Such a license would obligate Coinbase—a global company that operates nationwide and has users in all 50 States— to restrict its services to only people who are physically located within Michigan. *Id.* § 432.411(1). And if Coinbase intended to serve customers in nearby states, the company would be forced to obtain similar licenses imposing similar limitations. *See, e.g.*, Ohio Rev. Code Ann. §§ 3775.11(A), 3775.12(A). These geographic barriers, besides being impractical and prohibitively costly to maintain, would sap prediction markets of their liquidity, a necessary element for survival because event contracts can be executed only if a buyer and a seller are paired at the same price.

To facilitate event-contract transactions, FCMs like Coinbase must partner with DCMs like Kalshi—which, under Michigan's view, are *also* subject to its gambling laws. *See* Ex. 1, Dubin Decl. ¶ 5 & Ex. D at 1; *see also id.* ¶ 3 & Ex. B. And under federal law, these DCMs must provide all users with "impartial access to its markets and services." 17 C.F.R. 38.151(b); *see also* 17 C.F.R. 38.150. Michigan's geographic restrictions are fundamentally inconsistent with that federal impartial-access requirement. Still worse, on Michigan's view, every other State could attempt to graft its own laws onto the CEA, creating an impenetrable regulatory thicket that is wholly inconsistent with the nationwide, unified framework Congress designed. At a minimum, Michigan's view would create a state-by-state free-for-all where "the most stringent [state] standard" would become a *de facto* national standard, turning our system of federalism upside

down. *Am. Libraries Ass'n* v. *Pataki*, 969 F. Supp. 160, 183 (S.D.N.Y. 1997). Just as it would be unthinkable to require interest rate swaps or foreign exchange and cross-currency swaps—markets with enormous daily volumes and cross-border liquidity—to trade under 50 different state regulatory frameworks rather than a uniform, centralized exchange, it is equally unworkable to expect Coinbase to offer nationwide event contracts while navigating a patchwork of divergent and potentially conflicting state rules.

c.     Finally, the Supreme Court has explained that even when a federal and state law share the same policy goals, the state statute is nevertheless preempted if it includes a different "method of enforcement" than the federal law. *Arizona*, 567 U.S. at 406. Here, enforcing Michigan's gambling laws against Coinbase would topple "the careful balance struck by Congress" with respect to enforcement of the applicable regulations governing gaming event contracts. *Id.* at 406. Congress already granted the CFTC the authority to prohibit these contracts if it determines that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Rather than employ the blunt hammer of blanket prohibition, Congress thus provided the CFTC with the scalpel of case-by-case review. But Michigan seeks to circumvent the CFTC's case-by-case public-interest review by broadly threatening enforcement actions under the State's gambling laws against entities that offer access to sports-related event contracts listed on CFTC-designated exchanges. Ex. 1, Dubin Decl. ¶ 5 & Ex. D at 1; *see also id.* ¶ 3 & Ex. B. Indeed, if Michigan's laws were allowed to govern sports event contracts, then

*state* regulators could "prohibit the acceptance of any" of those alleged "internet sports betting wagers" that are "contrary to the public policies" of the *State*. Mich. Admin. Code R. 432.745(6); *see also* Ex. 1, Dubin Decl. ¶ 4 & Ex. C at 1, 3. "This is not the system Congress created." *Arizona*, 567 U.S. at 408.

## II. COINBASE WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

It is blackletter law that a party suffers irreparable injury when threatened with ruinous civil and criminal penalties for failing to comply with an invalid law. *Ex parte Young*, 209 U.S. 123, 148 (1908). The "very purpose of the Declaratory Judgment Act" is to "ameliorate" the irreparable harm that a party suffers from confronting the "dilemma" of either "abandoning his rights or risking prosecution" and financial damage. *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007).

Absent this Court's prompt intervention, Coinbase will face that precise Hobson's choice: either risk immense criminal liability or cease prediction-market operations in Michigan. *See* Ex. 2, Sears Decl. ¶¶ 25-29. The State has underscored that risk by repeatedly threatening to take "all necessary steps" against companies like Coinbase for offering prediction markets that do "not operate in accordance with state gaming laws or pursuant to state-issued gaming licenses." Exs. B at 2; D at 1. Coinbase thus faces an imminent enforcement action predicated on preempted state laws, a quintessential form of irreparable harm that warrants immediate relief. *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("prospect" of adverse state action under

preempted law "supplies the necessary irreparable injury").

If Coinbase attempts to comply with Michigan's preempted law and refrains from offering sports event contracts altogether, it will be forced to forgo a critical part of its business plan, disrupt its partnerships, and abandon a product that the company invested significant resources to build over the last year.  *See* Ex. 2, Sears Decl. ¶ 26. Selectively prohibiting Michigan users from accessing event contracts on Kalshi's exchange, moreover, puts Coinbase and its partner at risk of running afoul of *federal* law, which requires a registered exchange to provide "impartial access to its markets and services."  17 C.F.R. 38.151(b).  Nor could Coinbase recoup lost revenue and market share if its position is ultimately vindicated through litigation; not only are these harms incalculable, but sovereign immunity bars Coinbase from obtaining monetary damages against the State.  *See Tennessee* v. *Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024).

Michigan's enforcement threats also jeopardize Coinbase's reputation and goodwill among consumers.  As the Sixth Circuit has recognized, those harms are irreparable and weigh in favor of preliminary relief because "the damages flowing from such losses are difficult to compute" after the fact.  *Basicomputer Corp.* v. *Scott*, 973 F.2d 507, 512 (6th Cir. 1992).  Michigan's saber-rattling threatens to tarnish Coinbase's reputation as an industry leader that obeys all applicable federal and state laws.  *See* Ex. 2, Sears Decl. ¶¶ 27-28.  And if Coinbase is forced to shutter its prediction markets, the company risks losing the goodwill of its customers, who rely on Coinbase to provide a unified platform for their digital assets.  *See* Ex. 2, Sears Decl. ¶ 14.

Since Coinbase has shown a high likelihood of success on the merits, the equitable balance tips heavily in Coinbase's favor. *See City of Pontiac Retired Emps. Ass'n* v. *Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014). The irreparable injuries at stake only underscore the need for a preliminary injunction. *See* Ex. 2, Sears Decl. ¶¶ 25-40.

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF.

Michigan is threatening companies like Coinbase with crippling liability based on state laws that are squarely preempted as applied to sports event contracts traded on DCMs. The balance of the equities and the public interest thus strongly favor Coinbase.

Although Coinbase faces immediate harm from Michigan's threats, the same cannot be said on the other side of the ledger. Michigan would suffer no comparable harm if its gambling laws were preliminarily enjoined as to Coinbase's activity because the State lacks any cognizable interest in enforcing a preempted law. *See Felder* v. *Casey*, 487 U.S. 131, 138 (1988) ("Under the Supremacy Clause . . . the relative importance to the State of its own law is not material when there is a conflict with a valid federal law.").

Because the CFTC has blessed the availability of event contracts for many years, the equities further cut in Coinbase's favor. For starters, the CFTC has expressly green-lit event contracts that pertain to political elections. *See, e.g., Clarke* v. *CFTC*, 74 F.4th 627, 633-74 (5th Cir. 2023). And the CFTC has allowed countless event contracts to be executed on federal exchanges in recent years. It would turn our constitutional system on its head if companies that painstakingly comply with costly federal

regulations, pursuant to a federal agency's "exclusive jurisdiction," could nonetheless be charged with crippling liability under state law.  There is no contest on this prong.

The public interest also firmly supports Coinbase because "[i]t is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp.* v. *Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).  And the public has a substantial interest in accessing the event contracts that Coinbase seeks to offer and that federal law authorizes.  Granting the requested relief would both vindicate these interests and protect Coinbase from existential harm.

## CONCLUSION

For the foregoing reasons, Coinbase respectfully requests that the Court issue an order preliminarily enjoining Defendants from enforcing the relevant provisions of Michigan law to prohibit Coinbase from offering access to event contracts traded on federally registered exchanges.

Dated: December 19, 2025

Respectfully submitted,

By: */s/ Matthew P. Allen*
Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
840 W. Long Lake Rd., Ste. 150
Troy, MI 48009
Tel:  (248) 879-2000
cranmer@millercanfield.com
allen@millercanfield.com

Benjamin R. Walker
Yaira Dubin
Akash M. Toprani
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
walkerb@sullcrom.com
dubiny@sullcrom.com
toprania@sullcrom.com

Jeffrey B. Wall
James M. McDonald
Rishabh Bhandari
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
Tel:  (202) 956-7500
wallj@sullcrom.com
mcdonaldj@sullcrom.com
bhandarir@sullcrom.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2025, I filed the foregoing document

with the Clerk of the Court using the ECF system which will serve a copy upon all

counsel record.

By: _/s/ Matthew P. Allen_____
Matthew P. Allen (P57914)