# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

<table>
<tr>
<td>

COINBASE FINANCIAL MARKETS, INC.,

                           *Plaintiff*,

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board,

                           *Defendants*.

</td>
<td>

Case No. 25-cv-14092-SDK-KGA

Hon. Shalina D. Kumar

</td>
</tr>
</table>

## <u>DECLARATION OF YAIRA DUBIN</u>

I, Yaira Dubin, declare as follows:

1.      I am a partner at the law firm Sullivan & Cromwell LLP, counsel to Plaintiff Coinbase Financial Markets, Inc. in the above-captioned action.  I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction.

2.     Attached hereto as Exhibit A is a true and correct copy of a letter sent by KalshiEX LLC, dated January 22, 2025, notifying the Commodity Futures Trading Commission that it would begin listing sports event contracts on January 23, 2025.

3.     Attached hereto as Exhibit B is a true and correct copy of a press release from the Michigan Gaming Control Board, dated April 11, 2025, with the subject line "Michigan Gaming Control Board opens investigations into unlicensed sports prediction markets."

4.     Attached hereto as Exhibit C is a true and correct copy of a letter sent from Henry Williams, Executive Director of the Michigan Gaming Control Board, to Caroline Pham, Acting Chairperson of the Commodity Futures Trading Commission, dated April 29, 2025, with the subject line "Prediction Markets" and a true and correct copy of a press release from the Michigan Gaming Control Board, dated April 29, 2025, with the subject line "Michigan Gaming Control Board raises concerns to CFTC about risks of sporting event contracts in Michigan."

5.     Attached hereto as Exhibit D is a true and correct copy of a public memorandum issued by the Michigan Gaming Control Board, to Commercial Casinos, Gaming-Related Commercial Casino Suppliers, Internet Gaming Operators, Internet Gaming Suppliers, Sports Betting Operators, Sports Betting Suppliers, and Fantasy Contest Operators, dated October 3, 2025, with the subject line "Involvement in Prediction Markets."

6.     Attached hereto as Exhibit E is a true and correct copy of a letter from Christopher J. Kirkpatrick, Secretary of the Commodity Futures Trading Commission, approving KalshiEX LLC's application for designation as a contract market on November 3, 2020.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: December 18, 2025

/s/ *Yaira Dubin*
Yaira Dubin

45287794.2/164212.00001

# Exhibit A

January 22, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing
of the "Will <team> win <title>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the
Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies
the Commission that it is self-certifying the "Will <team> win <title>?" contract (Contract). The Contract
will initially be listed on **January 23, 2025**. The Exchange intends to list the contract on a  custom ˅
basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:
- **<team>**
- **<title>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name: "Will \<team\> win \<title\>?"**
**Rulebook: TITLE**
**Kalshi Contract Category:**  Sports ˅
**January 22, 2025**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix E), and the Commission's regulations thereunder.

**I.   Introduction**

The "Will \<team\> win \<title\>?" Contract is a contract relating to American sports leagues.[1]

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

---

[1] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

## CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2

Based on the above analysis, the Exchange certifies that:
- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

By: Xavier Sottile
Title: Head of Markets
Date: January 22, 2025

**<u>Attachments:</u>**
Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Confidential Appendices

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will \<team> win \<title>?"**
**Rulebook: TITLE**

# TITLE

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the winner of <title>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are the Associated Press, ESPN, The Wall Street Journal, and Fox Sports.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next year that <title> is awarded.

**<team>:** <team> refers to an entity participating in a sport.

**<title>:** <title> refers to a given sports title, and will include a specified year and/or other distinguishing information, e.g., "The 2025 National Football League Super Bowl" or "The 2025 National Football League American Football Conference Championship". <title> may refer to the titles of the National Football League, the National Hockey League, National Basketball Association, or the National Collegiate Athletic Association.[2]

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that it is reported that the first official final result of <title> event is that <team> holds the title.

- If the <title> event is postponed past its scheduled date (e.g. because of severe weather or other emergencies), then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is suspended during play, then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is moved to be earlier than its scheduled date, then the market will remain open and will resolve after the winner is reported.

---

[2] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

- If the <title> event is cancelled outright (or declared "no contest") before it is played, or after it has started, then the markets for eligible teams (not disqualified or eliminated) will resolve so "Yes" holders receive $1/[the number of eligible teams (not disqualified or eliminated) remaining for which there is a strike listed] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout.
- If multiple teams are reported <title> holders, then the markets for those teams will resolve so "Yes" holders receive $1/[the number of teams declared <title> holders] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout. For example, if two teams tie in the <title> event and both teams are reported as <title> holder, both "Yes" and "No" holders for each <team> shall receive $0.50 per share.
- If <team> forfeits the <title> event, the market will resolve to "No" for the forfeiting team.
- If the <title> event is ended early, before regulation time has ended, but the associated governing body declares that the event is over and there is a winner or multiple winners, or a tie, then the market will resolve based on that determination.
- If <team> is disqualified before the Contract expires – even if the <title> event has finished – the market for <team> will resolve to "No". If this causes another team to be formally declared the winner of <title>, the contract will resolve on the basis of which team is named <title> holder.
- Note that any revisions after Expiration will not be considered. Therefore if <team> or its opponent is disqualified or stripped of its title after the Contract expires, that will not impact the market's resolution.
- If <team> was eliminated from contention for <title>, then the market will resolve "No". A team is eliminated from contention for <title> when it is reported so by the Source Agency.
- If <team> is eliminated from contention for <title>, and the market for <team> resolved to No, but then <team> is re-entered into contention (for example, because a team that was originally in contention was disqualified), then a new market with the same <team> may be created. The original market will remain resolved to No.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

*KalshiEX LLC*

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after the day the title event has an official final result. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will be instituting additional prohibitions for trading the TITLE contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League, the National Hockey League, National Basketball Association, and the National Collegiate Athletic Association;
- Paid employees of the league and league participants;
- Owners of teams and the league;
- and household members and immediate family of all above.

These prohibitions apply to the appropriate values of <title>. For example, former players of the National Football League are not prohibited from trading on iterations of the Contract related to the National Basketball Association unless they are part of any other group listed for that league. To clarify, "league" here refers to any of the four organizations in the first bullet point.

# Exhibit B



## MGCB Michigan Gaming Control Board

# Michigan Gaming Control Board opens investigations into unlicensed sports prediction markets

April 11, 2025

**Media Contact:**

### Lisa Keith

Public Information Officer

MGCB-media@michigan.gov

313-456-1344

DETROIT, April 11, 2025 — The Michigan Gaming Control Board (MGCB) has initiated investigations into unlicensed sports prediction markets operating within the state. These platforms, which bypass Michigan's regulatory framework, have raised significant concerns about consumer protections.

Michigan's investigations align with similar actions already taken by other state regulatory bodies and focus on how this form of unlicensed sports betting may jeopardize the integrity of Michigan's legal sports betting system.

> *"We take consumer protection very seriously and are committed to ensuring that Michigan residents are engaging with safe and legal sports betting options," said **Henry Williams, Executive Director of the MGCB**. "Unlicensed entities not only pose a risk to consumers but also undercut the integrity and revenue-generating potential of the state's regulated sports betting industry. We are actively investigating these practices and will pursue appropriate measures to protect Michigan bettors."*

The unlicensed platforms offer what they describe as innovative financial products that allow users to trade their predictions on the outcomes of sports events. By sidestepping the regulatory protections of Michigan's legal sports betting market, these platforms

1

pose a serious risk to consumers. They create potential confusion among bettors and blur the line between sports betting as entertainment and sports betting as a financial trading vehicle.

Beyond concerns over lost tax revenue, these unregulated platforms may expose Michigan residents to various risks, including fraud, identity theft, and inadequate data security. Unlike licensed sportsbooks, which are required to adhere to strict regulations including age verification, Know Your Customer (KYC) protocols, anti-money laundering (AML) measures, self-exclusion policies, and integrity monitoring, unlicensed entities may operate without these safeguards. As a result, consumers can be left vulnerable to financial harm.

The MGCB is also concerned that promoting sports betting as an investment opportunity directly contradicts Michigan's established responsible gaming principles.

> *"Sports betting is meant to be a form of entertainment, not a financial investment,"* **Williams** *added. "By framing sports contracts as investment vehicles, these platforms risk confusing consumers and undermining the state's commitment to responsible gaming. Moreover, many of these unlicensed platforms are often accessible to individuals as young as 18, in stark contrast to Michigan's 21+ age requirement for legal sports betting."*

The MGCB will continue to investigate and take all necessary steps as deemed appropriate.

*Gambling in any form is for entertainment purposes only. If you or someone you know may have a gambling problem, contact the National Problem Gambling Helpline at 1-800-GAMBLER, text 800GAM, or visit www.1800gamblerchat.org. Help is available 24/7 and is free and confidential. Michigan citizens can also visit the Responsible Gaming page of the MGCB website for information on self-exclusion programs including the Disassociated Persons List and the Internet Gaming and Sports Betting Responsible Gaming Database, and DontRegretTheBet.org for additional tools to game responsibly.*

*The Michigan Gaming Control Board shall ensure the conduct of fair and honest gaming to protect the interests of the citizens of the state of Michigan. Learn more at Michigan.gov/MGCB.*

MI Newswire        Gaming Control Board        Executive Office

Licensing        Internet Gaming and Internet Sports Betting

Press Release          04 April       2025

# Related News

iGaming, sports betting operators report $335.7M in November revenue

Detroit Casinos Report $108.2M in November Revenue

MGCB Issues 12 Cease-and-Desist Letters to Offshore Gambling Operators Illegally Targeting Michigan Residents

MGCB Approves Launch of Hard Rock Bet in Michigan

Michigan Gaming Control Board to meet December 9

iGaming, sports betting operators report $352.3M in October revenue

Detroit Casinos Report $107.4M in October Revenue

Gaming Control Board Issues Cease-and-Desist Letters to Three Online Casinos Operating Illegally in Michigan

Michigan Gaming Control Board to meet November 18

Protecting the Game: Michigan Gaming Control Board Responds to NBA Gambling Scandal



**Michigan Gaming Control Board opens investigations into unlicensed sports prediction markets**

Copyright State of Michigan

# Exhibit C



STATE OF MICHIGAN
**MICHIGAN GAMING CONTROL BOARD**
**DETROIT**

**GRETCHEN WHITMER**
GOVERNOR

**HENRY L. WILLIAMS, JR.**
EXECUTIVE DIRECTOR

April 29, 2025

The Honorable Caroline Pham, Acting Chairperson
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

*Sent via email only to*
*ChairmanPham@cftc.gov*

Re: Prediction Markets

Dear Acting Chairperson Pham:

The Michigan Gaming Control Board (MGCB) is writing to provide feedback to the Commodity Futures Trading Commission (CFTC) regarding the topic of prediction markets. As discussed herein, the MGCB has several concerns regarding certain event contracts that presumably are available in Michigan.

The MGCB regulates internet sports betting in Michigan pursuant to the Lawful Sports Betting Act (LSBA),[1] a state statute duly passed by the Michigan Legislature and signed into law by the honorable Governor Gretchen Whitmer. LSBA was enacted to establish a secure, responsible, fair, and legal system of internet sports betting to protect Michigan residents and capture revenue in the form of taxes and payments.[2] The law applies to any transaction in which an individual risks cash or cash equivalents through the internet on an athletic event or other approved event, including, but not limited to, a single-game bet, moneyline bet, straight bet, or exchange bet.[3] Internet sports betting may only be conducted in Michigan to the extent it is conducted in accordance with LSBA.[4]

The MGCB understands that event contracts involving sporting events (sporting event contracts), in which an individual acquires a position on the outcome of a sports-related event such as a game, series, or tournament, are offered by entities regulated by the CFTC in all 50 states, including Michigan. The MGCB further understands that purchasing a sporting event contract is tantamount to risking cash or cash equivalents through the internet on the outcome of an athletic event – a transaction that, at its core, is materially identical to an internet sports betting wager that is subject to LSBA in Michigan. The sporting event contracts presumably offered by CFTC-regulated entities in Michigan are not operating pursuant to or in accordance with LSBA.

The MGCB is concerned that the availability of sporting event contracts in Michigan, operating outside the boundaries of the legal framework established by LSBA, places Michigan citizens at undue risk. Under

---

[1] 2019 PA 149, MCL 432.401 *et seq.*
[2] MCL 432.402(d).
[3] MCL 432.403(s), (w), & (bb).
[4] MCL 432.404(1).

MGCB Feedback Regarding Prediction Markets
April 28, 2025
Page 2

Michigan law, internet sports betting may only be offered by a sports betting operator, which must be a licensed commercial casino or a federally recognized tribe (operating independently or in partnership with an internet sports betting platform provider).[5]  Each sports betting operator, any suppliers it utilizes to conduct internet sports betting in Michigan, and certain key persons and employees must be investigated and licensed by the MGCB.  The licensing process is intended to ensure that sports betting operators and suppliers are suitable in terms of character, reputation, integrity, business probity, and financial ability, thereby protecting Michigan citizens from potential bad actors and reducing their risk of financial harm.[6]  A license is considered a revocable privilege, and offering internet sports betting without a sports betting operator license is a felony under Michigan law.[7]

Beyond licensing, LSBA and the administrative rules promulgated thereunder establish numerous requirements for the conduct and regulation of internet sports betting that serve to protect Michigan citizens and safeguard the integrity of sports betting and the events on which wagers are accepted.  Some key examples include, without limitation, the following:

- Responsible Gaming:  The MGCB operates a statewide self-exclusion program, and each sports betting operator is required to offer various responsible gaming tools.  At a minimum, such tools must include temporary and permanent self-exclusion, self-imposed responsible gaming limits (e.g., periodic deposit and wagering limits), temporary account suspension, and links to responsible gaming information and resources.[8]

- Patron Protection:  Sports betting operators must comply with numerous requirements meant to protect patrons from financial and other harms.  For example, an operator must segregate patron funds from operating funds, must maintain a reserve sufficient to ensure the security of all patron funds, and must timely honor a patron's valid withdrawal request.  In addition, each operator must receive and investigate patron complaints, and patrons are given the option of filing unresolved complaints with the MGCB.  Sports betting operators must also adhere to requirements designed to protect the confidentiality of patrons and their accounts, including requirements for passwords and strong authentication (or multi-factor authentication), privacy and information sharing, encryption, and system security.[9]

- Age and Identity Verification:  A sports betting operator must verify an individual's age and identity before allowing the individual to create an account and place a wager.  The operator must ensure the individual is not under the age of 21, self-excluded, or otherwise prohibited from participating in internet sports betting in Michigan.  In addition, the operator must prevent certain individuals from wagering on events with which they are associated or for which they have access to nonpublic information (e.g., athletes and coaches are prohibited from wagering on any event overseen by the sports governing body with which they are affiliated).[10]

---

[5] MCL 432.404(7) & 432.406(1).
[6] MCL 432.406 & 432.408; Mich Admin Code R 432.723, R 432.725a, & R 432.725b.
[7] Mich Admin Code R 432.728(1); MCL 432.413(1)(a) & (2).
[8] MCL 432.412; Mich Admin Code R 432.752, R 432.753, R 432.754, R 432.759, R 432.772, & R 432.774.
[9] Mich Admin Code R 432.733, R 432.735, R 432.738, R 432.739, R 432.741, R 432.744, R 432.751b, R 432.752, R 432.753, R 432.755d, R 432.762, & R 432.763(2); Identity Verification and Strong Authentication Memo.
[10] MCL 432.411(1) & (4); Mich Admin Code R 432.751a, R 432.751b, R 432.755, R 432.763(2), R 432.771, R 432.772, R 432.774, & R 432.775; Identity Verification and Strong Authentication Memo.

MGCB Feedback Regarding Prediction Markets
April 28, 2025
Page 3

- Integrity: Each sports betting operator must partner with an independent integrity monitoring provider to review and identify suspicious wagering activity that may threaten the integrity of internet sports betting or events on which wagers are accepted.  In addition, sports betting operators must adopt procedures designed to prevent and detect fraud, cheating, theft, collusion, money laundering, identity theft, and other illegal activity.  Sports betting operators must also comply with applicable provisions of the Bank Secrecy Act.[11]

- Events and Wager Types: All events and wager types must be reviewed and approved by the MGCB before they are offered for wagering by a sports betting operator.  The MGCB prohibits the acceptance of wagers on any events or the offering of any wager types that are illegal under state or federal law, inherently objectionable, or inconsistent with the public policy of Michigan (e.g., events played by individuals at the high school level or below).  All events must be subject to effective supervision and integrity safeguards, and a sports governing body may object to the acceptance of wagers on its events in the case of an integrity concern.[12]

The comprehensive licensing and regulatory framework established by LSBA and the related administrative rules supports public policy objectives that are critical to the State of Michigan.  To the extent CFTC-regulated entities and the sporting event contracts offered thereby do not meet the minimum standards of this framework, the MGCB believes there is an elevated risk of harm to Michigan citizens, their personal information, and their funds.

The MGCB is also concerned that the availability of sporting event contracts will cause financial harm to state, local, and tribal governments in Michigan.  Under LSBA, sports betting operators are required to remit taxes or payments – equal to 8.4% of their adjusted gross sports betting receipts – to state and local governments.  The taxes and payments provide funding for various state and local programs, including programs dedicated to public safety, economic development, compulsive gambling prevention, and public education.  The City of Detroit receives municipal services fees from certain sports betting operators (commercial casinos), while internet sports betting conducted by tribes generates revenue for tribal governments.[13]  Sports betting operators paid over $20 million in taxes, payments, and municipal services fees in calendar year 2024.  Any reduction in internet sports betting participation that results from the offering of sporting event contracts to Michigan citizens will deprive state, local, and tribal governments of these critical funds.

Finally, the MGCB is concerned that the promotion of sporting event contracts as an investment vehicle is antithetical to the agency's stance and foundational message on responsible gaming – that gambling in any form is for entertainment purposes only.  The notion that internet sports betting can and should be pursued as a viable means of financial gain undermines this position and increases the risk of irresponsible and problem gambling behavior.

---

[11] MCL 432.411(3); Mich Admin Code R 432.742, R 432.743, R 432.759, R 432.762, & R 432.763(2).
[12] MCL 432.410(3) & (4); Mich Admin Code R 432.745; MGCB Sports Wagering Catalog.
[13] MCL 432.407(1)(f), 432.414, 432.415, 432.415a, & 432.416.

MGCB Feedback Regarding Prediction Markets
April 28, 2025
Page 4

The MGCB respectfully requests that the CFTC consider these concerns as it continues to evaluate whether sporting event contracts are contrary to the public interest, particularly to the extent they are offered in Michigan in any manner that is inconsistent with Michigan law.[14]

The MGCB appreciates the opportunity to comment and stands ready to answer any questions or provide any additional information the CFTC may need.

Sincerely,

Henry Williams
Executive Director
Michigan Gaming Control Board

CC:  Kristin N. Johnson, Commissioner, CFTC
       Christy Goldsmith Romero, Commissioner, CFTC
       Summer K. Mersinger, Commissioner, CFTC

---

[14] While the MGCB understands and respects the authority granted to the CFTC under the Commodity Exchange Act, this letter should in no way be interpreted or construed as an indication that the MGCB believes it has no other avenues or remedies to prevent entities from violating Michigan law.



## MGCB Michigan Gaming Control Board

# Michigan Gaming Control Board raises concerns to CFTC about risks of sporting event contracts in Michigan

April 29, 2025

**Media Contact:**

### Lisa Keith

Public Information Officer

MGCB-media@michigan.gov

313-456-1344

DETROIT, April 29, 2025 — The Michigan Gaming Control Board (MGCB) has formally submitted comments to the Commodity Futures Trading Commission (CFTC) expressing strong concerns about the offering of "sporting event contracts" in Michigan. In a letter addressed to Acting Chairperson Caroline Pham, Executive Director Henry Williams underscored that these contracts—financial positions based on the outcome of sports events—are equivalent to internet sports betting wagers that are subject to the Lawful Sports Betting Act (LSBA).

The MGCB emphasized that any form of internet sports betting must comply with the LSBA, a law enacted to ensure a legal, fair, and responsible framework for sports betting in Michigan. Entities offering sporting event contracts without a sports betting operator license issued by the MGCB may be violating Michigan law.

*"The offering of sporting event contracts by CFTC-regulated entities, without adherence to Michigan's licensing requirements and in a manner that may not meet prescribed consumer protections, exposes Michigan residents to unnecessary risk and undermines public trust," said **Henry Williams, Executive Director of the MGCB**. "We*

5

> *are particularly concerned that such contracts are being promoted as investment opportunities, a message that directly contradicts Michigan's responsible gaming principles."*

The MGCB's letter outlines several key regulatory standards that apply to internet sports betting in Michigan, including:

- **Licensing and Oversight:** Michigan law requires that all sports betting operators, platform providers, and certain individuals be licensed, undergo thorough background checks, and demonstrate suitability to protect consumers.

- **Responsible Gaming:** Michigan mandates a comprehensive suite of responsible gaming tools and maintains a statewide self-exclusion program.

- **Consumer Protection:** Licensed operators must secure patron funds, process withdrawals promptly, and provide complaint resolution options, among other safeguards.

- **Event Integrity:** Events and wager types must be approved by the MGCB and be subject to integrity monitoring and fraud prevention protocols.

The agency also noted that diverting sports betting activity away from licensed Michigan operators could lead to a reduction in state, local, and tribal government revenues. In 2024, legal sports betting operations in Michigan contributed more than $20 million in taxes and fees supporting public services and responsible gaming programs.

"The potential for financial harm to both consumers and government programs is real," added Williams. "Any erosion of the legal, regulated sports betting market undermines the very safeguards we have in place to protect Michiganders."

The MGCB has urged the CFTC to consider these concerns as it evaluates whether sporting event contracts serve the public interest.

*Gambling in any form is for entertainment purposes only. If you or someone you know may have a gambling problem, contact the National Problem Gambling Helpline at* **1-800-GAMBLER***, text 800GAM, or visit* *www.1800gamblerchat.org. Help is available 24/7 and is free and confidential. Michigan citizens can also visit the* *Responsible Gaming page of the MGCB website for information on self-exclusion programs including the Disassociated Persons List and the Internet Gaming and Sports Betting Responsible Gaming Database, and* *DontRegretTheBet.org for additional tools to game responsibly.*

*The Michigan Gaming Control Board shall ensure the conduct of fair and honest gaming to protect the interests of the citizens of the state of Michigan. Learn more at* *Michigan.gov/MGCB.*

MI Newswire          Gaming Control Board          Board

Executive Office          Internet Gaming and Internet Sports Betting

Illegal Gaming          Press Release          04 April          2025

## Related News

### Detroit Casinos Report $108.2M in November Revenue

### MGCB Issues 12 Cease-and-Desist Letters to Offshore Gambling Operators Illegally Targeting Michigan Residents

### MGCB Approves Launch of Hard Rock Bet in Michigan

### Michigan Gaming Control Board to meet December 9

### iGaming, sports betting operators report $352.3M in October revenue

### Detroit Casinos Report $107.4M in October Revenue

### Gaming Control Board Issues Cease-and-Desist Letters to Three Online Casinos Operating Illegally in Michigan

### Michigan Gaming Control Board to meet November 18

## Protecting the Game: Michigan Gaming Control Board Responds to NBA Gambling Scandal

## MGCB Targets Eight Illegal Online Casinos Operating in Michigan



**Michigan Gaming Control Board raises concerns to CFTC about risks of sporting event contracts in Michigan**

Copyright State of Michigan

Exhibit D



STATE OF MICHIGAN
**MICHIGAN GAMING CONTROL BOARD
DETROIT**

**GRETCHEN WHITMER**
GOVERNOR

**HENRY L. WILLIAMS, JR.**
EXECUTIVE DIRECTOR

# Memorandum

TO: Commercial Casinos, Gaming-Related Commercial Casino Suppliers, Internet Gaming Operators, Internet Gaming Suppliers, Sports Betting Operators, Sports Betting Suppliers, and Fantasy Contest Operators (Licensees)

FROM: Henry Williams, Executive Director

DATE: October 3, 2025

SUBJECT: Involvement in Prediction Markets

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Michigan Gaming Control Board (MGCB) understands that certain licensees may be considering opportunities to operate, offer, or facilitate access to prediction markets, where individuals can buy, sell, and trade event contracts that are based on a future event, occurrence, or value. The MGCB further understands that many of these prediction markets would offer sporting event contracts – event contracts in which an individual acquires a position on the outcome of a sporting event or other occurrence related to a sporting event – and would not operate in accordance with state gaming laws or pursuant to state-issued gaming licenses. The MGCB writes to make you aware that any involvement in the offering of sporting event contracts, directly or via an affiliate, key person, related business entity, or other association, will have implications relative to your licensure in Michigan.

Under the Michigan Gaming Control and Revenue Act, MCL 432.201 *et seq.*, the Lawful Internet Gaming Act, MCL 432.301 *et seq.*, the Lawful Sports Betting Act, MCL 432.401 *et seq.*, and the Fantasy Contests Consumer Protection Act, MCL 432.501 *et seq.*, and their respective administrative rules, the MGCB is tasked with developing licensing qualifications, standards, and procedures and evaluating a person's suitability for licensure, both when an application is made and on a continuing basis.[1] It is the burden of a person applying for or holding a license to establish and maintain its suitability as to character, reputation, integrity, business probity, and financial ability, which must be demonstrated by clear and convincing evidence and is impacted by a person's conduct – including that of its affiliates, key persons, related business entities, and other associates – in both Michigan and other jurisdictions.[2]

---

[1] *See* MCL 432.204(14)(a) & (d)(iii); 432.204a(1)(e); 432.206; 432.207a; 432.306; 432.308; 432.309(1)(a); 432.310(b); 432.406; 432.408; 432.409(1)(a); 432.410(1)(g); & 432.503(6)-(8). *See also* Mich. Admin. Code Rules 432.1301(6); 432.1304(1); 432.1305; 432.1306; 432.1307(r); 432.1313(1); 432.1324; 432.1326; 432.11101(2); 432.513(3)(a)-(b); 432.516(1); 432.525; 432.525a(1); 432.525b; 432.528(6); 432.613(3)(a)-(b); 432.616(1); 432.625; 432.625a(1); 432.625b; 432.628(6); 432.713(3)(a)-(b); 432.716(1); 432.725; 432.725a(1); 432.725b; & 432.728(6).

[2] *See* MCL 432.204(14)(a); 432.206; 432.207a; 432.306(2); 432.406(2); & 432.503(6)-(8). *See also* Mich. Admin. Code Rules 432.1301(2) & (6)(b); 432.1307(c)(i); 432.1313; 432.1326; 432.11101(1); 432.525b(2); 432.528(2) & (6)(b); 432.625b(2); 432.628(2) & (6)(b); 432.725b(2); & 432.728(2) & (6)(b).

Involvement in Prediction Markets
October 3, 2025
Page 2

As the MGCB fulfills its statutory duty to monitor and evaluate each licensee's continued suitability for licensure, it will consider whether the licensee and its affiliates, key persons, related business entities, and any other associates are involved in the offering of sporting event contracts in Michigan and other jurisdictions.  Conduct that will be taken into account includes, but is not limited to, the following:

- Directly or indirectly operating, offering, or facilitating access to sporting event contracts in Michigan, except to the extent such contracts are approved by the MGCB and operated pursuant to Michigan law and an MGCB-issued license.

- Partnering, coordinating, or associating with an entity that operates, offers, or facilitates access to sporting event contracts in Michigan, except to the extent such contracts are approved by the MGCB and operated pursuant to Michigan law and an MGCB-issued license.

- Directly or indirectly operating, offering, or facilitating access to sporting event contracts in any jurisdiction other than Michigan in which a regulatory body, law enforcement agency, or other governmental authority has expressly objected to or acted in any way to prevent or cease the offering of sporting event contracts in such jurisdiction.

- Partnering, coordinating, or associating with an entity that operates, offers, or facilitates access to sporting event contracts in any jurisdiction other than Michigan in which a regulatory body, law enforcement agency, or other governmental authority has expressly objected to or acted in any way to prevent or cease the offering of sporting event contracts in such jurisdiction.

Each licensee is under an ongoing duty to notify the MGCB of any material change in licensing information, or any change in circumstance that is relevant to a licensee's suitability.[3]  Accordingly, the MGCB expects any licensee that is actively pursuing any involvement in the offering of sporting event contracts will provide prompt notice to the MGCB.

---

[3] *See* Mich. Admin. Code Rules 432.1206(2); 432.1313(4); 432.1324(2)(i); 432.528(6)(a); 432.528a; 432.628(6)(a); & 432.728(6)(a).

Exhibit E

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

_____

In the Matter of the Application
of KalshiEX LLC for
Designation as a Contract Market
_____

ORDER OF DESIGNATION

KalshiEX LLC ("Kalshi") has submitted to the Commodity Futures Trading Commission

("Commission"), pursuant to Section 5(a) of the Commodity Exchange Act ("Act"), 7 U.S.C. §

7(a), and Commission Regulation 38.3(a), 17 C.F.R. § 38.3(a), an application for designation as

a contract market, which includes submissions dated December 30, 2019 through September 17,

2020.  Having reviewed Kalshi's application, the Commission makes the following findings and

rulings:

WHEREAS Commission staff reviewed Kalshi's application for designation as a contract

market, including Kalshi's rules, and conducted a technical evaluation of Kalshi's operational

capabilities to evaluate whether Kalshi was in compliance with the core principles and

corresponding regulations in accordance with Section 5(d) of the Act, 7 U.S.C 7(d)(1).

WHEREAS based on its review, staff concludes that Kalshi's application, including all

amendments thereto and representations made by Kalshi, demonstrates compliance with the

applicable requirements of the Act and the Commission's regulations for designation as a

contract market.

1

The Commission FINDS that Kalshi has demonstrated, as required by Section 6(a) of the Act, 7 U.S.C. § 8(a), and Regulation 38.3(a), 17 C.F.R. § 38.3(a), that Kalshi complies with the provisions set forth in the Act and the Commission's regulations thereunder applicable to designation as a contract market and provides a sufficient assurance that it will continue to comply with the requirements of the Act and the Commission's regulations.

Therefore:

IT IS HEREBY ORDERED, pursuant to Sections 5 and 6(a) of the Act, that the application of Kalshi for designation as a contract market is approved, subject to the terms and conditions specified herein:

(1)     Kalshi shall comply with all representations and submissions made by Kalshi in support of its application for designation as a contract market, as shown in the application record;

(2)     Kalshi shall comply with all provisions of the Act and all requirements set forth in the Commission's regulations, as may be amended or adopted from time to time, that are applicable to designated contract markets; and

(3)     Kalshi may not permit any futures commission merchant to intermediate any transactions or carry accounts for customers executing trades on, or pursuant to the rules of, the contract market unless the Kalshi Order of Designation has been amended to permit futures commission merchants to carry customer accounts.

Issued in Washington, D.C., this 3rd day of November, 2020.


By the Commission,


Christopher J. Kirkpatrick
Secretary of the Commission