# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

COINBASE FINANCIAL MARKETS, INC.,

     *Plaintiff*,

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board,

     *Defendants*.

Case No. 2:25-cv-14092-SDK

Hon. Shalina D. Kumar

_____

*Counsel for Plaintiff:*

Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
840 W. Long Lake Rd., Ste. 150
Troy, MI 48009
Tel: (248) 879-2000
cranmer@millercanfield.com

*Counsel for Defendants:*

John L. Thurber (P44989)
Lauren E. Fitzsimons (P82997)
Felepe H. Hall (P59533)
Assistant Attorneys General
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor

allen@millercanfield.com

Jeffrey B. Wall
James M. McDonald
Rishabh Bhandari
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 956-7500
wallj@sullcrom.com
mcdonaldj@sullcrom.com
bhandarir@sullcrom.com

Benjamin R. Walker
Yaira Dubin
Akash M. Toprani
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
walkerb@sullcrom.com
dubiny@sullcrom.com
toprania@sullcrom.com

East Lansing, MI  48823
Tel: (517) 241-0210
ThurberJ@michigan.gov
FitzsimonsL@michigan.gov
HallF2@michigan.gov

---

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

John L. Thurber
Assistant Attorney General
Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI  48823
(517) 241-0210
ThurberJ@michigan.gov
(P44989)

Dated:  January 16, 2026

# TABLE OF CONTENTS

Page

Index of Authorities...................................................................... iii

Concise Statement of Issues Presented......................................xi

Controlling or Most Appropriate Authority ............................xii

Introduction ................................................................................1

Statement of Facts......................................................................4

    Coinbase/Kalshi's placement, purchase, and sale of sports
        wagers on its platform are sports betting. ...........................5

    Michigan regulates sports betting to protect the public
        interest..................................................................................8

Argument ..................................................................................16

I.    Coinbase is unlikely to succeed on the merits because its
    proposed sports betting is not within the exclusive
    jurisdiction of the CFTC.................................................. 16

    A.    Event contracts are not swaps within the ordinary
        meaning of the CEA, canons of statutory
        interpretation, or the CEA's legislative history. ..................17

        1.    Implied Repeal of the Wire Act ...................................24

        2.    Implied Repeal of IGRA................................................24

    B.    Congress did not preempt the State of Michigan from
        regulating sports betting because nothing in the CEA
        preempts the State of Michigan from regulating sports
        betting..................................................................................26

        1.    Express Preemption.....................................................28

        2.    Field Preemption .........................................................30

3.      Conflict Preemption ........................................................ 31

II.   Coinbase's claimed injuries are purely speculative and any harm it may suffer is of its own making. ....................................... 33

III.  The irreparable harm to Michigan and its citizens from being exploited by Coinbase/Kalshi's gambling enterprise masquerading as an investment opportunity outweighs Coinbase's speculative self-created harms. ................................... 36

Conclusion and Relief Requested ............................................................ 38

Certificate of Service (e-file) ................................................................ 40

# INDEX OF AUTHORITIES

<u>Page</u>

**Cases**

*Ah Sin v. Wittman,*
198 U.S. 500 (1905) ...................................................................... 27

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.,*
511 F. App'x. 398 (6th Cir., 2013) ................................................ 33

*Altira Grp., Inc. v. Good,*
555 U.S. 70 (2008) ........................................................................ 28

*American Civil Liberties Union Fund of Mich. v. Livingston County,*
796 F.3d 636 (6th Cir, 2015) ........................................................ 15

*American Civil Liberties Union of Ky. v. McCreary County, Ky.,*
354 F.3d 438 (6th Cir, 2003) ........................................................ 16

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................ 30, 32

*Baffert v. Churchill,*
Case No. No. 3:22-cv-123, 2023 U.S. Dist. LEXIS 27306 (W.D. Kentucky, February 17, 2023) ............................................................ 33

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd., et al.,*
Case No. 25-1235, 2025 U.S. App. LEXIS 32798 (6th Cir. December 16, 2025) ...................................................................... 27

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ...................................................................... 26

*CSX Transp. v. Easterwood,*
507 U.S. 658(1993) ....................................................................... 29

iii

*Epic. Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ............................................................... 24

*Florida Lime & Avocado Growers, Inc. v. Paul,*
  373 U.S. 132 (1963) ............................................................... 31

*Greater New Orleans Broad. Ass'n, Inc. v. United* States, 527 U.S.
  173, 185 (1999).......................................................................27

*Griffin v. Oceanic Contractors, Inc.,*
  458 U.S. 564 (1982) ............................................................... 30

*Huron Mountain Club v. U.S. Army Corps of Engineers,*
  545 F. App'x. 390 (6th Cir. 2013).......................................... 33

*KalshiEX LLC v. Martin,*
  Case No. 25-cv-1283, 2025 U.S. Dist. LEXIS 147815 (D. Md.
  August 1, 2025).......................................................................22

*KalshiEX, LLC v. Commodity Futures Trading Comm'n,*
  Case No. 23-3257, 2024 U.S. Dist. LEXIS 163925, at *3 (D.D.C.
  Sept. 12, 2024) ...................................................................... 17

*KalshiEX, LLC v. Flaherty,*
  Case No. 25-CV-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893
  (D.N.J. Apr. 28, 2025)......................................................22, 23

*KalshiEX, LLC. v. Hendrick, et al.,*
  Case No. 2:25-cv-00575, 2025 U.S. Dist. LEXIS 67832 (D. Nev.
  April 9, 2025) ...................................................................20, 21

*Kansas v. Garcia,*
  589 U.S. 191 (2020) ............................................................... 31

*Kentucky v. Biden,*
  57 F.4th 545 (6th Cir. 2023)...................................................36

*Maryland v. Louisiana,*
  451 U.S. 725 (1981) ............................................................... 28

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ............................................................... 27

*Memphis A. Phillip Randolph Instit. v. Hargett*,
    2 F.4th 548 (6th Cir., 2021) ................................................. 15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) .............................................................. 18

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) .............................................................. 25

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018) .......................................................... 9, 32

*North American Derivatives Exchange KalshiEX.  Robinhood
    Derivatives, LLC v. Dreitzer*,
    Case No. 2:25-cv-01541, 2025 U.S. Dist. LEXIS 231144 (D. Nev.
    November 25, 2025) ............................................................... 21

*North American Derivatives Exchange, Inc., d/b/a Crypto.com v.
    Gaming Control Board*,
    Case No. 2:25-cv-00978, 2025 U.S. Dist. LEXIS 202104 (D. Nev.
    October 14, 2025) ........................................................... 20, 21

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) .............................................................. 31

*R.J. Hereley & Son Co. v. Stolter & Co.*,
    466 F. Supp. 345 (N.D. Ill. 1979) ......................................... 18

*Sikkelee v. Precision Airmotive Corp.*,
    822 F.3d 680 (3rd Cir. 2016) ................................................ 31

*Six Clinics Holding Corp, II v. Cafcomp Sys*,
    119 F. 3d 393, 399 (6th Cir. 1997) ........................................ 16

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ......................................................... 15, 16

*Vita-Mix Corp. v. Tristar Prods.*,
   Case No. 1:07-cv-275, 2008 U.S. Dist. LEXIS 143319 (N.D. Ohio
   September 30, 2008) ............................................................................ 34

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................................ 29

*Winter v Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 16

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ............................................................................ 27

**Statutes**

7 U.S.C. §§ 1, *et seq* ........................................................................... 5

7 U.S.C. § 1-27f ...................................................................................  2

7 U.S.C. § 1a(47)(A)(ii) ............................................................... 24, 29

7 U.S.C. § 1a(47)(A)(ii). ...................................................................... 19

7 U.S.C. § 2(a) .................................................................................... 20

7 U.S.C. § 2(a)(1)(A)...................................................................22, 28, 29

7 U.S.C. § 7a-2(c)(5)(C)(1)................................................................... 19

18 U.S.C. § 1084.................................................................................. 23

18 U.S.C. § 1084(a) ............................................................................. 24

18 U.S.C. § 1084(b) ............................................................................. 24

25 U.S.C. § 2701 *et seq* ...................................................................... 23

25 U.S.C.  § 2702(1) ............................................................................ 25

25 U.S.C.  § 2702(2) ............................................................................ 25

25 U.S.C. § 2703(8) ............................................................................. 25

25 U.S.C. § 2710(d)(1) ................................................................................. 25

28 U.S.C. § 1651 ............................................................................................. 5

28 U.S.C. § 2201 ............................................................................................. 5

28 U.S.C. § 2202 ............................................................................................. 5

28 U.S.C. § 3702 ............................................................................................. 8

Mich. Comp. Laws § 432.401 *et seq* ........................................................... 9

Mich. Comp. Laws § 432.402(d) .................................................................... 9

Mich. Comp. Laws § 432.403(bb) ................................................................ 10

Mich. Comp. Laws § 432.403(s) ................................................................... 10

Mich. Comp. Laws § 432.403(w) .................................................................. 10

Mich. Comp. Laws § 432.404(1) ................................................................... 11

Mich. Comp. Laws § 432.404(7) ................................................................... 11

Mich. Comp. Laws § 432.406 ....................................................................... 11

Mich. Comp. Laws § 432.406(1) ................................................................... 11

Mich. Comp. Laws § 432.408 ....................................................................... 11

Mich. Comp. Laws § 432.410(3) ................................................................... 14

Mich. Comp. Laws § 432.410(4) ................................................................... 14

Mich. Comp. Laws § 432.411(1) ................................................................... 13

Mich. Comp. Laws § 432.411(3) ................................................................... 14

Mich. Comp. Laws § 432.411(4) ................................................................... 13

Mich. Comp. Laws § 432.412 ....................................................................... 12

Mich. Comp. Laws §§ 432.415a .................................................................... 10

Mich. Comp. Laws § 432.416 .................................................... 10

## Other Authorities

156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) ....................... 18

*Compulsive Gambling*, Mayo Clinic, (June 18, 2022),
    https://www.mayoclinic.org/diseases-conditions/compulsive-
    gambling/symptoms-causes/syc-20355178.  (Last accessed
    January 14, 2026) ................................................................ 37

*DSM-5-TR Diagnostic Criteria for Gambling Disorder*, (Mar. 10,
    2024), https://www.gatewayfoundation.org/blog/dsm-5-
    gambling/.  (Last accessed January 14, 2026) ............................ 37

History of the CFTC:  U.S. Futures Trading and Regulation
    Congress Before Creation of the
    CFTC,https://www.cftc.gov/About/HistoryoftheCFTC/history_pre
    cftc.html. (Last visited January 12, 2026) ........................... 17, 18

## Rules

Fed. R. Civ. P. 65 ................................................................ 15

Mich. Admin. Code R. 432.723 .................................................. 11

Mich. Admin. Code R. 432.725a ................................................. 11

Mich. Admin. Code R. 432.725b ................................................. 11

Mich. Admin. Code R. 432.733 .................................................. 12

Mich. Admin. Code R. 432.735 .................................................. 12

Mich. Admin. Code R. 432.738 .................................................. 12

Mich. Admin. Code R. 432.741 .................................................. 12

Mich. Admin. Code R. 432.742 .................................................. 14

Mich. Admin. Code R. 432.743 .................................................. 14

Mich. Admin. Code R. 432.744 ...................................................... 12

Mich. Admin. Code R. 432.745 ...................................................... 14

Mich. Admin. Code R. 432.745(9) ................................................... 8

Mich. Admin. Code R. 432.745(10) .................................................. 8

Mich. Admin. Code R. 432.751a ..................................................... 13

Mich. Admin. Code R. 432.751b ................................................ 12, 13

Mich. Admin. Code R. 432.752 ...................................................... 12

Mich. Admin. Code R. 432.753 ...................................................... 12

Mich. Admin. Code R. 432.754 ...................................................... 12

Mich. Admin. Code R. 432.755 ...................................................... 13

Mich. Admin. Code R. 432.755d ..................................................... 12

Mich. Admin. Code R. 432.759 ................................................ 12, 14

Mich. Admin. Code R. 432.762 ................................................ 12, 14

Mich. Admin. Code R. 432.763(2) ............................................ 12, 13, 14

Mich. Admin. Code R. 432.771 ...................................................... 13

Mich. Admin. Code R. 432.772 ................................................ 12, 13

Mich. Admin. Code R. 432.774 ................................................ 12, 13

Mich. Admin. Code R. 432.775 ...................................................... 13

**Regulations**

17 C.F.R. § 40.11(a)(1) ......................................................... 19, 29

17 C.F.R. § 40.11(a)(2) ............................................................ 19

25 C.F.R. § 502.4(c) ............................................................... 25

## Constitutional Provisions

U.S. Const. art VI, cl. 2 ........................................................................2, 26

## CONCISE STATEMENT OF ISSUES PRESENTED

1.  To obtain a preliminary injunction, a plaintiff must show a strong likelihood of success on the merits.  In this case, Coinbase has filed a single count complaint alleging that the Defendants  violated the Supremacy Clause.  However, event contracts are not swaps as defined by the Commodity Exchange Act and federal law does not preempt state law.  Should the Court deny the motion for a preliminary injunction because Coinbase does not have a strong likelihood of success on the merits?

2.  To obtain a preliminary injunction, a plaintiff must also show that it will suffer an irreparable injury if the injunction is not granted.  In this case, Coinbase cannot show that it will suffer an irreparable injury without a preliminary injunction because its claimed injuries are speculative and theoretical, not certain and immediate, and because any harm it may suffer is of its own making.  Should the Court deny the motion for a preliminary injunction because Coinbase has not shown an irreparable injury?

3.  In considering whether to grant a preliminary injunction, Courts also consider whether granting the requested injunction would harm others or the public interest.  In this case, granting the requested injunction would harm the citizens of the State of Michigan by allowing unregulated sports betting and deprive the State, local governments, and tribal governments of income.  Should the Court deny the motion for a preliminary injunction because Coinbase has failed to show that injunctive relief would not harm the public interest?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>*Authority*</u>:

*Ah Sin v. Wittman*, 198 U.S. 500 (1905)

*Altira Grp., Inc. v. Good*, 555 U.S. 70 (2008)

*Baffert v. Churchill* 2023 WL 2089221 (W.D. Kentucky, 2023)

*Epic. Sys. Corp. v. Lewis*, 584 U.S. 497 (2018)

*KalshiEX, LLC v. Hendrick*, 2:25-cv-00575, 2025 U.S. Dist. LEXIS 234246 (D. Nev. November 24, 2025)

*KalshiEX LLC v. Martin*, Case No. 25-cv-1283, 2025 U.S. Dist. LEXIS 147815 (D. Md. August 1, 2025)

*Kentucky v. Biden*, 57 F.4th 545 (6th Cir. 2023)

*Maryland v. Louisiana*, 451 U.S. 725 (1981)

*Memphis A. Phillip Randolph Instit. v. Hargett*, 2 F.4th 548 (6th Cir., 2021)

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)

*North American Derivatives Exchange, Inc., d/b/a Crypto.com v. Gaming Control Board,* Case No. 2:25-cv-00978, 2025 U.S. Dist. LEXIS 202104 (D. Nev. October 14, 2025)

*Sikkelee v. Precision Airmotive Corp.,* 822 F.3d 680 (3rd Cir. 2016)

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)

*Wyeth v. Levine*, 555 U.S. 555 (2009)

## INTRODUCTION

In its own words, Coinbase wants to take bets on "Will the Lions win the Super Bowl?" (ECF No. 13, PageID.242.) Contrary to Coinbase's argument, that is in fact a "garden-variety wager." Coinbase's convoluted brief attempts to cover this fact by dressing up their proposed gambling operation in buzz words, a complex corporate structure, and strategically timed partnership announcements.

This case is simple though. Like a back-alley bookie, Coinbase wants to avoid Michigan's reasonable regulatory framework for sports betting, which was designed to protect the people of this state.

Coinbase, through its role as an intermediary for partner KalshiEX, LLC (Kalshi), attempts to artfully recast the placement, purchase, and sale of sports wagers on its platform as "event contracts," claiming federal preemption prohibits Michigan from regulating Coinbase/Kalshi's bookie activities. But federal preemption does not apply to betting on questions like "Will the Lions win the Super Bowl?"

First, Coinbase's proposed sports betting does not fall within the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC") and bets on questions like "Will the Lions win the Super

1

Bowl?" are neither "swaps" nor "contracts of a sale of a commodity for future delivery" under the Commodity Exchange Act ("CEA").  7 U.S.C. § 1-27f.  Second, even if a bet on a question like "Will the Lions win the Super Bowl?" is a "swap" or commodity future, Coinbase/Kalshi's gaming devices are specifically prohibited by CFTC regulation from being listed on a Designated Contract Market ("DCM"). Since Kalshi's gaming devices are prohibited from such listing, they are outside the CFTC's exclusive jurisdiction, and Michigan may regulate them.

Notably, the Michigan Gaming Control Board ("MGCB") has not taken any action against Coinbase, or its partner Kalshi, currently. Instead, the recent sense of urgency for Coinbase/Kalshi is based on citing public documents that the MGCB created in April 2025.  (ECF No. 13, PageID.253.)  Even though Coinbase/Kalshi have been working on this "over the last year," the alleged "Hobson's choice" was not urgent enough to file anytime in the past year before the Thursday ahead of the Christmas holiday.  (ECF No. 13, PageID.276-277.)  Any hardships for Coinbase/Kalshi are purely speculative and of their own making.

Coinbase/Kalshi claims to be different than licensed sportsbooks for a number of irrelevant reasons.[1]  But the most important difference between a licensed sportsbook and Coinbase/Kalshi is that a licensed sportsbook is not allowed to masquerade as an investment opportunity in order to prey on unsuspecting citizens who are then exploited to "contribute to the depth and liquidity of the market and thereby facilitate hedging by others."  (ECF No. 12, PageID.248.)

The balance of hardships favors the protection of Michigan's citizens and businesses against being the prey of unlicensed sports betting.  As such, Coinbase's Motion should be denied.

---

[1] Those reasons are (1) Coinbase/Kalshi is allegedly better at setting odds than a normal licensed sportsbook and (2) that it does not act as the counterparty to bets.  (ECF No. 13, PageID.246-249).  Kalshi's subsidiary acts as the counterparty, but they creatively call this legal fiction a "market-maker" instead of the "house."  (ECF No. 13, PageID.249, fn 2.)

3

## STATEMENT OF FACTS

On April 29, 2025, Henry Williams, the Executive Director of the MGCB, sent an email to Caroline Pham, the Acting Chairperson of the CFTC.  (ECF No 1-4, PageID.74-81.)  Williams raised concerns regarding event contracts.

On October 3, 2025, Williams issued a memorandum (ECF No. 1-5, PageID.83-84.)  The subject line of the memorandum is "Involvement in Prediction Markets".  (ECF No. 1, PageID.83.)  Williams concluded the memorandum by stating "[a]ccordingly, the MGCB expects any licensee that is actively pursuing any involvement in the offering of sporting event contracts will provide prompt notice to the MGCB." (ECF No. 1, PageID.84.)

Coinbase filed its complaint on December 18, 2025.  (ECF No. 1, PageID.1-87.)  Coinbase named Dana Nessel, Jim Ananich, Joni Thrower-Davis, Andrew Palms, Deidre Lambert-Bounds, Mark Evenson, and Henry Williams as Defendants.  Coinbase sued the Defendants in their official capacities.  (ECF No.1, PageID.9-10, ¶¶ 16-23.)  According to the complaint "[b]eginning in January 2026, Coinbase will offer event-contract trading to customers throughout the United

4

States, including in Michigan.  (ECF No. 1, PageID.3, ¶ 3.)  Coinbase

seeks declaratory and injunctive relief under the Declaratory Relief Act

and the Federal Constitution.  28 U.S.C. §§ 1651, 2201, and 2202.  (ECF

No. 1, PageID.6-7, ¶ 10.)  Coinbase alleges that pursuant to the

Supremacy Clause, the CEA preempts state law as to event contracts.

U.S. Const. art. VI, cl. 2; 7 U.S.C. §§ 1, *et seq*. (ECF No 1, PageID.31-49,

¶¶ 62-93.)

### Coinbase/Kalshi's placement, purchase, and sale of sports wagers on its platform are sports betting.

Coinbase's convoluted facts can be summed down to the following.

Coinbase is a federally registered intermediary for its partner Kalshi, a

federally registered exchange.  Coinbase plans to offer the placement,

purchase, and sale of sports wagers from Kalshi's exchange on

Coinbase's platform/interface in January 2026.

Kalshi began listing its sports event contracts in other states in

January 2025.  Defendants' Counsel is aware of at least seven other

ongoing lawsuits initiated by Kalshi in federal court in the past year.

Kalshi currently has ongoing litigation in Nevada (*KalshiEX LLC v.*

*Hendrick, et al.*, Case No 2:25-cv-00575), New Jersey (*KalshiEX LLC v.*

*Flaherty*, et al., Case No1:25-cv-02152)  Maryland (*KalshiEX LLC v. Martin et al.*, Case No. 1:05-cv-01283), Ohio (*KalshiEX LLC v. Schuler, et al.*, Case No 2:25-cv-01165),  New York (*KalshiEX LLC v. Williams, et al.*, Case No. 1:25-cv-08846), Connecticut (*KalshiEX LLC v. Cafferelli, et al.*, Case No. 3:25-cv-02016), and Tennessee (*KalshiEX LLC v. Orgel, et al.*, Case No. 3:26-cv-00034).

Coinbase and Kalshi claim that Kalshi's sports betting is distinguishable because (1) Kalshi is allegedly better at setting the odds than a traditional sportsbook and (2) Kalshi is just a middleman for "peer-to-peer" trading with no stake in the wagers.  Michigan law does not distinguish between the skill level that sportsbooks may have at setting the odds in sports wagers.   See infra [pages describing LSBA definitions].  Michigan law also does not distinguish between what Coinbase/Kalshi refers to as "traditional sportsbooks" operating as the counterparty to every bettor and explicitly includes "exchange betting" such as that offered by Coinbase/Kalshi.  It is also logically consistent with how gambling has been regulated well before internet sports betting.  For example, poker does not magically fall outside of gambling

because the casino acts as a neutral third party and just takes a commission from each game.

Interestingly, Kalshi does act as a counterparty to bettors anyway. Kalshi's subsidiary, Kalshi Trading, LLC makes transactions on Kalshi's marketplace and functions as the counterparty to bettors through Kalshi's "market-maker program" and provides "liquidity." Kalshi's subsidiary provides "liquidity" by constantly buying and selling contracts on Kalshi's own market, profiting from the bid-ask spread while ensuring gamblers can always enter or exit positions, making the market functional.  Notably, Kalshi does not disclose how many wagers are made by its subsidiary trading arm.

Kalshi is not subject to the same accountability requirements and rules that Michigan's licensed sportsbooks must meet.  For example, in September 2025, Kalshi users were able to place bets that Chicago Bears running back Roschon Johnson would not score against the Minnesota Vikings after Johnson had been ruled inactive before kickoff. https://www.sportico.com/business/sports-betting/2025/kalshi-trading-exchange-peer-house-1234870465/.  (Last visited January 14, 2026). Confusingly, Kalshi's fine print allegedly reflected that the market

retroactively settles at whatever Kalshi retroactively determined the odds were at the moment the player was announced inactive, causing Kalshi users that took the bet and were correct to lose money. Notably, Kalshi also did not disclose whether its subsidiary was the counterparty to any of those bets.

Michigan's regulatory scheme protects participants from this type of predatory "heads I win, tails you lose" situation. If one of Michigan's licensed sportsbooks allowed this type of wager to be placed, they would be required to cancel and refund any wagers placed as required by Michigan's sports betting regulations. Mich. Admin. Code R. 432.745(9), (10).

Coinbase/Kalshi have been well aware of the conflict with state regulatory schemes. Kalshi has filed multiple lawsuits and has been a party to others.

### Michigan regulates sports betting to protect the public interest.

In 2018, the Supreme Court issued its ruling in *Murphy* overruling PASPA[2] and permitting states to legalize sports wagering

---

[2] The Professional and Amateur Sports Protection Act, 28 U.S.C. § 3702.

within their boundaries. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018). The Michigan Legislature authorized internet sports betting via the Lawful Sports Betting Act (LSBA),[3] to establish a secure, responsible, fair, and legal system of internet sports betting to protect Michigan residents and capture revenue in the form of taxes and payments. Mich. Comp. Laws § 432.402(d).

For January 2025 through November 2025, internet sports wagering delivered over $22 million in revenue to the State and over $7 million in revenue to the City of Detroit. https://www.michigan.gov/mgcb/detroit-casinos/resources/revenues-and-wagering-tax-information. (Last visited January 14, 2026). Internet sports betting conducted by tribes generates revenue for tribal governments. The revenue to the State is primarily allocated to the Compulsive Gambling Prevention Fund, the Michigan Strategic Fund,[4]

---

[3] 2019 P.A. 149, Mich. Comp. Laws § 432.401 *et seq.*

[4] The Michigan Strategic Fund promotes economic development and the creation of jobs in the State. Mich. Comp. Laws § 125.2002.

the First Responder Presumed Coverage Fund,[5] and the School Aid Fund.  Mich. Comp. Laws §§ 432.415a, 432.416.

Michigan's LSBA defines internet sports betting as "operating, conducting, or offering for play sports betting through the internet." Mich. Comp. Laws § 432.403(s).  An internet sports betting wager is defined as "the cash, or cash equivalent, including free play, loyalty points, and other redeemable sports betting credits, risked by an authorized participant on sports betting through the internet."  Mich. Comp. Laws § 432.403(w).  Finally, according to the statute, "[s]ports betting means to operate, conduct, or offer for play wagering conducted under this act on athletic events and other events approved by the board.  Sports betting includes, but is not limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in-game betting, proposition bets, and straight bets.  Sports betting does not include a fantasy contest."  Mich. Comp. Laws § 432.403(bb).  The LSBA states that "[i]nternet sports betting may be conducted only to

---

[5] The First Responder Presumed Coverage Fund provides workers' disability compensation benefits to certain first responders. Mich. Comp. Laws § 418.405(2).

the extent that it is conducted in accordance with this act." Mich.

Comp. Laws § 432.404(1).

Michigan's regulation of lawful sports wagering is comprehensive.

Under Michigan law, internet sports betting may only be offered by a

sports betting operator, which must be a licensed commercial casino or

a federally recognized tribe (operating independently or in partnership

with an internet sports betting platform provider).  Mich. Comp. Laws

§§ 432.404(7) and 432.406(1).  Each sports betting operator, any

suppliers it utilizes to conduct internet sports betting in Michigan, and

certain key persons and employees must be investigated and licensed by

the MGCB.  The licensing process is intended to ensure that sports

betting operators and suppliers are suitable in terms of character,

reputation, integrity, business probity, and financial ability, thereby

protecting Michigan citizens from potential bad actors and reducing

their risk of financial harm.  Mich. Comp. Laws §§ 432.406 and 432.408;

Mich. Admin. Code R. 432.723, R. 432.725a, and R. 432.725b.

Beyond licensing, the LSBA and the administrative rules

promulgated thereunder establish numerous requirements for the

conduct and regulation of internet sports betting that serve to protect

11

Michigan citizens and safeguard the integrity of sports betting and the

events on which wagers are accepted.  Some key examples include,

without limitation, the following:

- **Responsible Gaming**: The MGCB operates a statewide self-exclusion program, and each sports betting operator is required to offer various responsible gaming tools.  At a minimum, such tools must include temporary and permanent self-exclusion, self-imposed responsible gaming limits (e.g., periodic deposit and wagering limits), temporary account suspension, and links to responsible gaming information and resources.[6]

- **Patron Protection**: Sports betting operators must comply with numerous requirements meant to protect patrons from financial and other harms.  For example, an operator must segregate patron funds from operating funds, must maintain a reserve sufficient to ensure the security of all patron funds, and must timely honor a patron's valid withdrawal request.  In addition, each operator must receive and investigate patron complaints, and patrons are given the option of filing unresolved complaints with the MGCB.  Sports betting operators must also adhere to requirements designed to protect the confidentiality of patrons and their accounts, including requirements for passwords and strong authentication (or multi-factor authentication), privacy and information sharing, encryption, and system security.[7]

---

[6] Mich. Comp. Laws § 432.412; Mich. Admin. Code R. 432.752, R. 432.753, R. 432.754, R. 432.759, R. 432.772, and R. 432.774.

[7] Mich. Admin. Code R. 432.733, R. 432.735, R. 432.738, R. 432.739, R. 432.741, R. 432.744, R. 432.751b, R. 432.752, R. 432.753, R. 432.755d, R. 432.762, and R. 432.763(2); Identity Verification and Strong Authentication Memo. .  https://www.michigan.gov/mgcb/-/media/Project/Websites/mgcb/Internet-Gaming-and-Fantasy-

- **Age and Identity Verification**: A sports betting operator must verify an individual's age and identity before allowing the individual to create an account and place a wager.  The operator must ensure the individual is not under the age of 21, self-excluded, or otherwise prohibited from participating in internet sports betting in Michigan.  In addition, the operator must prevent certain individuals from wagering on events with which they are associated or for which they have access to nonpublic information (e.g., athletes and coaches are prohibited from wagering on any event overseen by the sports governing body with which they are affiliated).[8]

- **Integrity**: Each sports betting operator must partner with an independent integrity monitoring provider to review and identify suspicious wagering activity that may threaten the integrity of internet sports betting or events on which wagers are accepted.  In addition, sports betting operators must adopt procedures designed to prevent and detect fraud, cheating, theft, collusion, money laundering, identity theft,

---

Contests/Technical-Standards/20241104-Memo-Identity-Verification-and-Strong-Authentication.pdf?rev=8f620066a1b942d8a2714d13f2e4517b&hash=DA558ABADD655BF27784108C1FBDC68F.  (Last visited January 16, 2026).

[8] Mich. Comp. Laws §§ 432.411(1) and (4); Mich. Admin. Code R. 432.751a, R. 432.751b, R. 432.755, R. 432.763(2), R. 432.771, R. 432.772, R. 432.774, and R. 432.775; Identity Verification and Strong Authentication Memo.  https://www.michigan.gov/mgcb/-/media/Project/Websites/mgcb/Internet-Gaming-and-Fantasy-Contests/Technical-Standards/20241104-Memo-Identity-Verification-and-Strong-Authentication.pdf?rev=8f620066a1b942d8a2714d13f2e4517b&hash=DA558ABADD655BF27784108C1FBDC68F.  (Last visited January 16, 2026).

and other illegal activity.  Sports betting operators must also comply with applicable provisions of the Bank Secrety Act.[9]

- **Events and Wager Types**: All events and wager types must be reviewed and approved by the MGCB before they are offered for wagering by a sports betting operator.  The MGCB prohibits the acceptance of wagers on any events or the offering of any wager types that are illegal under state or federal law, inherently objectionable, or inconsistent with the public policy of Michigan (e.g., events played by individuals at the high school level or below).  All events must be subject to effective supervision and integrity safeguards, and a sports governing body may object to the acceptance of wagers on its events in the case of an integrity concern.[10]

When the Michigan Legislature authorized internet sports betting, it recognized the potential harm to the public and included these safeguards to protect all participants, especially those most vulnerable.

---

[9] Mich. Comp. Laws § 432.411(3); Mich. Admin. Code R. 432.742, R. 432.743, R. 432.759, R. 432.762, and R. 432.763(2).

[10] Mich. Comp. Laws §§ 432.410(3) and (4); Mich. Admin. Code R. 432.745; MGCB Sports Wagering Catalog. https://www.michigan.gov/mgcb/internet-gaming-and-fantasy-contests/forms/sports-wagering-catalog-submissions.  (Last visited January 16, 2026).

**Michigan takes no action against Coinbase and Coinbase seeks a preliminary injunction**

On December 18, 2025, Coinbase filed its motion for a preliminary injunction.  (ECF No. 13, PageID.229-281.)  Coinbase seeks declaratory and injunctive relief.  Specifically, Coinbase seeks an order preliminarily enjoining the Defendants from enforcing Michigan law which prohibits it from offering access to event contracts traded on federally registered exchanges.  (ECF No 13, PageID.279.)

## STANDARD OF REVIEW

Fed. R. Civ. P. 65 details the process for granting preliminary injunctions.  A preliminary injunction is an 'extraordinary' equitable remedy that is never awarded as of right.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citation omitted).  The party seeking a preliminary injunction bears the burden of justifying such relief. *Memphis A. Phillip Randolph Instit. v. Hargett*, 2 F.4th 548, 554 (6th Cir., 2021) (citing *American Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir, 2015)).

Specifically, the plaintiff must establish (1) that it has a strong likelihood of succeeding on the merits, (2) that it will suffer irreparable injury without an injunction, (3) that the issuance of an injunction will

15

not cause substantial harm to others, and (4) that the issuance of an injunction is in the public interest. *American Civil Liberties Union of Ky. v. McCreary County, Ky.,* 354 F.3d 438, 445 (6th Cir, 2003), see also *Starbucks*, 602 U.S. at 346, (citing *Winter v Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue. *Six Clinics Holding Corp, II v. Cafcomp Sys*, 119 F. 3d 393, 399 (6th Cir. 1997). Applying the facts of this case, the Court should deny Coinbase's motion because it cannot satisfy any of the four factors.

## ARGUMENT

### I.  Coinbase is unlikely to succeed on the merits because its proposed sports betting is not within the exclusive jurisdiction of the CFTC.

This Court should deny Coinbase's motion for a preliminary injunction because its proposed sports betting, creatively labeled "event contracts," are not swaps. Should this Court determine that event contracts are swaps it should deny Coinbase's motion because the CEA does not preempt Michigan law regarding sports betting.

16

### A.   Event contracts are not swaps within the ordinary meaning of the CEA, canons of statutory interpretation, or the CEA's legislative history.

Congress passed the CEA in 1936.  Initially, Congress passed the CEA to regulate "commodities that includes cotton, rice, mill feeds, butter, eggs, and Irish potatoes, as well as grains."  History of the CFTC:  U.S. Futures Trading and Regulation Congress Before Creation of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html. (Last visited January 12, 2026).  The CFTC subsequently amended the CEA in 1974 to create the CFTC and gave the CFTC exclusive jurisdiction over commodity futures. https://www.cftc.gov/About/HistoryoftheCFTC/history_1970s.html. (Last visited January 12, 2026).  The CFTC regulates derivatives.  "A derivative is a financial instrument or contract whose price is 'directly dependent upon (i.e.[,] derived from)' the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments."  *KalshiEX, LLC v. Commodity Futures Trading Comm'n*, Case No. 23-3257, 2024 U.S. Dist. LEXIS 163925, at *3 (D.D.C. Sept. 12, 2024).  According to the Supreme Court, the CEA's

17

exclusive jurisdiction provision was "intended only to consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982).  The purpose of the CEA was "to remedy the confusion about whether certain types of commodities transactions came within the definition of a security and thus subject to regulation under the securities laws." *R.J. Hereley & Son Co. v. Stolter & Co.*, 466 F. Supp. 345, 347 (N.D. Ill. 1979).

In 2010 Congress gave the CFTC the authority to regulate swaps. Congress amended "the Commodity Exchange Act to establish a comprehensive new regulatory framework for swaps and security-based swaps."

https://www.cftc.gov/About/HistoryoftheCFTC/history_2010s.html. (Last visited January 12, 2026).

Congress did not intend for investors' funds to be tied up in "gambling" contracts that "served no commercial purpose at all." 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (Sen. Feinstein). Coinbase presented no evidence in any legislative history that Congress

intended  swaps to replace the States' ability to regulate gaming.  The lack of any such evidence that Congress intended the CFTC to have jurisdiction over sports betting indicates the opposite.

Under the CEA, a swap is an agreement, contract or transaction that is "dependent on the occurrence, nonoccurrence, or the extent of the event or contingency associated  with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  The CFTC has the authority to determine whether certain event contracts can be prohibited because they are "contrary to the public interest" if they involve activity that is unlawful under Federal or state law, involve terrorism,  involve assassination, involve war, involve gaming or involve similar activity that the Commissions deems to be contrary to the public interest.  7 U.S.C. § 7a-2(c)(5)(C)(1).  Pursuant to 17 C.F.R. § 40.11(a)(1)-(2), "A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:" a swap "that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law…" or an activity that is contrary to the public interest.  Thus, gaming contracts are prohibited by 17 C.F.R. § 40.11(a)(1).  Because

19

gaming contracts are prohibited from being offered on a DCM they are not swaps.  Gaming contracts are clearly contrary to Michigan's gaming laws.  Accordingly, gaming contracts cannot fall within the CFTC's exclusive jurisdiction.

Although Judge Andrew Gordon of the District of Nevada initially granted a preliminary injunction in Kalshi's favor that concluded event contracts are swaps under the CEA, he later realized this error in a similar case that event contracts offered by Crypto.com are not swaps falling under the CFTC's jurisdiction.  *KalshiEX, LLC. v. Hendrick, et al.*, Case No. 2:25-cv-00575, 2025 U.S. Dist. LEXIS 67832 (D. Nev. April 9, 2025); *North American Derivatives Exchange, Inc., d/b/a Crypto.com v. Gaming Control Board*, Case No. 2:25-cv-00978, 2025 U.S. Dist. LEXIS 202104, *4-5 (D. Nev. October 14, 2025).  Judge Gordon then corrected the error in the KalshiEX case as well and dissolved the preliminary injunction that he issued against Nevada gaming authorities in *KalishiEx* because he found that event contracts based on the outcomes of sporting events are not swaps and do not fall within the CFTC's exclusive jurisdiction conferred by the CEA under 7 U.S.C. § 2(a).  *KalshiEX, LLC v. Hendrick*, 2:25-cv-00575, 2025 U.S. Dist.

LEXIS 234246, *11 (D. Nev. November 24, 2025).  As Judge Gordon

succinctly put it, event contracts "are sports wagers and everyone who

sees them knows it."  (*Id*. at *27).  Thus, according to Judge Gordon,

federal law did not preempt Nevada's gaming authorities from enforcing

state law.  The following day Judge Gordon denied a motion for a

temporary restraining order sought by Robinhood Derivatives based on

his reasoning in *North American Derivatives Exchange KalshiEX.*

*Robinhood Derivatives, LLC v. Dreitzer*, Case No. 2:25-cv-01541, 2025

U.S. Dist. LEXIS 231144, *9-10 (D. Nev. November 25, 2025).

Judge Gordon noted in *North American Derivatives Exchange, Inc.*

that the CEA does not define the terms "occurrence" or "event."  *North*

*American Derivatives Exchange, Inc., d/b/a Crypto.com v. Gaming*

*Control Board*,  at * 19. The outcome of a sporting event does not fall

within the meaning of the statute.  Event contracts do not involve the

sporting event per se.  Rather, event contracts are based on the outcome

of the event.  Thus, event contracts fall easily within the definition of a

sports wager.  Event contracts are simply a different name for a sports

wager.  Event contracts are not related to the economic impact of a

sporting event taking place.  Put simply, event contracts based on the

outcome of live events are not swaps that fall within the CFTC's exclusive jurisdiction in 7 U.S.C. § 2(a)(1)(A).  Thus, this Court should deny Coinbase's request for a preliminary injunction.

On August 1, 2025, Judge Adam Abelson of the District of Maryland denied Kalshi's (the Plaintiff) motion to issue a preliminary injunction against Maryland's state gaming authorities.  Judge Abelson assumed without deciding that event contracts are swaps under the CEA.  *KalshiEX LLC v. Martin*, Case No. 25-cv-1283, 2025 U.S. Dist. LEXIS 147815 (D. Md. August 1, 2025).  However, he concluded that Maryland's state gaming authorities were not preempted from regulating Kalshi's event contracts.  That case is currently pending before the Fourth Circuit.  *KalshiEX, LLC v. Martin*, No. 25-1892 (Fourth Cir.).  The Fouth Circuit has not yet issued a decision.

Finally, On April 28, 2025, Judge Edward Kiel of the District of New Jersey concluded that event contracts are swaps and granted a preliminary injunction against the State of New Jersey.  *KalshiEX, LLC v. Flaherty*, Case No. 25-CV-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893, *18 (D.N.J. Apr. 28, 2025).  The State of New Jersey appealed that decision.  Judge Kiel erred in finding that event contracts are

22

swaps because events contracts do not focus on the event itself but instead focus on the outcome of the event.  Event contracts are nothing more than a speculation on who will win a specific sporting event. Ultimately, the only people who benefit from the outcome of a sporting event are the participants.  Whether one side wins or loses does not change the economic, financial or commercial outcome except for the participants.  The Third Circuit heard oral arguments on September 10, 2025.  *KalshiEX, LLC v. Flaherty*, No. 25-1922 (Third Cir.).  The Third Circuit has not yet issued a decision.  The Defendants urge this Court to reject Judge Kiel's analysis.  The development of the case law in this arena is such that the stronger position is that event contracts are not swaps within the meaning of the CEA and do not fall under the CFTC's jurisdiction.

Additionally, a finding that event contracts regarding sporting events are swaps would, at a minimum, impliedly repeal two other federal regulatory statutes, the Wire Act and the Indian Gaming Regulatory Act ("IGRA").  18 U.S.C. § 1084 and 25 U.S.C. § 2701 *et seq.* The Supreme Court has held there is a strong presumption that repeal of  a statute by implication is disfavored.  *Epic. Sys. Corp. v. Lewis*, 584

U.S. 497, 510 (2018).  Rather, "Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute."  (*Id.*)

### 1.   Implied Repeal of the Wire Act

The Wire Act makes it a criminal offense for businesses to transmit "bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest: if such wagering is illegal under state law."  18 U.S.C. § 1084(a)-(b).  Coinbase's argument that event contracts are swaps necessarily involves the repeal of the Wire Act by implication and is not a plausible reading of the definition of a swap.  7 U.S.C. § 1a(47)(A)(ii).  Congress could easily have amended the Wire Act directly by exempting swaps.  Adopting Coinbase's position regarding the definition of swaps would entail a partial repeal of the Wire Act.

### 2.   Implied Repeal of IGRA

IGRA prohibits "Class III gaming" on Indian lands unless the relevant Tribe authorizes it, the State in which the Indian land is located "permits such gaming for any purpose by any person,

organization, or entity…", and is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4(c); 25 U.S.C. § 2710(d)(1). IGRA provides "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and ensures that the Indian tribe is protected from corrupting influences and is the "primary beneficiary of the gaming operation…" 25 U.S.C. § 2702(1)-(2). A finding that event contracts related to sports gaming would necessarily result in repealing parts IGRA.

"[I]t is a commonplace of statutory construction that the specific governs the general…." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). In this case, Congress did not intend to repeal the specific provisions of the Wire Act and IGRA with general language from the CEA, absent a clear intent to do so. Thus, this Court should reject Coinbase's position that event contracts are swaps under the CEA.

**B.**   **Congress did not preempt the State of Michigan from regulating sports betting because nothing in the CEA preempts the State of Michigan from regulating sports betting.**

Coinbase also maintains that Michigan is preempted from enforcing its gaming laws as to event contracts traded on CFTC exchange.  Specifically, Coinbase argues that Michigan is barred from enforcing its gaming laws based on the concepts of express preemption, field preemption, and conflict preemption.  (ECF No. 13, PageID.255-260.)  This Court should reject those arguments.  Even if this Court determines that event contracts are swaps covered by the CEA it should find that the CEA does not preempt Michigan's statutes that apply to sports wagers.

Pursuant to the Supremacy Clause, the Constitution and federal law "shall be the supreme Law of the Land…anything in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art VI, cl. 2.  Congress has the power to preempt state law. *Crosby v. Nat'l Foreign Trade* Council, 530 U.S. 363, 372 (2000).  Courts recognize three types of  federal preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption.  *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd., et al.*, Case No. 25-1235,

26

2025 U.S. App. LEXIS 32798, *9-10 (6th Cir. December 16, 2025).

Coinbase argues that all three types of preemption apply in this case. (ECF No. 13, PageID.255-260.)  This Court should reject Coinbase's arguments and find that the CEA does not preempt Michigan's ability to regulate sports betting.

There is a strong presumption against preemption.  Preemption cases begin with the premise "that the historic police powers of the States were not superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  See also *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  The Supreme Court has recognized that gambling regulations are part of the States' core, traditional police powers.  *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185 (1999).  This Court should deny Coinbase's motion for a preliminary injunction because it has not shown that it is likely to prevail on the merits because it has not overcome the presumption against preemption.

Preemption can be either express or implied.  Two kinds of implied preemption exist: field preemption and conflict preemption.

"Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

### 1.   Express Preemption

Express Preemption exists when Congress expresses preemptive intent through language rather than through a statute's structure and purpose. *Altira Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  Contrary to Coinbase's position, the CEA does not expressly preempt Michigan's gaming statutes.

The text of the CEA does grant the CFTC exclusive jurisdiction as to contracts of a sale commodity for future delivery and swaps.[11]  7 U.S.C. § 2(a)(1)(A).  However, the statute also provides that "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from

---

[11] Coinbase does not argue that event contracts are contracts of a sale commodity for future delivery.

carrying out their duties and responsibilities in accordance with such laws." *Id.* Thus, when a particular transaction falls outside of the CFTC's exclusive jurisdiction state laws can apply. The text of the statute does not express that Congress clearly intended to usurp the States' ability to regulate gambling. Furthermore, event contracts for sporting events are not swaps as defined by the CEA.

7 U.S.C. § 1a(47)(A)(ii). As noted above, event contracts regarding sporting events do not involve the sporting event itself. Rather, event contracts based on sporting events rely on the outcome of the event.

Even if event contracts based on sporting events qualify as swaps they are specifically prohibited from being offered on a DCM because they are contrary to 17 C.F.R. § 40.11(a)(1).

The Supreme Court has held that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In the absence of clear language from Congress, this Court should be hesitant to read federal preemption into an area traditionally part of the States' police powers. *CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993). If

Congress had intended to overturn gambling regulations nationwide and allow for nationwide gambling based on event contracts it would have done so explicitly.  Given the presumption against preemption, Coinbase's argument is without merit because Congress did not intend to enable nationwide gambling to come under the jurisdiction of the CFTC.  "[I]nterpretations of statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).  Congress would not have overturned the States' ability to regulate sports betting in such an obtuse manner. Therefore, Coinbase cannot show that Congress expressly preempted Michigan's ability to regulate sports betting.

### 2.    Field Preemption

Field preemption is one type of implied preemption.  According to the Supreme Court, States may not regulate "in a field that Congress, acting within its proper authority, has determined must be regulated by exclusive governance."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  Field preemption only applies in rare cases in which Congress legislated so comprehensively that it left no room for supplementary

30

state legislation.  *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).  Courts

must avoid "interpreting the scope of the preempted field too broadly."

*Sikkelee v. Precision Airmotive Corp.,* 822 F.3d 680, 689 (3rd Cir. 2016).

Here, Congress did not intend to occupy the field of regulating sports

betting.  The great weight of the evidence shows that the CEA is not

meant as a vehicle to legalize sports betting nationwide or to displace

the individual states' ability to regulate it.  Furthermore, the

presumption against preemption weighs in the Defendants' favor.

Under those circumstances, this Court should find that Coinbase is not

likely to succeed on the merits.

### 3.    Conflict Preemption

Finally, Coinbase argues that conflict preemption applies.  (ECF

No. 3-1, PageID.129.)  This Court should reject that argument.  Conflict

preemption applies when federal law directly conflicts with state law.

*PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011).  The Supreme Court

has held that conflict preemption exists when "compliance with both

federal and state regulations is a physical impossibility."  *Florida Lime*

*& Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963).  The

conflict occurs when compliance with both sets of laws is impossible or

31

when state law is an obstacle to accomplishing Congress's objectives. *Arizona v. United States*, 567 U.S. at 399. Generally, Congress tends to "respect the policy choices of the people of each state on the controversial issue of gambling." *Murphy v. NCAA*, 584 U.S. 453, 484 (2018). The CEA and Michigan's LSBA are not in conflict. Here, Coinbase has not shown that Michigan's laws conflict with the CEA. While Coinbase does not want to comply with Michigan gaming laws, it presented no evidence that it cannot comply with them. In the arena of sports betting, the CEA and Michigan's sports betting laws work together and complement one another. The CEA and the CFTC work to address derivatives and Michigan's sports betting laws work to protect the public from the ills associated with all forms of gambling. Coinbase has not shown that Congress intended the CEA to completely preclude Michigan from enforcing the LSBA. Regulating gambling, as noted above, is precisely the kind of core state function that falls within the purview of the states. This Court should not invalidate Michigan's sports betting laws with respect to event contracts absent clear direction from Congress. Here, there is no clear directive from

Congress.  Accordingly, Coinbase cannot establish a conflict between the CEA and Michigan's sports betting laws.

## II.   Coinbase's claimed injuries are purely speculative and any harm it may suffer is of its own making.

When evaluating whether a plaintiff will suffer an irreparable injury absent an injunction, this Court must also consider whether the plaintiff has unreasonably delayed seeking the requested injunctive relief.  *Baffert v. Churchill,* Case No. No. 3:22-cv-123, 2023 U.S. Dist. LEXIS 27306, *35 (W.D. Kentucky, February 17, 2023) (citing *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x. 398, 405 (6th Cir., 2013).  See also *Huron Mountain Club v. U.S. Army Corps of Engineers*, 545 F. App'x. 390, 398 (6th Cir. 2013).  "An unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm."  *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x. 398, 405 (6th Cir., 2013). "[N]umerous courts have recognized that any presumption of irreparable injury resulting from a court's finding that the plaintiff can show a substantial likelihood of success on the merits is rebutted by a delay of even a few months in seeking preliminary injunctive relief."

*Vita-Mix Corp. v. Tristar Prods.*, Case No. 1:07-cv-275, 2008 U.S. Dist. LEXIS 143319, *26-27 (N.D. Ohio September 30, 2008).

The documents that Coinbase relies upon as a predicate to this suit are a public letter sent to the CFTC by the MGCB's Executive Director on April 29, 2025, and a Memo issued to Michigan licensees on October 3, 2025.  (ECF No. 13, PageID.304-315.)  This is not a new issue.

Coinbase's partner, Kalshi, has been strategically playing whack-a-mole with different state gaming regulators in federal courts for the past year.  As noted above, Kalshi is involved in multiple lawsuits against state gaming regulators nationwide.

Coinbase, and its partner Kalshi, have been working on their partnership "over the last year," but delayed announcing it until December 17, 2025, before filing this lawsuit on December 18, 2025. (ECF No. 13, PageID.277.)

Coinbase waited until December 19, 2025, to serve the Defendants and then sought a preliminary injunction professing false urgency because it intended to offer unlicensed sports betting products to Michigan customers in January 2026.  Coinbase waited until the 11th

34

hour to file this action and then came to this Court seeking immediate relief.  This Court should deny injunctive relief because any potential harm it may suffer is of its own making.  This Court should not reward Coinbase for waiting until the 11th hour to file this lawsuit and then expect the Court to prohibit the State of Michigan from enforcing laws that do not conflict with the CEA.

Coinbase/Kalshi's alleged harm is just monetary with some window dressing.  No action has been taken against either Coinbase or Kalshi by Michigan.  The idea that Coinbase's reputation and goodwill, as Kalshi's intermediary, will be affected by any enforcement action by Michigan is unrealistic at best.  Kalshi has been suing and getting sued by different state regulators for the past year, adding another to the list would not make any significant difference to Kalshi's, and its intermediary, Coinbase's reputations.  Finally, Coinbase's alleged damages to its "business plan" and hypothetical "market share" are vague at best.

III. **The irreparable harm to Michigan and its citizens from being exploited by Coinbase/Kalshi's gambling enterprise masquerading as an investment opportunity outweighs Coinbase's speculative self-created harms.**

As to the third and fourth factors this Court reviews in whether to grant a preliminary injunction, the Sixth Circuit has held, "[t]he two remaining preliminary injunction factors—whether issuing the injunction would harm others and where the public interest lies—merge when the government is the defendant." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). The third and fourth factors are in the Defendants' favor.

Michigan's comprehensive regulatory scheme was designed to keep licensed sportsbooks accountable and to create safeguards for the people most vulnerable including children and individuals with gambling addictions. Coinbase/Kalshi's unlicensed gambling enterprise would eliminate these carefully constructed safeguards, which can cause irreparable harm to those vulnerable citizens.

The American Psychiatric Association (APA) recognizes gambling disorder as an addiction that can disrupt a person's everyday pursuits and relationships. *DSM-5-TR Diagnostic Criteria for Gambling Disorder*, (Mar. 10, 2024), https://www.gatewayfoundation.org/blog/dsm-

36

5-gambling/.  (Last accessed January 14, 2026).  Aside from the obvious financial implications, compulsive gambling can have profound and long-lasting consequences including: depression, anxiety, poor work performance or job loss, poor general health, and even suicide, suicide attempts, or suicidal thoughts.  *Compulsive Gambling*, Mayo Clinic, (June 18, 2022), https://www.mayoclinic.org/diseases-conditions/compulsive-gambling/symptoms-causes/syc-20355178.  (Last accessed January 14, 2026)  The likelihood of these harms is exacerbated by the lack of guardrails on Coinbase/Kalshi's unlicensed gambling enterprise and the lack of oversight from a regulatory gaming authority.

Coinbase/Kalshi's proposal expressly wants to use Michigan citizens to "contribute to the depth and liquidity of the market and thereby facilitate hedging by others."  (ECF No. 13, PageID.248).  "Facilitating hedging" in this case means making it easier for sophisticated investors or Kalshi's subsidiary to offset losses onto unsuspecting citizens who Coinbase/Kalshi markets their sports betting operation to as an investment opportunity.

Coinbase/Kalshi's proposed gambling operation will create an uneven playing field between state-licensed sportsbooks that pay state taxes and must abide by state regulations for patron protection, gaming integrity, age/identity verification, and most importantly, responsible gaming protections, including offering temporary and permanent self-exclusion, self-imposed responsible gaming limits (e.g., periodic deposit and wagering limits), and temporary account suspension.

Finally, any reduction in internet sports betting participation that results from Coinbase/Kalshi's offering of unlicensed sports betting to Michigan citizens will deprive state, local, and tribal governments of critical funds.

The potential harms to the public outweigh Coinbase's hypothetical and self-inflicted harms.   Thus, this Court should deny Coinbase's motion for a preliminary injunction.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the Defendants respectfully request this Court to deny the Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

/s/ John L. Thurber
Assistant Attorney General

38

Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI  48823
(517) 241-0210
ThurberJ@michigan.gov
(P44989)

Dated:  January 16, 2026

## CERTIFICATE OF SERVICE (E-FILE)

I hereby certify that on January 16, 2026, I electronically filed the

above document(s) with the Clerk of the Court using the ECF System,

which will provide electronic copies to counsel of record.

/s/John L. Thurber
Assistant Attorney General
Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI  48823
(517) 241-0210
tjhurberJ@michigan.gov
(P44989)

40