## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

COINBASE FINANCIAL
MARKETS, INC.,

      *Plaintiff,*

      v.

DANA NESSEL, et al.

      *Defendants.*

Civil Action No.: 4:25-cv-14092-SDK-KGA

Hon. Shalina D. Kumar

Magistrate Judge Kimberly G. Altman

## BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, OKALHOMA INDIAN GAMING ASSOCIATION, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 33 FEDERALLY RECOGNIZED INDIAN TRIBES AS AMICI CURIAE IN SUPPORT OF DEFENDANTS

The Indian Gaming Association ("IGA"), National Congress of American

Indians ("NCAI"), Arizona Indian Gaming Association ("AIGA"), California

Nations Indian Gaming Association ("CNIGA"), Washington Indian Gaming

Association ("WIGA"), Oklahoma Indian Gaming Association ("OIGA"), San

Manuel Gaming and Hospitality Authority ("SMGHA"), and 33 federally

recognized Indian Tribes ("Amici Tribes")[1] (collectively, "Tribal Amici")

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Grand Traverse Band of Ottawa and Chippewa Indians; Hannahville Indian Community; Jamestown S'Klallam Tribe;

respectfully submit this brief in support of Defendants' response to Coinbase

Financial Markets, Inc.'s ("Coinbase") motion for preliminary injunction.

---

Keweenaw Bay Indian Community; Kickapoo Traditional Tribe of Texas; Lac Vieux Desert Band of Lake Superior Chippewa Indians; Little River Band of Ottawa Indians; Little Traverse Bay Bands of Odawa Indians; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan (Gun Lake Tribe); Mescalero Apache Tribe; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Nottawaseppi Huron Band of the Potawatomi; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Saginaw Chippewa Indian Tribe; Salt River Pima-Maricopa Indian Community; Santa Ynez Band of Chumash Mission Indians; Sault Ste. Marie Tribe of Chippewa Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract); Spokane Tribe of the Spokane Reservation; Table Mountain Rancheria; Tunica-Biloxi Indian Tribe; and Yuhaaviatam of San Manuel Nation.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

CONCISE STATEMENT OF THE ISSUES ......................................... vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ vii

STATEMENT OF INTEREST................................................................1

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................4

I.      Congress Did Not Repeal IGRA or the Tribal-State Gaming Compacts
        Between the State of Michigan and Michigan Tribes. ...............................4

        A.    IGRA's Structure ...................................................................4

        B.    Michigan's Cooperative Sports-Betting Regulatory Structure..............5

        C.    Congress Did Not Repeal IGRA or Prohibit Tribes from Conducting
              Sports Wagering When It Amended the CEA in 2010..........................9

        D.   Coinbase's Theory Does Not Meet the Standard for Implied Repeals. ..13

              1.    Coinbase's sports-betting contracts are not "swaps."......................14

              2.    Congress did not manifest clear intent to repeal IGRA or to make the
                    CFTC the nation's sole gaming regulator. ..........................................15

              3.    The Indian Canons of Construction require this Court to resolve any
                    a    mbiguity in favor of tribes. ..............................................................17

II.     The Major Questions Doctrine Forecloses Coinbase's Theory. ..............18

CONCLUSION .....................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Beckert v. Our Lady of Angels Apartments, Inc.*,
    192 F.3d 601 (6th Cir. 1999) ...............................................................................16

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987)...................................................................................2, 24

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
    42 F.4th 1024 (9th Cir. 2022) ........................................................................2, 24

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018)...........................................................................................16

*FCC v. Consumers' Rsch.*,
    606 U.S. 656 (2025)...........................................................................................22

*FDA v. Brown & Williamson*,
    529 U.S. 120 (2000) .................................................................................. 25, 26

*KalshiEX LLC v. CFTC*,
    No. 24-5205 (D.C. Cir. Nov. 15, 2024)...........................................................19

*KalshiEX, LLC v. Hendrick*,
    No. 2:25-cv-575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025)  11, 12, 17, 18, 26

*Montana v. Blackfeet Tribe of Indians*,
    471 U.S. 759 (1985).........................................................................................20

*Morton v. Mancari*,
    417 U.S. 535 (1974).......................................................................... 16, 21, 25

*Murphy v. NCAA*,
    584 U.S. 453 (2018).........................................................................................24

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.* (*Crypto.com*),
    No. 2:25-CV-978, 2025 WL 2916151 (D. Nev. Oct. 14, 2025)................. 12, 17

*Robinhood Derivatives, LLC v. Dreitzer*,
    No. 2:25-cv-1541, 2025 WL 3283308 (D. Nev. Nov. 25, 2025) .......................17

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001) ............................................................................23

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
   951 F.3d 1142 (9th Cir. 2020) ...........................................................21

*United States v. Washington*,
   879 F.2d 1400 (6th Cir. 1989) ...........................................................24

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ..................................................................... 22, 23

**Statutes & Regulations**

17 C.F.R. § 40.11(a)(1) ...........................................................................16

18 U.S.C. § 1084 ....................................................................................18

18 U.S.C. § 1166(d) ...............................................................................12

18 U.S.C. § 1952 ....................................................................................18

18 U.S.C. § 1955 ....................................................................................18

25 C.F.R. § 502.3(c) ...............................................................................10

25 C.F.R. § 502.4(c) ....................................................................... 5, 9, 11

25 U.S.C. § (d)(7)(B)(vii) .........................................................................5

25 U.S.C. § 2701(5) ...................................................................... 2, 11, 12

25 U.S.C. § 2702 ......................................................................................5

25 U.S.C. § 2702(1) ..................................................................................2

25 U.S.C. § 2702(2) ..................................................................................6

25 U.S.C. § 2702(3) ................................................................................12

25 U.S.C. § 2710(b)(2)(B)(i) .....................................................................7

25 U.S.C. § 2710(b)(2)(B)(v) ....................................................................7

25 U.S.C. § 2710(d)(1) ...........................................................................5, 9

25 U.S.C. § 2710(d)(3) ..................................................................................12

25 U.S.C. § 2710(d)(5) ..................................................................................12

25 U.S.C. § 2710(d)(7) ..................................................................................12

25 US.C. § 2710(b)(2)(A) ................................................................................6

7 U.S.C. § 1a(47)(A)(ii) ................................................................................14

7 U.S.C. § 2(e) ..............................................................................................10

7 U.S.C. § 5(a)–(b) ................................................................................. 10, 21

7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii) ....................................................................16

MCL § 431.302(o) .........................................................................................10

MCL § 432.403(bb) .........................................................................................7

MCL § 432.403(e) ...........................................................................................9

MCL § 432.404(1) ...........................................................................................7

MCL § 432.406(1) ...........................................................................................7

MCL § 432.412 ...............................................................................................9

Mich. Admin. Code R. § 432.711(w)(iii) .......................................................9

Mich. Admin. Code R. § 432.743(4) ..............................................................9

**Other Authorities**

156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) ........................... 13, 15

CTFC Staff Letter No. 25-36 (Sep. 30, 2025) ..............................................17

Event Contracts, 89 Fed. Reg. 48968 (Jun. 10, 2024) ..................................17

*Gaming Compacts*, U.S. DOI, Bureau of Indian Affs. ...................................6

*Internet Sports Betting Revenue and Tax/Payments – 2025*, Mich. Gaming Control. Bd. (Dec. 15, 2025) ..............................................................................8

Jessica Welman, *Kalshi's lawyer goes hard at state-regulated gambling*, SBCAmericas (Jul. 11, 2025) ............................................................... 12

*Tribal Casino Revenue Sharing Payments*, Mich. Gaming Control Bd. (last visited Jan. 24, 2026) ......................................................................................... 8

*Tribal Gaming Report 2024*, Mich. Gaming Control Bd. at 3–5 (Apr. 11, 2025) .... 8

Will Gottsegen, *The Polymarket Bets on Maduro Are a Warning*, The Atlantic (Jan. 6, 2026) ..................................................................................... 9

## CONCISE STATEMENT OF THE ISSUES

1.  Whether Congress intended to impliedly repeal the Indian Gaming Regulatory Act or the Tribal-State Gaming Compacts between the State of Michigan and Michigan Tribes.

**Tribal Amici's Answer:  No**

2.  Whether the Major Questions Doctrine forecloses Coinbase's preemption theory.

**Tribal Amici's Answer:  Yes**

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

1.  The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*

2.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018).

3.  *Beckert v. Our Lady of Angels Apartments, Inc.*, 192 F.3d 601 (6th Cir. 1999).

## STATEMENT OF INTEREST

As described more fully in their brief in support of the motion for leave to file, IGA, NCAI, CNIGA, AIGA, WIGA, OIGA, SMGHA, and the Amici Tribes all have a shared, strong interest in this case because of its potential to have a significant impact on tribal sovereign rights regarding gaming on Indian lands. Tribal gaming revenue provides vital funding for essential government services, tribal programs, and economic development.

## INTRODUCTION

Coinbase is asking this Court to override the unique tribal-state regulatory structure of sports betting in Michigan, abandon the national policy of sports-betting regulation, and turn decades of federal law on its head. The Court should not be persuaded to do so.

America's history is replete with prospectors taking resources from Indian lands without permission from tribes. But Congress put a stop to that practice long ago. Yet Coinbase would have this Court believe that, without so much as a whisper of legislative intent, Congress permitted it to conduct unregulated nationwide sports betting, including on Indian lands. Congress did no such thing.

Tribes have primary jurisdiction over their lands and activities occurring thereon. Tribes, like states, also have a strong sovereign interest in determining what gaming activities may take place on their lands. As recognized by the

Supreme Court and Congress, this tribal jurisdiction extends to gaming.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216–22 (1987); 25 U.S.C. § 2701(5).  When Congress adopted the Indian Gaming Regulatory Act ("IGRA"), it sought to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  IGRA has been incredibly successful on that front.[2]  Since IGRA's passage in 1988, tribes across the United States have lifted entire generations out of poverty through tribal gaming.  Gaming revenue supports thousands of jobs in hundreds of communities and tribal government programs.  It also provides critical funding to state and local governments through revenue-sharing agreements, tax revenue, and economic stimulus.  For many tribal governments, gaming is not merely a "commercial" endeavor; rather, it is essential to their self-determination.  *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022) ("Class III gaming is not only a source of substantial revenue for tribes, but *the lifeblood on which many tribes have come to rely*." (emphasis added)).

---

[2] *See, e.g.*, National Indian Gaming Commission, FY 2023 Gross Gaming Revenue Report 4–5 (July 2024), available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

In Michigan, IGRA's framework has allowed the twelve federally recognized Indian tribes within Michigan[3] (collectively the "Michigan Tribes") and State of Michigan to forge a historic and unique regulatory relationship over sports betting throughout the state and to protect their sovereign interests.  In 2021, the Michigan Tribes became the first tribes in the United States to operate statewide online sports wagering.  This partnership also promotes the health, safety, and welfare of each sovereign's citizens through comprehensive gaming regulation and ensures that gaming revenue is used for the public's benefit.

In contrast, Coinbase, without any license or approval from the Michigan Tribes or the State, brazenly entered onto state and tribal lands to conduct unregulated gaming.  In doing so, Coinbase is siphoning away vital tribal and state governmental revenue directly into its owners' private pockets.

Coinbase now asks this Court to subvert the longstanding and comprehensive regulatory regime of IGRA.  Its reading of the Commodity

---

[3] These Tribes include: Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Hannahville Indian Community, Keweenaw Bay Indian Community, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Gun Lake Tribe), Nottawaseppi Huron Band of Potawatomi, Pokagon Band of Potawatomi Indians, Saginaw Chippewa Indian Tribe of Michigan, and Sault Ste. Marie Tribe of Chippewa Indians.

Exchange Act ("CEA") would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent; nullify existing tribal-state gaming compacts and regulatory frameworks; allow Coinbase and its partner Kalshi—not states or tribes—to regulate its sports-betting activity on Indian lands; permit Coinbase to siphon gaming revenues from tribal and state governments; and diminish tribal self-determination. In Michigan in particular, Coinbase's theory would completely undermine the Tribal-State Gaming Compacts ("Compacts") between the Michigan Tribes and State that carefully and thoroughly balance both tribal and state interests over the regulation of gaming throughout Michigan.

Accordingly, this Court should deny Coinbase's motion for preliminary injunction.

## ARGUMENT

### I. Congress Did Not Repeal IGRA or the Tribal-State Gaming Compacts Between the State of Michigan and Michigan Tribes.

#### A. IGRA's Structure

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribal government and is in a state that permits such gaming. 25 U.S.C. § 2710(d)(1). Class III gaming—including sports betting—is authorized on Indian lands only where tribes and states have entered into a compact or procedures prescribed by the Secretary of the Interior to regulate that gaming. *Id.* § 2710(d)(1), (d)(7)(B)(vii); *see* 25 C.F.R. § 502.4(c). This rule

4

has remained unchanged since 1988.  Under this regime, regulation of class III gaming on Indian lands is shared between three sovereign governments: tribes, states, and the federal government.

Congress carefully crafted this comprehensive statutory regime to advance clearly articulated policy goals to: (1) promote tribal economic development, self-sufficiency, and strong tribal governments; (2) provide a statutory basis for regulation that protects players and ensures tribes' ability to be the primary beneficiary of gaming on their lands; and (3) establish a federal regulatory agency to adopt federal standards and protect tribal gaming as a means of generating tribal revenue.  25 U.S.C. § 2702.  Congress made it abundantly clear that tribes—not private entities—must benefit from any gaming conducted on their Indian lands. *See id.* §§ 2702(2), 2710(b)(2)(A).

## B. Michigan's Cooperative Sports-Betting Regulatory Structure

Working within IGRA's comprehensive regulatory scheme, the Michigan Tribes and the State of Michigan have developed a model for gaming regulation that protects consumers, layers regulatory responsibility across tribal, state, and federal agencies, and provides significant revenues to tribal and state governments.

5

Seven of the Michigan Tribes[4] entered into Tribal-State gaming compacts in 1993.  Four of the Michigan Tribes[5] entered into Tribal-State gaming compacts in 1999.  And finally, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Gun Lake Tribe) entered into a Tribal-State Gaming compact in 2009.  The Secretary of the Interior reviewed and approved (either affirmatively or by law) these agreements.[6]

Michigan's Lawful Sports Betting Act of 2019 (the "Act") allows internet sports betting within the State to be conducted "only to the extent that it is conducted in accordance with [the Lawful Sports Betting Act]."  MCL § 432.404(1).  The Act expressly defines "sports betting" to include exactly the type of betting that Coinbase offers.  *See* MCL § 432.403(bb).  Under the Act, a sports betting operator license may only be issued to either: "A person who holds a

---

[4] Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Hannahville Indian Community, Keweenaw Bay Indian Community, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Saginaw Chippewa Indian Tribe, and Sault Ste. Marie Tribe of Chippewa Indians.

[5] Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, Nottawaseppi Huron Band of Potawatomi Indians, and Pokagon Band of Potawatomi Indians.

[6] *See Gaming Compacts*, U.S. DOI, Bureau of Indian Affs., https://www.bia.gov/as-ia/oig/gaming-compacts?field_us_state_s__value=MI&field_bogs_federally_recognized_target_id=All&field_approve_or_not_approved_value=All.

casino license under the Michigan Gaming Control and Revenue Act," or "An Indian tribe that lawfully conducts class III gaming in a casino located in [Michigan] under a facility license" issued in accordance with IGRA.  *Id.* at § 432.406(1).  Currently, all 12 Michigan Tribes are licensed to offer sports betting under the Act.  This regulatory framework means that federal, tribal, and state regulations apply to every aspect of online sports wagering in Michigan, and ensures that there are no jurisdictional gaps.

Consistent with IGRA, the Michigan Tribes use their gaming revenue, including sports betting revenue, for the public benefit, including to "help fund operations of local government agencies" and "tribal government operations [and] programs."  *See* 25 U.S.C. §§ 2710(b)(2)(B)(i), (v).  The Michigan Tribes also help fund the State government through net win payments, and local governments through two percent revenue sharing payments.[7]  They have also contributed tens of millions of dollars to the State through sports betting tax payments paid by

---

[7] *See Tribal Gaming Report 2024*, Mich. Gaming Control Bd. at 3–5 (Apr. 11, 2025), https://www.michigan.gov/mgcb/-/media/Project/Websites/mgcb/Annual-Reports/2024/2024-Tribal-Gaming-Annual-Report---Final-Draft.pdf?rev=b82b6ff60f19467eaba531c6533a6f37&hash=A8553A316C0B830450EA643F3AA84AB0.

Tribal Operators.[8]  As of November 2025, the Michigan Tribes have contributed more than $1 billion in gaming revenue to the State through the Michigan Strategic Fund or the Michigan Development Corporation, and more than $680 million in gaming revenue to local governments within the State.[9]

Additionally, the regulatory relationship between the Michigan Tribes and State ensures the protection of consumers.  For example, this system prohibits anyone under the age of 21 from placing sports bets and includes stringent problem-gambling measures to protect the public more broadly.  *See*, *e.g.*, MCL §§ 432.403(e), 432.412.  Further, Michigan's regulations prohibit the "[m]isuse of inside information" as a type of "[s]uspicious wagering activity."  Mich. Admin. Code R. §§ 432.711(w)(iii), 432.743(4).[10]

---

[8] *See Internet Sports Betting Revenue and Tax/Payments – 2025*, Mich. Gaming Control. Bd. (Dec. 15, 2025), https://www.michigan.gov/mgcb/-/media/Project/Websites/mgcb/Detroit-Casino-Revenue-Files/Internet-Sports-Betting---2025.xlsx?rev=f95184e0bc4e4455863d6a7a670d4d95&hash=C95F8DB1934A80F0DF7A517B70E4603D.

[9] *Tribal Casino Revenue Sharing Payments*, Mich. Gaming Control Bd. (last visited Jan. 24, 2026), https://www.michigan.gov/mgcb/tribal-casinos/tribal-casino-revenue-sharing-payments.

[10] Contrast this regulation with remarks made by Coinbase CEO Brian Armstrong at the end of last year *encouraging* insider trading: "If your goal is actually for the 99 percent of people trying to get signal about what's going to happen in the world—like, 'Is the Suez Canal going to be reopened?' or whatever—you actually want insider trading."  Will Gottsegen, *The Polymarket Bets on Maduro Are a*

Coinbase's sports-betting activities fall squarely within IGRA's scope when they occur on Indian lands.  *See* 25 C.F.R. § 502.4(c) (classifying sports betting as class III gaming).  However, as described above, IGRA prohibits Coinbase from offering class III gaming activities—including sports betting—on the Michigan Tribes' Indian lands unless, among other things, its gaming activities are conducted in conformance with a tribal-state compact.  25 U.S.C. § 2710(d)(1).

### C.    Congress Did Not Repeal IGRA or Prohibit Tribes from Conducting Sports Wagering When It Amended the CEA in 2010.

Coinbase does not assert that its conduct complies with IGRA.  In fact, Coinbase has made no attempt to ensure that its sports-betting activities on Indian lands comply with IGRA.  Instead, Coinbase argues that Congress's definition of a single term ("swaps") within a statute whose entire purpose is to address the risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), effectively repealed core provisions of IGRA.  Under this theory, Congress silently stripped away tribes' and states' longstanding authority over sports betting[11] (and

--------------------

*Warning*, The Atlantic (Jan. 6, 2026), https://www.theatlantic.com/technology/2026/01/venezuela-maduro-polymarket-prediction-markets/685526/.

[11] Coinbase also suggests that its sports-event contracts are not sports betting because there is no betting against the "house." Compl. at 42–43, *Coinbase Fin. Mkts., Inc. v. Nessel, et al.*, No. 4:25-cv-14092 (E.D. Mich. Dec. 18, 2025), ECF No. 1.  Not so.  A "house" is not a necessary element of gaming.  For example, pari-mutuel wagering—a type of betting system where all bets or wagers are

potentially other kinds of class III gaming) while allowing for-profit companies like Coinbase to run internet casinos pursuant to their own private regulations.

What's more, if sports-betting contracts are "swaps" subject to the exclusive jurisdiction of the CFTC, as Coinbase maintains, then all off-market sports betting—including sports betting conducted by the Michigan Tribes and other tribes under IGRA—is prohibited by the CEA.  *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 3286282, at *1 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-7516 (9th Cir.).  With one inapplicable exception, the CEA prohibits off-market swaps.  *See* 7 U.S.C. § 2(e).  Consequently, if all sports-betting contracts are swaps, "then all sports betting must be done on a [Designated Contract Market (DCM)]."  *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.* (*Crypto.com*), No. 2:25-CV-978, 2025 WL 2916151, at *9 (D. Nev. Oct. 14, 2025), *appeal filed*, No. 25-7187 (9th Cir.).

Coinbase's argument thus does double violence.  On one hand, Coinbase's preemption argument sweeps aside Congress's recognition that "Indian tribes have

---

pooled and players bet against each other rather than a "house"—is considered gaming.  *See* MCL § 431.302(o) (defining "pari-mutuel wagering" to mean "the form or system of gambling in which the winner or winners divide the total amount of money bet, after deducting the net commission").  Another example is provided in the IGRA regulations, which define class II gaming to include, among other things, nonbanking card games that are necessarily played without a house.  25 C.F.R. § 502.3(c).

the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C.
§ 2701(5). On the other hand, it prohibits tribes from offering sports betting that
IGRA plainly authorizes. *See* 25 C.F.R. § 502.4(c).

Moreover, the reach of Coinbase's broad definition of "swaps" could extend
beyond sports betting to encompass other forms of gaming because it has "no
limiting principle." *See Hendrick*, 2025 WL 3286282, at *6; *Crypto.com*, 2025
WL 2916151, at *9. Coinbase's definition of "an event or contingency associated
with a potential financial, economic, or commercial consequence" is so broad that
it necessarily includes betting on other casino games or class III gaming. This
implication means that virtually all gaming activity across the country would be
illegal unless offered on a DCM, and, by the same token, DCMs could offer all
forms of internet gaming pursuant to their private regulation. The irony of this
result is that the gaming conducted pursuant to tribal-state gaming compacts or
state law provides significantly more consumer protection than the unregulated
sports betting offered by Coinbase, which allows users as young as 18 years old to
engage in practically limitless betting with very few, if any, guardrails. In fact, as

noted, Coinbase's own CEO Brian Armstrong has actually *encouraged* insider trading on its platform and across the prediction market.[12]

Further, if the CEA governs Coinbase's sports-betting contracts (and potentially other forms of gaming) on Indian lands, then Congress must have intended to repeal other key provisions of IGRA that expressly grant regulatory authority over this activity to tribes, states, the National Indian Gaming Commission ("NIGC"), the Department of the Interior, and the Department of Justice. *See* 25 U.S.C. §§ 2701(5), 2702(3), 2710(d)(3),(5),(7); 18 U.S.C. § 1166(d). Congress also must have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereign authority to conduct and regulate gaming activity on Indian lands. *See* 25 U.S.C. § 2701(5). No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA.

---

[12] *See* n.10, *supra*. This lack of responsible gaming measures and consumer protections, which are required by legal gaming operations, is dangerous and contrary to the public interest. Josh Sterling (a former CFTC employee and an attorney representing Coinbase's partner, Kalshi) recently dismissed such responsible gaming concerns, stating: "People are adults, and they're allowed to spend their money however they want it, and if they lose their shirt, that's on them." Jessica Welman, *Kalshi's lawyer goes hard at state-regulated gambling*, SBCAmericas (Jul. 11, 2025), https://sbcamericas.com/2025/07/11/kalshi-nclgs-sports-contract-debate/?amp.

This Court should therefore reject Coinbase's boundless interpretation of a "swap" and give effect to both statutes by excluding sports-betting contracts, such as Coinbase's, from the CEA's definition of "swap."  Such an interpretation, in any case, is more faithful to the CEA's statutory language and legislative intent.  *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statement of Sen. Lincoln) ("It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.  These types of contracts would not serve any real commercial purpose.  Rather, they would be used solely for gambling.").

### D.  Coinbase's Theory Does Not Meet the Standard for Implied Repeals.

Coinbase's preemption argument must be rejected because it would manufacture an implied repeal of IGRA where none exists.  Coinbase cannot meet the heavy burden of proving Congress intended to repeal IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend to Coinbase's sports bets.

Courts apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018); *see Beckert v. Our Lady of Angels Apartments,*

13

*Inc.*, 192 F.3d 601, 606 (6th Cir. 1999).  Congress's intent to repeal must be "clear and manifest." *Epic Sys.*, 584 U.S. at 510.  "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* at 515; *see also Morton v. Mancari*, 417 U.S. 535, 550 (1974).  Here, IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting, consistent with longstanding CFTC regulations.

> 1.   *Coinbase's sports-betting contracts are not "swaps."*

The CEA defines "swap" as "any agreement, contract, or transaction . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  Coinbase's sports-betting contracts simply do not fall under this definition and Congress therefore could not have intended to repeal IGRA.

First, Coinbase's sports-event contracts are not dependent on the *occurrence*, *nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs—but rather on the *outcome* of the sports event (or parts thereof)—i.e., which team wins or who scores a touchdown.  The Nevada District Court recently held that sports bets are not swaps for precisely this reason. *Crypto.com*, 2025 WL 2916151, at *1, 6–9; *Hendrick*, 2025 WL 3286282, at *3;

*Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-1541, 2025 WL 3283308, at *1 (D. Nev. Nov. 25, 2025).

Second, there is no "financial, commercial, or economic consequence" associated with Coinbase's sports-betting contracts. Aside from whether the purchaser of a sports-betting contract wins or loses their bet, Coinbase's sports-betting contracts have no direct financial consequences for the purchaser. To constitute a swap, the underlying event itself "must be inherently associated with a potential financial consequence." *Hendrick*, 2025 WL 3286282, at *7. "[E]xternalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Id.* Coinbase's sports-betting contracts do not satisfy this requirement and therefore do not qualify as swaps.

> 2.    *Congress did not manifest clear intent to repeal IGRA or to make the CFTC the nation's sole gaming regulator.*

Congress did not repeal IGRA and grant the CFTC the exclusive authority to regulate nationwide sports betting. In fact, Congress expressed the opposite intent and went out of its way to prevent event contracts from being used as a means to conduct gaming. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (colloquy between Sens. Feinstein and Lincoln). To that end, Congress enacted the "Special Rule" authorizing the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest" and to *disallow* any "gaming"

activity on DCMs at all.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii).  The CFTC acted

consistently with Congress's intent by promulgating its blanket prohibition of

event contracts involving gaming.  17 C.F.R. § 40.11(a)(1).

Coinbase's partner, Kalshi, even acknowledged this fact in a brief filed with

the D.C. Circuit (mere weeks before launching its nationwide sports betting app).

*See* Appellee Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15,

2024), Doc. No. 2085055 ("An event contract thus involves 'gaming' if it is

contingent on a game or game-related event.  The classic example is a contract on

the outcome of a sporting event; as the legislative history directly confirms,

*Congress did not want sports betting to be conducted on derivatives markets*."

(emphasis added, citation omitted)).  That the CEA and IGRA overlap here is due

only to Coinbase's backdoor attempt to evade comprehensive gaming regulations.

Furthermore, only Coinbase (a private company with a direct financial

interest in its sports-betting activity), not Congress or the CFTC, claims that the

CEA's definition of "swap" displaces tribal, state, and federal regulation of sports

betting.  The text and legislative history of the 2010 CEA amendments, as well as

subsequent CFTC actions, confirm that the CFTC was not established to regulate

sports betting, let alone assume the role of the nation's sole sports-betting

regulator.  *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (Jun. 10, 2024)

("The [CFTC] notes that in the United States, gambling is overseen by state

regulators . . . . The [CFTC] is not a gaming regulator . . . and the [it] does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for [it] to exercise its jurisdiction or expend its resources in this manner.").

The CFTC's own actions confirm that it has not asserted authority to regulate sports betting.  In a recent advisory letter, the CFTC clarified it has not "taken any official action to approve the listing for trading of sports-related event contracts on any DCM."  CTFC Staff Letter No. 25-36 at 2 n.4 (Sep. 30, 2025).

> ### 3. *The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to repeal IGRA when it amended the CEA in 2010 (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.").  Federal courts have consistently applied these canons for over a half-century to ensure that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance tribal interests, without a clear statement from Congress.  *See, e.g.*, *Mancari*, 417 U.S. at 550–51; *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1159–60 (9th Cir. 2020).

17

This Court should therefore reject Coinbase's preemption argument requiring an implied repeal of IGRA.

## II.   The Major Questions Doctrine Forecloses Coinbase's Theory.

In 2010, the Professional and Amateur Sports Protection Act ("PASPA") prohibited sports betting nationwide.  Coinbase's position thus posits that the CEA not only to eradicated state and federal gaming laws by preemption or implied repeal, but also reversed the federal policy that prohibited sports betting at the time —turning it instead into a nationwide authorization of such betting under the sole jurisdiction of the CFTC.[13]  Whether Congress did so is a major question.[14]

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in "extraordinary

_____

[13] Coinbase's sports-betting contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 U.S.C. § 1955, and the Travel Act, 18 U.S.C. § 1952.  If Congress authorized sports betting via the CEA in 2010, then it also effectively limited the scope of these federal laws, in addition to PASPA.

[14] In addition to the Major Questions Doctrine, this Court could further find that the Doctrine of Constitutional Avoidance forecloses Coinbase's arguments. Specifically, Coinbase's reliance on Kalshi's self-certifications of its sports-betting contracts violates the private nondelegation doctrine because it is based upon an understanding of the CEA that empowers Kalshi—a private, for-profit entity—to oversee an entire sports betting enterprise while simultaneously failing to provide any meaningful mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC can implement its discretion.  *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 693, 697 (2025).

18

cases" where the agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  Considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization." *Id.* at 723.  Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.*

In effect, Coinbase contends that the 2010 CEA amendments displaced state and tribal gaming regulations, legalized sports betting nationwide, and placed sports betting (and other forms of gaming) under the exclusive regulatory jurisdiction of the CFTC, all at a time when PASPA broadly prohibited sports betting.  This theory is unquestionably a "radical" and "fundamental" overhaul of both PASPA and IGRA, and certainly raises concerns of "economic and political significance."  This Court therefore has "reason to hesitate" and should require "clear congressional authorization" before considering Coinbase's preemption argument.  *See id.* at 721, 723.

First, Congress must be clear when it "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001).  Here, the authority to regulate gaming, including sports betting, has been understood to fall

within traditional state power.  *See Murphy v. NCAA*, 584 U.S. 453, 474, 481–85

(2018); *accord United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989)

("The enactment of gambling laws is clearly a proper exercise of the state's police

power in an effort to promote the public welfare.").  As the Supreme Court noted

in *Murphy*, Congress has long structured federal criminal law to "respect the policy

choices of the people of each State on the controversial issue of gambling."  584

U.S. at 484; *Chicken Ranch*, 42 F.4th at 1031 (explaining that IGRA strikes "a

delicate balance" between tribal and state sovereignty over gaming).  And even

when Congress chose to prohibit sports betting nationally with PASPA, it did so

*through* state regulation, rather than by directly regulating private actors.  *See

Murphy*, 584 U.S. at 484–85.

Similarly, courts have long recognized tribes' inherent sovereign authority to

regulate gaming on their lands.  *See Cabazon*, 480 U.S. at 207–14.  And later-

enacted statutes of general applicability—like the CEA—cannot repeal earlier-

enacted legislation that is specifically designed to advance the United States'

special relationship with tribes—such as IGRA—without a clear statement from

Congress.  *See, e.g., Mancari*, 417 U.S. at 550–51.  Accordingly, Coinbase must

show clear congressional language overturning federal policy.  But it cannot

because no such language exists.

Second, sports betting has a "unique place in American history and society," and therefore its own "political history." *See FDA v. Brown & Williamson*, 529 U.S. 120, 159–60 (2000). Given this history, at the time of the 2010 CEA amendments, Congress had already "for better or for worse, . . . created a distinct regulatory scheme" for sports betting—namely, PASPA. *Id.* The conflict between Coinbase's argument that the CEA's 2010 amendments authorized sports betting nationwide and the existence of PASPA's nationwide sports-betting prohibition in 2010 therefore indicates that Congress could not have intended to regulate sports betting in the way that Coinbase now claims. "Given this history and the breadth of the authority that [Coinbase] has asserted [the CFTC has]," this Court should not defer to Coinbase's "expansive construction" of the CEA. *See id.* at 160.

Ignoring history, context, and common sense, Coinbase presents an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), exclusively governs nationwide sports betting, including that occurring on Indian lands. Coinbase therefore creates a world where Congress repealed the comprehensive regulatory scheme set forth in IGRA and the federal policy requiring states to prohibit sports betting, as codified in PASPA. And Coinbase incredibly argues all of this happened without even a whisper of legislative intent.

Coinbase's revisionist history cannot withstand even the slightest scrutiny. As the Nevada District Court aptly stated: "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick*, 2025 WL 3286282, at *9 (footnote omitted).

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny Coinbase's requests for injunctive and declaratory relief.

Dated: January 29, 2026                    Respectfully submitted,

/s/ Bruce T. Wallace
Bruce T. Wallace (P24148)                  Joseph H. Webster (DC 448458)
Hooper Hathaway Price                      Elizabeth A. Bower (DC 90031924)
Beuche & Wallace                           Jens W. Camp (DC 90033528)
126 South Main Street                      Hobbs, Straus, Dean & Walker LLP
Ann Arbor, MI 48104                        1899 L Street NW, Suite 1200
(734) 662-4426                             Washington, DC 20036
bwallace@hooperhathaway.com                (202) 822-8282
                                           jwebster@hobbsstraus.com
*Counsel for Tribal Amici*                 ebower@hobbsstraus.com
                                           jcamp@hobbsstraus.com

                                           *Counsel for Tribal Amici*

Bryan Newland (P70992)
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
(202) 349-4265
Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian Community,*
*Mohegan Tribe of Indians of Connecticut,*
*Rincon Band of Luiseño Indians, and Santa*
*Ynez Band of Chumash Mission Indians*

Scott Crowell (WA 18868)
(admission pending)
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Counsel for Nottawaseppi Huron Band of*
*Potawatomi, Rincon Band of Luiseño*
*Indians, Santa Ynez Band of Chumash*
*Mission Indians, and Spokane Tribe of the*
*Spokane Reservation*

Michael Hoenig (DC 497369)
(admission pending)
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
(909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San*
*Manuel Nation and San Manuel*
*Gaming and Hospitality Authority*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2026, a copy of the foregoing was filed with the Clerk of the United States District Court for the Eastern District of Michigan via the Court's CM/ECF's electronic filing system, which will provide notice and service on all counsel of record for the parties.

Respectfully submitted,

DATED:  January 29, 2026

/s/ Bruce T. Wallace
Bruce T. Wallace (P24148)