## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

COINBASE FINANCIAL MARKETS, INC.,

        *Plaintiff,*

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board,

        *Defendants.*

Case No. 2:25-cv-14092

Hon. Shalina D. Kumar

**ELECTRONICALLY FILED**

## REPLY BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

Preliminary Statement ........................................................................................... 1

Argument ................................................................................................................. 2

I.      Coinbase Is Likely To Succeed On The Merits. ...................................... 2

        A.      The Event Contracts At Issue Are Swaps Subject To The CFTC's
                Jurisdiction ...................................................................................... 2

        B.      The CEA Preempts Michigan's Gambling Laws. ........................ 7

                1.      The presumption against preemption does not apply .... 7

                2.      Michigan's gambling laws are expressly and impliedly
                        preempted as applied to Coinbase. .................................. 8

        C.      Defendants' claim that sports event contracts and sportsbook
                wagers are indistinguishable under Michigan law is irrelevant. ............... 11

II.     Coinbase Faces Irreparable Harm Absent Relief. ................................. 12

III.    The Public Interest Favors Injunctive Relief. ........................................ 14

Conclusion ............................................................................................................. 15

# **TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Am. Ag. Movement, Inc.* v. *Bd. of Trade of Chi.*,
 977 F.2d 1147 (7th Cir. 1992) ...................................................................................... 10

*Churchill Downs Tech. Initiatives Co.* v. *Mich. Gaming Control Bd.*,
 162 F.4th 631 (6th Cir. 2025) ................................................................................... 8, 14

*Cothran* v. *Ellis*,
 16 N.E. 646 (Ill. 1888).................................................................................................... 9

*Crosby* v. *Nat'l Foreign Trade Council*,
 530 U.S. 363 (2000) ...................................................................................................... 11

*Erlenbaugh* v. *United States*,
 409 U.S. 239 (1972) ........................................................................................................ 7

*Interstate Brands, Corp. Butternut Bread Div.* v. *Chauffeurs, Teamsters,
 Warehousemen & Helpers Loc. Union No. 135*,
 909 F.2d 885 (6th Cir. 1990) ......................................................................................... 3

*Kentucky* v. *Biden*,
 57 F.4th 545 (6th Cir. 2023) ........................................................................................ 13

*Morales* v. *Trans World Airlines, Inc.*,
 504 U.S. 374 (1992) ...................................................................................................... 13

*Puerto Rico* v. *Franklin Cal. Tax-free Tr.*,
 579 U.S. 115 (2016) ........................................................................................................ 8

*Rice* v. *Bd. of Trade of Chi.*,
 331 U.S. 247 (1947) ........................................................................................................ 9

*Susan B. Anthony List* v. *Driehaus*,
 573 U.S. 149 (2014) ...................................................................................................... 13

*United States* v. *Bass*,
 404 U.S. 336 (1971) ........................................................................................................ 8

*United States* v. *Locke*,
  529 U.S. 89 (2000) ........................................................................... 7

*W. Flagler Assocs., Ltd.* v. *Haaland*,
  71 F.4th 1059 (D.C. Cir. 2023)....................................................... 7

*Welch* v. *Brown*,
  551 F. App'x 804 (6th Cir. 2014) ................................................. 13

**Constitutional Provisions, Statutes, and Regulations**

U.S. Const. art. VI, cl. 2 ................................................................ 11

7 U.S.C. § 1a(19)(iv) ......................................................................... 4

7 U.S.C. § 1a(47)(A)(ii) .................................................................... 3

7 U.S.C. § 2(a)(1)(A) ......................................................................... 8

7 U.S.C. § 7a-2(c)(5)(C)(i) ............................................................... 6

15 U.S.C. § 8302(d)(1) ..................................................................... 11

31 U.S.C. § 5362(1)(E)(ii) ................................................................. 7

17 C.F.R. 40.11 ................................................................................. 5

Concept Release on Event Contracts,
  73 Fed. Reg. 25669 (May 8, 2008) ................................................ 4

Event Contracts,
  89 Fed. Reg. at 48968 (June 10, 2024)......................................... 3

Further Definition of "Swap,"
  77 Fed. Reg. 48208 (Aug. 13, 2012) ............................................ 11

Provisions Common to Registered Entities,
  76 Fed. Reg. 44776 (July 27, 2011) .............................................. 5

Mich. Comp. Laws § 750.301.......................................................... 12

**Other Authorities**

156 Cong. Rec. S5869 (daily ed. July 15, 2010)............................. 3, 4

*Contingency*, Black's Law Dictionary (9th ed. 2009) ............................................................. 3

*CFTC Withdraws Event Contracts Rule Proposal and Staff Sports Event Contracts Advisory*, CFTC (Feb. 4, 2026) ........................................................................... 5

*Event*, Webster's II New College Dictionary (3d ed. 2005) ................................................ 3

Jeff Edelstein, *Michigan Online Casino Operators Take In Record $315.8 Million in December*, Yahoo! Fin. (Jan. 21, 2026). .......................................................... 10

Michael Selig, CFTC Chair, Remarks at Joint SEC-CFTC Event (Jan. 29, 2026) ........................................................................................................................................ 2

## PRELIMINARY STATEMENT

Congress granted the CFTC "exclusive jurisdiction" over derivatives traded on federally registered exchanges, including swaps—displacing state law seeking to regulate those same derivatives.  The event contracts at issue here fall squarely within the Commodity Exchange Act's definition of "swap."  There is no textual basis to excise event contracts relating to sports (or most any other subject) from that definition. Attempts to apply state law to those same contracts are thus preempted.

The State disputes remarkably little of that straightforward analysis.  Defendants do not contest that a grant of exclusive jurisdiction to a federal agency to apply federal law ordinarily preempts state law.  They do not deny that Congress entrusted oversight of derivatives markets to the CFTC and deliberately adopted a broad definition of "swap" in delineating the CFTC's jurisdiction.  And they do not dispute that the "swap" definition generally draws no distinctions based on subject matter—*i.e.*, whether an event contract relates to soybean futures, the weather, gold prices, or a sporting event.

The State instead limits its opposition to a grab-bag of arguments for why sports-related event contracts specifically fall outside the CEA's expansive definition of swap. Each argument fails on the merits—and none could possibly justify a categorical carve-out for all sports-related event contracts.  Beyond that, Defendants offer results-oriented arguments against preemption, premised largely on moral and practical intuitions equating such contracts to gambling and skepticism about the CFTC's ability to regulate them. These I-know-gambling-when-I-see-it arguments are not new; States

have long sought to brand various futures contracts as unlawful gambling. But it is Congress, not the States' intuitions, that defines the CFTC's jurisdiction—as CFTC Chairman Selig reaffirmed just last week, Congress granted the CFTC "exclusive jurisdiction over commodity derivatives," and event contracts, for that reason, have "operated within the CFTC's regulatory perimeter for more than two decades." Remarks at Joint SEC-CFTC Event (Jan. 29, 2026), https://tinyurl.com/ydv9r8wf. Indeed, the CFTC has expressed its intent to participate as an amicus in support of companies like Coinbase in the litigation surrounding sports event contracts.[1]

The CFTC has protected consumers and ensured integrity in the multi-trillion-dollar derivatives markets for decades, and has ample authority, tools, and expertise to continue doing so with prediction markets. Michigan's characterization of these robustly supervised exchanges as unregulated blinks reality; these markets are extensively regulated—at the *federal* level. Injunctive relief is warranted.

**ARGUMENT**

I.    **COINBASE IS LIKELY TO SUCCEED ON THE MERITS.**

   A.    **The Event Contracts At Issue Are Swaps Subject To The CFTC's Jurisdiction.**

Defendants try five different tacks in attempting to excise sports-related event contracts from the CEA's "swap" definition. Each fails.

---

[1] Unopposed Motion of CFTC for Leave to File an Out-of-Time Amicus Curiae Brief, *N. Am. Derivatives Exch., Inc.* v. *Nevada*, No. 25-7187 (9th Cir. Feb. 5, 2026).

*First*, Defendants argue (at 20-22, 29) that sports event contracts turn on an event's "outcome" rather than its "occurrence."  This artificial outcome-occurrence distinction rests on semantics; event contracts, including sports event contracts, can be phrased to turn on *either* the occurrence or the outcome of an event, without a change in substance.  CFM Br. 26-27.  And the ordinary meaning of "event" includes "outcome," such that contracts based on the "outcome" of an event are also based on an "event," as the Sixth Circuit has acknowledged.[2]  The CFTC has thus explained that event contracts are "based on the *outcome* of an underlying occurrence or event."  Event Contracts, 89 Fed. Reg. 48968, 48969 (emphasis added).  Nothing about Defendants' outcome-occurrence distinction, moreover, is limited to sports; on Defendants' view, commonplace event contracts involving a range of topics—such as public health (outcome of a clinical trial), technology (outcome of a patent application), and politics (outcome of an election)—would fall outside the swap definition.  This Court should decline Defendants' invitation to "'game the system' by labeling" classic event contracts as event-"outcome" contracts beyond the CEA's reach.  156 Cong. Rec. S5923 (daily ed. July 15, 2010) (statement of Sen. Lincoln).[3]

---

[2] *See Interstate Brands, Corp. Butternut Bread Div.* v. *Chauffeurs, Teamsters, Warehousemen & Helpers Loc. Union No. 135*, 909 F.2d 885, 891 n.5 (6th Cir. 1990) (observing that the "outcome of criminal proceedings" qualifies as an "event"); *Event*, Webster's II New College Dictionary (3d ed. 2005) ("[t]he actual outcome or final result").

[3] Sports event contracts also qualify as "swaps" because they depend on the occurrence of a "contingency," 7 U.S.C. § 1a(47)(A)(ii)—*e.g.*, the "possibility" that a particular team will win a game, *Contingency*, Black's Law Dictionary (9th ed. 2009).

*Second*, Defendants contend (at 23) that sports event contracts cannot be "swaps" because sports events are not associated with potential financial consequences: "Whether one side wins or loses" a sports event, Defendants say, does not change the "commercial outcome except for the participants." That unsubstantiated claim is out of touch with the reality of modern sports. Sports have become an important industry with *significant*—well beyond "potential"—economic consequences for sponsors, hotels, restaurants, merchandisers, and others. CFM Br. 7-8, 27-28. Defendants not only fail to dispute these examples but also fail to offer any contrary evidence.[4]

*Third*, relying on the legislative history of the Dodd-Frank Act, Defendants allege (at 18-19) that Congress did not intend for the "swap" definition to include "gambling" contracts that "serve[] no commercial purpose," 156 Cong. Rec. S5906-7 (daily ed. July 15, 2010) (statements of Sens. Lincoln & Feinstein). But even if the Court accepts Defendants' doubly flawed premise that sports event contracts involve gambling and lack any commercial purpose, the legislative history directly *refutes* the State's position here. After all, Senator Feinstein's very next sentence—which Defendants conveniently omit—applauds the 2010 CEA amendments for "restoring . . . authority" over these contracts "*to the CFTC.*" 156 Cong. Rec. S5906. Thus, to the extent these congressional statements shed light on the CEA's meaning, they show only that members of Congress

---

[4] Even if sports event contracts were not "swaps," they would still fall within the CFTC's exclusive jurisdiction because they qualify as options, futures, and even transactions in excluded commodities. Concept Release on Event Contracts, 73 Fed. Reg. 25669, 25669-70 (May 8, 2008); 7 U.S.C. § 1a(19)(iv).

deliberately chose to situate event contracts within the CFTC's regulatory ambit rather than leave them to state regulation. Indeed, it is the *State* that has failed to provide any textual, historical, or precedential evidence to support its gerrymandered theory that the CEA's broad "swap" definition encompasses events associated with potential economic consequences—unless those events involve sports.

*Fourth*, Defendants seem to contend (at 19-20) that because sports event contracts involve "gaming"—which are allegedly barred by CFTC Rule 40.11(a)—they cannot qualify as "swaps." Defendants' puzzling logic is both wrong and self-defeating. To begin, the State reads subsection (a) of Rule 40.11 in a vacuum. Subsection (c) of the same Rule—which Defendants conveniently omit—makes clear that if an event contract involves a category enumerated in subsection (a), the CFTC "*may*" (1) determine that such contract "be subject to a 90-day review" and (2) then issue an order "approving or disapproving" the contract depending on whether it is contrary to the public interest. 17 C.F.R. 40.11(c) (emphasis added); *see* Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011). This case-specific review process refutes Defendants' notion of a blanket ban. In fact, rather than prohibit sports event contracts pursuant to its Rule 40.11 authority, the CFTC has recently *withdrawn* guidance and a rule proposal that might have discouraged DCMs from offering access to such contracts.[5] The State cannot countermand the CFTC's determination.

---

[5] *CFTC Withdraws Event Contracts Rule Proposal and Staff Sports Event Contracts Advisory*, CFTC (Feb. 4, 2026), https://tinyurl.com/2s3as6js.

Equally fundamentally, Defendants cannot tenably maintain both (i) that sports event contracts involve "gaming" and are thus categorically prohibited under the CEA's Special Rule and Rule 40.11, and (ii) that Congress did not intend for the CEA's "swap" definition to include sports event contracts. After all, the Special Rule explicitly contemplates that "gaming" event contracts are swaps within the CFTC's jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Indeed, if gaming event contracts were not swaps within the CFTC's remit, then, by definition, the Commission would have no authority to review or prohibit them. Defendants' concession (at 19) that the CFTC may prohibit gaming event contracts—which, in their view, encompasses sports event contracts—is thus fatal. If such sports event contracts involve "gaming" (as Defendants assert), and if gaming event contracts are swaps subject to the CFTC's jurisdiction to *prohibit* (as Defendants concede), then sports event contracts necessarily fall within the CFTC's jurisdiction to *permit*. And per the express terms of the CEA, that jurisdiction is *exclusive*.

*Finally*, Defendants claim (at 23-25) that defining sports event contracts as swaps would impliedly repeal several federal laws relating to gambling. Not so. To start, as already explained, sports event contracts are derivative instruments and thus fall within the CFTC's exclusive jurisdiction; and once these contracts are properly categorized, the CEA sits comfortably alongside federal gambling statutes. Each of these statutory arguments fail for other reasons too. First, neither the Wire Act nor IGRA defines a covered "bet" or "wager." But the later-enacted Unlawful Internet Gaming Enforcement Act ("UIGEA") provides that those same terms "do[] not include . . . any

transaction conducted on or subject to the rules of a [DCM] under the [CEA]."  31 U.S.C. § 5362(1)(E)(ii).  UIGEA is "entitled to great weight in resolving any ambiguities" about how to interpret similar terms in "earlier act[s]."  *Erlenbaugh* v. *United States*, 409 U.S. 239, 244 (1972).  And even if UIGEA did not exist, Defendants' arguments would still fail because the CEA's Special Rule post-dated both the Wire Act and IGRA and explicitly contemplates event contracts related to gaming (which is, ultimately, how Defendants conceive of sports-related event contracts).  Moreover, the Wire Act includes a "safe harbor provision for bets placed to and from states" where that activity "is lawful."  *W. Flagler Assocs., Ltd.* v. *Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023).  Given that the CEA preempts all contrary state laws as to the event contracts at issue here, these contracts are legal in every State.

### B.     The CEA Preempts Michigan's Gambling Laws.

#### 1.     The presumption against preemption does not apply.

Defendants urge this Court (at 27) to begin with the presumption that the CEA does not preempt state gambling laws because "gambling regulations are part of the States' core, traditional police powers."  But the presumption against preemption— which would anyways be rebutted—would not apply even under Defendants' flawed premise that sports event contracts are tantamount to sports wagers.  The presumption applies only to fields that the States have traditionally and exclusively occupied, not areas with "a history of significant federal presence."  *United States* v. *Locke*, 529 U.S. 89, 108 (2000).  After all, the presumption is premised on the notion that Congress must

act clearly before "effect[ing] a significant change" in the federal-state relationship. *United States* v. *Bass*, 404 U.S. 336, 349 (1971).  But that concern is not present if federal law *already* shaped the landscape, as it has here:  Until 2018, federal law prohibited States from authorizing sports gambling.  *See Churchill Downs Tech. Initiatives Co.* v. *Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025) ("[T]he regulation of interstate gambling isn't a traditional area of state regulation." (cleaned up)).  Regardless, when, as here, a statute includes express-preemption language, courts must disregard "any presumption against pre-emption" and instead "focus on the [Act's] plain wording." *Puerto Rico* v. *Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016).

### 2.    Michigan's gambling laws are expressly and impliedly preempted as applied to Coinbase.

The CEA's text, structure, and history conclusively establish that state gambling laws are preempted as applied to sports event contracts traded on DCMs.  CFM Br. 16-20, 28-36.  The best Defendants can muster in response is a scattershot of results-oriented arguments—comprising just five pages of its 40-page brief—to explain why the CEA's undisputed preemptive effect does not cover state gambling laws.  All fail.

a. Rather than provide a competing interpretation of the CEA's exclusive-jurisdiction provision, Defendants start by noting (at 28) that the Act preserves state law governing transactions that "fall[] *outside* of the CFTC's exclusive jurisdiction." Coinbase agrees.  Congress carefully crafted the CEA to preserve state law over transactions that do not qualify as "swaps . . . traded or executed on a [DCM]."  7 U.S.C.

§ 2(a)(1)(A).  But the obvious corollary is that for swaps traded on DCMs—*i.e.*, derivatives *within* the CFTC's exclusive jurisdiction—state law is preempted.  *Rice* v. *Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947) (when a statute "use[s] such care" to preserve only "specific state authority," it is a "fair inference" that Congress intended to preempt regulatory fields "not saved to the States").  That conclusion should end this case.

Perhaps recognizing the weakness of their frontline position, Defendants fall back on the presumption against preemption, arguing (at 29-30) that if Congress intended to preempt state laws regulating event contracts, "it would have done so explicitly."  But even if the presumption applied (it does not), Defendants simply have no answer for why Congress's grant of "exclusive jurisdiction" to the CFTC is not "explicit" enough to rebut this presumption, especially given the mountain of—entirely unchallenged—dictionary definitions, statutory history, and case law establishing the provision's preemptive force.  CFM Br. 17-20.  Nor are Defendants' attempts to brand event contracts as "nationwide gambling" any more persuasive, considering that the CEA was enacted in the face of States characterizing futures contracts as "gambling in grain."  *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888).  If accepted, Defendants' position would resurrect the patchwork of state regulations that compelled Congress to enact the CEA in the first place; just this week, Nevada brought a lawsuit premised on nearly identical arguments to prohibit Coinbase from hosting *any* event contract in the State.

b. Defendants' field-preemption analysis fares no better.  In a single paragraph, Defendants assert (at 30-31) that Congress did not intend to occupy "the field of

regulating sports betting."  True, but irrelevant.  The CEA's text, structure, and history illustrate Congress's aim to create a comprehensive regulatory regime that occupies the field of derivatives, including event contracts, traded on DCMs.  CFM Br. 29-32.  Any state law—regardless of how it is styled—that seeks to regulate those exchanges is preempted.  Defendants thus slay a strawman by claiming (at 31) that the "great weight of the evidence"—none of which the State cites—shows that Congress did not intend to displace the States' power to regulate sports betting.  Again, Defendants may continue enforcing their gambling laws against state sportsbooks and casinos, which are fabulously profitable[6]; they simply may not invoke those laws to regulate derivatives trading on DCMs—whether those trades involve soybean futures, sports event contracts, or any other derivative that falls within the CFTC's exclusive jurisdiction.

c. Finally, Defendants contend (at 32) that Michigan's gambling statutes are not conflict preempted because the objectives of the CEA and the State's laws "complement one another":  The former "works to address derivatives"—whatever that means—whereas the latter protects the public "from the ills associated with all forms of gambling."  But in amending the CEA in 1974, Congress's overriding goal was to "bring the [derivatives] markets under a uniform set of regulations" and prevent States from "step[ping] in to regulate the futures markets themselves"—regardless of whether any particular State viewed futures contracts as gambling.  *Am. Ag. Movement,*

---

[6] *See* Jeff Edelstein, *Michigan Online Casino Operators Take In Record $315.8 Million in December*, Yahoo! Fin. (Jan. 21, 2026), https://tinyurl.com/2vctmzc2.

*Inc.* v. *Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see* CFM Br. 32-33. Subjecting DCMs and FCMs to a patchwork of state licensing regimes cannot be squared with this objective. And contrary to Defendants' claim (at 32-33) that a "clear directive from Congress" is required to displace state law in the face of this blatant conflict—which is just one of several that Coinbase identified, *see* CFM Br. 33-36— conflict preemption "does not depend on express congressional recognition that federal and state law" clash. *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000).

### C. Defendants' claim that sports event contracts and sportsbook wagers are indistinguishable under Michigan law is irrelevant.

Defendants also argue (at 6-8) that Michigan gambling laws cover both sportsbook bets and sports event contracts. But whether the Michigan legislature enacted gambling laws that distinguish between state-regulated sportsbooks and transactions on federally regulated exchanges is immaterial. The operative question is whether *federal* law—which is "supreme," U.S. Const. art. VI, cl. 2.—differentiates between the two. As Coinbase previously explained, the answer to that question is yes: Congress granted the CFTC exclusive jurisdiction over the latter, CFM Br. 24-26, and the CFTC has exercised its statutory authority to define the term "swap" in a manner that preserves the States' role in regulating other transactions. 15 U.S.C. § 8302(d)(1) (authorizing CFTC and SEC to define what counts as a "swap"); Further Definition of "Swap," 77 Fed. Reg. 48208, 48247 (Aug. 13, 2012) (CFTC considers whether transactions take place "on an organized market" in determining whether they are

swaps).  Under these principles, Michigan laws that purport to regulate transactions that take place on federally regulated exchanges are preempted.  That Michigan would prefer a different regulatory regime to govern swaps traded on DCMs cannot supplant Congress's decision to place these derivatives within the CFTC's exclusive jurisdiction.

Otherwise, Michigan could wield its sweeping gambling laws—which penalize those who accept money pursuant to an agreement that payment will be "contingent" on "the happening of any event not known by the parties to be certain," Mich. Comp. Laws § 750.301—to prohibit event contracts tied to any subject, including credit defaults, the weather, inflation, or other uncertain events.  Far from hypothetical, States like Nevada have already sought to bar Coinbase from hosting *any* event contract.

## II.  COINBASE FACES IRREPARABLE HARM ABSENT RELIEF.

Defendants raise three objections to Coinbase's asserted irreparable injuries. None is persuasive.

*First*, Defendants argue (at 33-35) that Coinbase unreasonably delayed in seeking a preliminary injunction because, although the company filed its motion almost immediately upon announcing its plans to host sports event contracts, the question of whether the CEA preempts Michigan gambling laws is "not a new issue."  But that is beside the point.  Coinbase's irreparable injury derives from the "prospect" of Michigan pursuing civil and criminal penalties against the company based on its preempted

gambling laws. *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992).[7]  This prospect of state enforcement developed into a "certain and immediate" injury, *Welch* v. *Brown*, 551 F. App'x 804, 813 (6th Cir. 2014), when Coinbase announced its partnership with Kalshi in December 2025—and was further cemented when the State refused to agree to hold off on enforcement action while this Court considers the merits of this preliminary-injunction motion absent a stipulation allowing Defendants to enforce Michigan's gambling laws against Coinbase with 48 hours' notice.[8]  That Coinbase did not rush to court in April to obtain an advisory opinion on the legality of Michigan's regulatory threats demonstrates not unreasonable delay but adherence to settled case law governing the availability of a preliminary injunction.  *See Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014).[9]

*Second*, Defendants characterize (at 35) Coinbase's irreparable harm as "just monetary."  But "monetary losses" qualify as an "irreparable" injury when "sovereign immunity" would render those expenses "unrecoverable."  *Kentucky* v. *Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  Defendants do not dispute that is true here.  *See* CFM Br. 37.

---

[7] Because the "prospect" of state enforcement activity "supplies the necessary irreparable injury," *Morales*, 504 U.S. at 382, Defendants' assertion (at 35) that no legal action has yet been taken against Coinbase is irrelevant.

[8] Order Governing Enforcement Actions, *Coinbase Financial Markets, Inc.* v. *Nessel*, No. 25-cv-14092 (E.D. Mich. Jan. 12, 2026), Dkt. No. 25.

[9] Sixth Circuit precedent similarly forecloses Defendants' backup argument (at 35) that Coinbase's harm is "of its own making" simply because the company did not acquiesce to Michigan's preempted gambling laws.  *See Biden*, 57 F.4th at 555-556.

*Third*, Defendants briefly claim (at 35) that because Kalshi is engaged in litigation with different state gambling regulators, Coinbase's fear of suffering reputational and goodwill harms from Michigan's enforcement threats is "unrealistic." That is a non-sequitur. Coinbase has a hard-earned reputation as an industry leader that complies with federal and state laws, *see* Sears Decl. ¶¶ 27-28, which Defendants threaten to tarnish by commencing an unconstitutional enforcement action, *see Churchill Downs*, 162 F.4th at 643 (finding that "Michigan's accusations of illegal gambling activity" caused irreparable harm to company's reputation and goodwill). And if Coinbase is forced to comply with Michigan's preempted state laws and void its sports event contracts, then the company risks squandering the current and prospective goodwill of its customers, who rely on Coinbase to provide a one-stop-shop for digital assets and other innovative financial products. *See* Sears Decl. ¶ 14. Neither of these irreparable injuries hinges on whether other States are considering enforcement actions against a different company.

## III.   THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF.

Defendants err as a matter of law in arguing that the State and public have an interest in enforcing preempted state laws. *Churchill Downs*, 162 F.4th at 643 ("[E]njoining the enforcement of a [preempted] law . . . is always in the public interest." (cleaned up)). Defendants' public-interest analysis (at 36-38) thus boils down to the policy argument that if state gambling laws are preempted as applied to sports event contracts traded on DCMs, the State's citizens will be left without legal protection. That is wrong. *Federal* law provides an exhaustive set of legal requirements that govern the

life cycle of an event contract as well as the DCMs and FCMs that facilitate those trades. CFM Br. 12-13, 30-32.  This comprehensive federal oversight—supplemented by the CEA's anti-manipulation and insider-trading prohibitions—is designed to protect customers who transact on derivatives exchanges.  And the CFTC has policed the multi-trillion-dollar derivatives market, including event contracts, for decades.  From nuclear safety to aviation, Congress and federal agencies are fully capable of regulating complex fields without state interference—and the same is true for exchange-traded derivatives.

## CONCLUSION

For the foregoing reasons, injunctive relief is warranted.

Dated: February 6, 2026

Respectfully submitted,

By: */s/ Thomas W. Cranmer*
Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
840 W. Long Lake Rd., Ste. 150
Troy, MI 48009
Tel:  (248) 879-2000
cranmer@millercanfield.com
allen@millercanfield.com

Jeffrey B. Wall
James M. McDonald
Rishabh Bhandari
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
Tel:  (202) 956-7500
wallj@sullcrom.com
mcdonaldj@sullcrom.com
bhandarir@sullcrom.com

Benjamin R. Walker
Yaira Dubin
Akash M. Toprani
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
walkerb@sullcrom.com
dubiny@sullcrom.com
toprania@sullcrom.com

*Counsel for Plaintiff*

-15-

## CERTIFICATE OF SERVICE

Thomas W. Cranmer of Miller, Canfield, Paddock and Stone, P.L.C. states that on February 6, 2026 he served a copy of the foregoing document using the ECF system which will send notification of such filing to all counsel of record.

/s/Thomas W. Cranmer
Thomas W. Cranmer (P25252)

45619103.1/164212.00001