# **EXHIBIT A**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

COINBASE FINANCIAL MARKETS, INC.,

                      *Plaintiff*,

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board,

                      *Defendants*.

Case No. 2:25-cv-14092

Hon. Shalina D. Kumar
Mag. Kimberly G. Altman

# PLAINTIFF'S [PROPOSED] RESPONSE
# TO DEFENDANTS' [PROPOSED] SUR-REPLY

## CONCISE STATEMENT OF ISSUE PRESENTED

1.      Should this Court ignore recent public statements made by the Chair of the CFTC announcing the CFTC's support for lawsuits like this one that seek to prevent encroachment on the CFTC's exclusive jurisdiction to regulate event contracts, including sports-related event contracts, an amicus brief filed by the CFTC in support of a prediction-market company's challenge to Nevada's enforcement of its gaming laws against federally regulated entities offering event contracts, and a report authored by Federal Reserve Board staff that underscores the public utility of nationwide prediction markets subject to uniform federal regulation?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

2.      7 U.S.C. § 1a(47)(A)(ii).

3.      7 U.S.C. § 2(a)(1)(A).

4.      15 U.S.C. § 8302(d)(1).

5.      *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369 (2024).

6.      *Burrage* v. *United States*, 571 U.S. 204 (2014).

In opposing Coinbase's motion for a preliminary injunction, Defendants argued that sports-related event contracts are not "swaps" regulated by the CFTC, and even if they are, the CFTC has prohibited market participants like Coinbase from offering such contracts. *See* Dkt. No. 27 at 2, 29.  But the CFTC and its Chair have since underscored that the event contracts at issue here *are* swaps subject to the CFTC's exclusive jurisdiction and *are* permissible under the CEA:  (i) as noted in Coinbase's reply brief (Dkt. No. 32 at 2), CFTC Chair Selig reaffirmed on January 29, 2026 that event contracts like those at issue in this case fall within "the CFTC's regulatory perimeter" and have "for more than two decades";  (ii) as Coinbase also noted in reply (at 5), the CFTC announced on February 4, 2026 that it would withdraw its guidance and a proposed rule that might have discouraged the offering of such contracts; (iii) on February 16, 2026 CFTC Chair Selig wrote an op-ed in *The Wall Street Journal* (attached hereto as Exhibit 1) announcing the CFTC's support for lawsuits like this one that seek to prevent encroachment on the CFTC's exclusive jurisdiction to regulate event contracts, including sports-related event contracts; and, (iv) just three days ago, the CFTC filed an amicus brief (attached hereto as Exhibit 2) in the U.S. Court of Appeals for the Ninth Circuit in support of a prediction-market company's challenge to Nevada's enforcement of its gaming laws against federally regulated entities offering event contracts.

Defendants' sur-reply attempts to undercut the significance of the CFTC's recent actions.  *See* Dkt. No. 33-1.  Defendants' arguments are meritless.

*First*, Defendants argue (at 1-2) that the CFTC has not specifically addressed whether *sports*-related event contracts are subject to its exclusive jurisdiction under the CEA.  But the CFTC's amicus brief establishes beyond doubt that the CFTC agrees with Coinbase that the Commission's exclusive jurisdiction encompasses sports-related event contracts, consistent with the absence of any textual basis in the CEA for distinguishing between sports-related and other event contracts.  *See* Ex. 2 at 15 ("[t]he final score of a sporting event" and "any other quantifiable result of a sports event" "falls easily within the broad language of the swap definition"); *id.* at 19 ("[b]ecause the statute does not demand certainty [as to economic consequences], sports event contracts fall comfortably" within the swap definition).

*Second*, Defendants argue (at 3) that "even if the CFTC" agrees with Coinbase that sports event contracts are swaps, the CFTC's views are entitled to little weight after the Supreme Court's decision in *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 412-13 (2024).  That is also incorrect.  As the Court recognized in *Loper Bright*, Congress may "'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Id.* at 394 (citation omitted); *see also Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty.,* 605 U.S. 168, 179-180 (2025).  That is precisely what Congress did in the CEA, which expressly delegates authority to the CFTC to "define the term[] 'swap.'"  15 U.S.C. § 8302(d)(1).  And the CFTC exercised this authority in 2012 by elaborating in great detail what types of financial products constitute a "swap."  *See* Dkt. No. 13 at 25-26 (discussing Further Definition of "Swap," 77 Fed. Reg. 48208, 48211-12 (Aug. 13,

2012)).  When a statute delegates such authority to an agency, a court must "recogniz[e]" the delegation, "fix[] the boundaries of [the] delegated authority," and "ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Loper Bright Enters.*, 603 U.S. at 396 (citations omitted).

*Third*, Defendants argue (at 4) that the CFTC Chair's comments (and now presumably the CFTC's amicus brief) should be given no weight because they supposedly represent an about-face in the CFTC's approach to event contracts.  Not so.  While the CFTC's views may have evolved over time about *how* to regulate event contracts, the CFTC has consistently maintained and exercised its exclusive authority to do so.  *See* Dkt. No. 13 at 5, 6 n.1.  Defendants highlight (at 4) the CFTC's now-withdrawn 2024 proposed rule that would have prohibited political and sports-related event contracts, but that proposed rule was itself an exercise of the CFTC's exclusive jurisdiction that Defendants deny.  Indeed, the proposed rule was explicitly premised on a CFTC determination that "event contracts are . . . derivative contract[s]" subject to its exclusive jurisdiction.  *See* 89 Fed. Reg. 48968, 48969 (June 10, 2024).  And even when the CFTC sued Kalshi during the prior administration to prohibit it from listing election-related event contracts, it did so based on its view that the "only legal avenue to trade . . . derivatives such as event contracts[] is on an exchange registered with the CFTC."  Brief of Appellant CFTC, *KalshiEx LLC* v. *U.S. Commodity Futures Trading Commission*, 2024 WL 4512583, at *6 (D.C. Cir. Oct. 16, 2024).  In short, Defendants' attempt to paint the CFTC's jurisdiction over event contracts as a late-breaking

-3-

development cannot be squared with over two decades of CFTC regulation across multiple administrations.  *See* Dkt. No. 13 at 5, 6 n.1.

*Finally*, Defendants criticize (at 2, 4) the CFTC's oversight under the CEA, describing the CFTC's approach as "hands-off" and calling into question the CFTC's capacity to effectively regulate event-contract markets.  To start, the reality is that derivatives exchanges—including those on which event contracts are traded—are in constant communication with the CFTC and subject to rigorous examinations and oversight, including to assess and enforce compliance with the CFTC's 23 "Core Principles."  *See* Dkt. No. 13 at 12 (collecting relevant CEA provisions and CFTC regulations).  The Commission has a staff of more than 700 employees and a budget of more than $350 million to handle this regulatory responsibility.[1]  Defendants' suggestion that the CFTC is asleep at the switch is baseless.

But more to the point, Defendants' argument is also completely irrelevant.  Courts do not selectively enforce the Supremacy Clause based on their own views of the wisdom of Congress's policy choices or the purported competence of federal agencies.  As the Supreme Court has commented, "these always-fascinating policy discussions are besides the point.  The role of [a court] is to apply the statute *as it is written*—even if [the court] think[s] some other approach might accord with good

---

[1] President's Fiscal Year 2026 Budget Request, Commodity Futures Trading Commission (May 2025), at 5, https://tinyurl.com/4r8cj2mp.

policy." *Burrage* v. *United States*, 571 U.S. 204, 218 (2014) (emphasis added) (quotations and alterations omitted). "And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation[.]" *Loper Bright Enters.*, 603 U.S. at 413.

And Defendants also misunderstand the important public function served by uniform federal regulation of prediction markets—illustrated by a recent report titled "Kalshi and the Rise of Macro Markets" authored by Federal Reserve Board ("FRB") staff and published on the FRB website on February 18, 2026 (attached hereto as Exhibit 3). The FRB report demonstrates the information-generating utility of Kalshi's "federally regulated" prediction markets "overseen by the CFTC." Ex. 3 at 1. As Coinbase has explained, uniform federal regulation of nationwide prediction markets is critical to ensure the trading volume and liquidity necessary for those markets to serve their predictive function and yield valuable data for public consumption. *See* Dkt. No. 13 at 35. And the FRB staff report confirms that Kalshi's nationwide prediction markets are currently serving their intended role quite well. The report notes that data derived from Kalshi's prediction markets are "comparable in forecasting accuracy to established benchmarks" and "provide unique insights—particularly for variables like GDP growth, core inflation, unemployment, and payrolls, for which no other market-based distributions currently exist." Ex. 3 at 34. The report thus concludes that "prediction markets can serve as a valuable complement to existing forecast tools in both research and policy settings." *Id.* The alternative 50-state patchwork that

Michigan advocates here would severely undermine, if not eviscerate, that important function of prediction markets by sapping them of liquidity and depth, which is precisely the result Congress sought to avoid in enacting the CEA and its amendments.

For the foregoing reasons and those set out in Coinbase's opening and reply briefs, Coinbase's motion for preliminary injunction should be granted.

Dated: February 20, 2026

Respectfully submitted,

By: /s/ *Thomas W. Cranmer*
Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
Miller Canfield PLC
840 W. Long Lake Rd., Ste. 150
Troy, MI 48009
Tel:  (248) 879-2000
cranmer@millercanfield.com
allen@millercanfield.com

Jeffrey B. Wall
James M. McDonald
Rishabh Bhandari
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
Tel:  (202) 956-7500
wallj@sullcrom.com
mcdonaldj@sullcrom.com
bhandarir@sullcrom.com

Benjamin R. Walker
Yaira Dubin
Akash M. Toprani
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
walkerb@sullcrom.com
dubiny@sullcrom.com
toprania@sullcrom.com

*Counsel for Plaintiff*

# Exhibit 1

# WSJ Opinion: Commentary: States Encroach on Prediction Markets - The Wall Street Journal

16 Feb 2026 15:08:29

By Michael S. Selig

Feb. 16, 2026 03:08 PM ET

The Commodity Futures Trading Commission for decades has overseen regulation of prediction markets-or event contracts, as we refer to them-that help market participants hedge risk, aggregate information and test hypotheses about future outcomes.

In recent years, states have waged legal attacks on the CFTC's authority to regulate these financial instruments. If they succeed, participants would be barred from access to federally regulated event-contract markets. So it should come as no surprise that the commission is filing a friend-of-the-court brief Tuesday supporting Crypto.com in the Ninth U.S. Circuit Court of Appeals.

Well-known CFTC-registered exchanges used by tens of millions of Americans-including Kalshi, Polymarket, (Coinbase) and Crypto.com-face an onslaught of state-driven litigation across the country, with nearly 50 active cases presenting a range of legal challenges. The most common allegation is that these contracts are a form of gambling and therefore subject to state laws. The CFTC will no longer sit idly by while overzealous state governments undermine the agency's exclusive jurisdiction over these markets by seeking to establish statewide prohibitions on these exciting products.

Event contracts serve legitimate economic functions. They allow businesses and individuals to hedge event-driven risks, enable investors to manage portfolio exposure, and provide the public with information about the outcome of future events. Farmers can manage risk related to temperature changes that may affect crops, and small-business owners can hedge against tax increases or energy-price spikes, to name two examples.

Markets that pay out based on the outcome of real-world events such as these emerged through academic and experimental platforms before moving into the commercial sector. In 1992 the CFTC issued its first official recognition of event contracts by granting relief to the Iowa Electronic Markets, a futures market at the University of Iowa in which traders can buy and sell contracts pegged to events such as presidential elections and corporate earnings. Years later, HedgeStreet, now known as Nadex, became the first marketplace to offer event-driven binary contracts that allowed retail traders to speculate on mortgage rates and gasoline prices.

Under the plain language of the Commodity Exchange Act, event contracts are "swaps." They are derivative instruments that allow two parties to speculate on future market conditions without owning the underlying asset. In the wake of the 2008 financial crisis, Congress expressly granted the CFTC comprehensive authority over any such contract based on a commodity. The statutory definition of "commodity" is extraordinarily broad and includes practically all goods, articles, services, rights and interests except for onions (due to a history of market manipulation) and movie box-office receipts (because of Hollywood lobbying).

The CEA's text is designed to account for financial innovation. Futures were novel at one point. So were swaps and exchange-traded funds. Even as derivatives markets have developed and grown, Congress has chosen to vest the CFTC with broad jurisdiction. That a derivative is novel or different is no excuse for a court to rewrite existing law. The CFTC has been overseeing the integrity of these markets the whole time, ensuring its rules remain durable and flexible in the face of rapid transformation.

The public also benefits from these markets. For anyone tracking prediction markets ahead of the 2024 presidential election, the scale of President Trump's victory was hardly unexpected. It's clear that Americans like the product and want to participate. Noting the exponential growth of transactions in the last two years, one recent industry report estimates the global number of users has quadrupled to 15 million.

Like all markets under the CFTC's exclusive jurisdiction, event-contracts markets are subject to rules and regulations that ensure fair outcomes for market participants. Trading exchanges are required to conduct market surveillance to safeguard against fraud and manipulation. Bank Secrecy Act rules also apply, meaning that CFTC-registered entities must collect customer information to enforce anti-money-laundering measures and prevent insider trading.

These exchanges aren't the Wild West, as some critics claim, but self-regulatory organizations that are examined and supervised by experienced CFTC staff.

America is home to the most liquid and vibrant financial markets in the world because our regulators take seriously their obligation to police fraud and institute appropriate investor safeguards. Any erosion of the CFTC's ability to regulate transactions in commodity derivatives is a direct threat to the markets and investors Congress intended the agency to oversee.

Mr. Selig is chairman of the U.S. Commodity Futures Trading Commission.

Journal Editorial Report: The week's best and worst from Kim Strassel, Bill McGurn, Allysia Finley and Dan Henninger.

This content is from The Wall Street Journal's Opinion section, which is published independently from the Dow Jones Newswires and the Journal's news sections.

(END)

Copyright (c) 2026 Dow Jones & Company, Inc.

nDJR6YZmgJ

Copyright © 2026 London Stock Exchange Group plc and its group of companies (LSEG) and/or its affiliates. All rights reserved. The LSEG content received through this service is the intellectual property of LSEG or its third party suppliers. Republication or redistribution of content provided by LSEG is expressly prohibited without the prior written consent of LSEG, except where permitted by the terms of the relevant LSEG service agreement. Neither LSEG nor its third party suppliers shall be liable for any errors, omissions or delays in content, or for any actions taken in reliance thereon. LSEG and its logo are trademarks of LSEG.

# Exhibit 2

No. 25-7187

# In The United States Court of Appeals for the Ninth Circuit

———————————————————

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D / B / A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*
v.
THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

———————————————————

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:25-cv-00978-APG-BNW

———————————————————

**AMICUS BRIEF OF COMMODITY FUTURES TRADING
COMMISSION, A FEDERAL GOVERNMENT AGENCY,
IN SUPPORT OF APPELLANT AND IN SUPPORT OF REVERSAL**

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127
*Counsel for Amicus Curiae*
*Commodity Futures Trading Commission*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................1

BACKGROUND ..................................................................................................3

I.  The Commodity Exchange Act Provides the Regulatory Framework
    for Commodity Derivatives Market in the United States. ................................3

II. The Development of Federal Regulation of U.S. Futures and
    Swaps Markets. ..........................................................................................5

    A. The Origins of Federal Oversight of Derivatives Regulation. ....................5

    B. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures
       Trading in 1974. ..................................................................................8

    C. Congress Reinforced and Clarified the CFTC's Exclusive
       Jurisdiction after 1974. ........................................................................9

    D. Congress Embraced Preemption as to Swaps Transactions
       in the Dodd Frank Act. .......................................................................13

ARGUMENT ......................................................................................................14

I.  Event Contracts Trading on CFTC-Regulated Markets Is Subject
    to the CFTC's Exclusive Jurisdiction. ...........................................................14

    A. Under the Plain Language of CEA Section 1(a)(47), Event
       Contracts Are "Swaps." ......................................................................14

    B. Sports Event Contracts Are Associated with Potential Financial,
       Economic, and Commercial Consequences. ...........................................19

II. The CEA Preempts Other Federal and State Actors from Exercising
    Regulatory Authority over Swaps, Including Event Contracts, on
    CFTC-Regulated Markets. ...........................................................................21

i

A. *The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges.* ............................................21

B. *The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify Its Field Preemptive Effect; It Preserves Traditional State Powers over State-Regulated Gambling.* ................................................24

C. *State Gambling Laws Are Conflict Preempted.* ..........................................26

III.   Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects. ....................28

CONCLUSION ........................................................................29

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alabama Power Co. v. Costle*,
  636 F.2d 323 (D.C. Cir. 1979)...............................................................................19

*Ali v. Federal Bureau of Prisons*,
  552 U.S. 214 (2008)..............................................................................................14

*Altria Group, Inc. v. Good*,
  555 U.S. 70 (2008)...........................................................................................22, 27

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992)...............................................................................22

*Arizona v. United States*,
  567 U.S. 387 (2012)..............................................................................................21

*Board of Trade of Chicago v. Christie Grain & Stock Co.*,
  198 U.S. 236 (1905)............................................................................................2, 6

*Bostock v. Clayton County, Ga.*,
  590 U.S. 644 (2020)..............................................................................................15

*Chicago Mercantile Exchange v. SEC*,
  883 F.2d 537 (7th Cir. 1989).................................................................................23

*Cothran v. Ellis*,
  16 N.E. 646 (Ill. 1888).............................................................................................6

*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000)..............................................................................................26

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  622 F.2d 216 (6th Cir. 1980),
*aff'd Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982)..............................................................................................23

*Dickson v. Uhlmann Grain Co.*,
  288 U.S. 188 (1933)................................................................................................7

*Duke Energy Trading & Marketing, LLC v. Davis*,
    267 F.3d 1042 (9th Cir. 2001) ...............................................................21

*Effex Capital, LLC v. National Futures Association*,
    933 F.3d 882 (7th Cir. 2019) ..................................................................22

*English v. General Electric Co.*,
    496 U.S. 72 (1990) ..................................................................................26

*Florida Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963) ................................................................................26

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001) ..............................................................25

*Hillman v. Maretta*,
    569 U.S. 483 (2013) ................................................................................26

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ..................................................................................26

*Hughes v. Talen Energy Marketing, LLC*,
    578 U.S. 150 (2016) ................................................................................21

*Hunter v. FERC*,
    711 F.3d 155 (D.C. Cir. 2013) ..............................................................25

*International Trading, Ltd. v. Bell*,
    556 S.W.2d 420 (Ark. 1977) ..................................................................23

*Irwin v. Williar*,
    110 U.S. 499 (1884) ..................................................................................5

*Leist v. Simplot*.
    638 F.2d 283 (2d Cir. 1980) ..................................................................22

*Los Angeles Memorial Coliseum Commission v. NFL*,
    726 F.2d 1381 (9th Cir. 1984) ..............................................................19

*Nevada, et al. v. Coinbase Financial Markets, Inc.*,
    No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) ..................2-3

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
  515 F. Supp. 202 (N.D. Ala. 1981) ...................................................23

*Pennsylvania v. National Collegiate Athletic Association*,
  948 F. Supp. 2d 416 (M.D. Pa. 2013) ........................................ 19-20

*Point Landing, Inc. v. Omni Capital International, Ltd.*,
  795 F.2d 415, 422 (5th Cir. 1986)*,*
*aff'd sub nom. Omni Capital International, Ltd. v. Rudolf Wolff & Co.,*
  484 U.S. 97 (1987) ........................................................................23

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ......................................................................27

*Richardson v. Kruchko & Fries*,
  966 F.2d 153 (4th Cir. 1992) .........................................................21

*Rumsey v. Berry*,
  65 Me. 570 (Me. 1876) ....................................................................6

*Stuber v. Hill*,
  170 F. Supp. 2d 1146 (D. Kan. 2001) ...........................................23

*Texas v. Monex International, Ltd.*,
  527 S.W.2d 804 (Tex. Civ. App. 1975),
  *writ refused* (Dec. 17, 1975) .........................................................23

*Time Warner Cable v. Doyle*,
  66 F.3d 867 (7th Cir. 1995) ...........................................................22

*Transcontinental Gas Pipe Line Co. v. Pennsylvania Environmental
Hearing Board*,
  108 F.4th 144 (3d Cir. 2024) .........................................................21

Statutes

7 U.S.C. §§ 1-26, CEA §§ 1-23 .........................................................1

7 U.S.C. § 1a(9), CEA § 1a(9) .........................................................16

7 U.S.C. § 1a(47), CEA § 1a(47) .....................................................14

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A) .......................................................14

7 U.S.C. § 1a(47)(A)(i), CEA § 1a(47)(A)(i) ..............................................14

7 U.S.C. § 1a(47)(A)(ii), CEA § 1a(47)(A)(ii) ...........................................14

7 U.S.C. § 1a(47)(A)(iv), CEA § 1a(47)(A)(iv) ..........................................14

7 U.S.C. § 1a(47)(A)(vi), CEA § 1a(47)(A)(vi) ..........................................14

7 U.S.C. § 1a(47)(B), CEA § 1a(47)(B) .....................................................16

7 U.S.C. § 2(a)(1), CEA § 2(a)(1) .........................................................1, 19

7 U.S.C. § 2(a)(1)(A), CEA § 2(a)(1)(A) ............................... 1, 4, 13, 21-25

7 U.S.C. § 2(d), CEA § 2(d) .......................................................................13

7 U.S.C. § 5, CEA § 3 ...................................................................................1

7 U.S.C. § 6(a), CEA § 4(a) .........................................................................4

7 U.S.C. § 13a-2, CEA § 6d .......................................................................10

31 U.S.C. § 5362(1)(E)(ii) .........................................................................24

Commodity Exchange Act,
    Pub. L. No. 74-675, 49 Stat. 1491 (1936).................................................7

Commodity Futures Trading Commission Act of 1974,
    Pub. L. No. 93-463, 88 Stat. 1389 (1974) ...............................................8

Commodity Futures Modernization Act of 2000,
    Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000)................................12

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) .........................................13

Future Trading Act of 1921,
    Pub. L. No. 67-66, 42 Stat. 187 (1921)...................................................6

Futures Trading Act of 1978,
    Pub. L. No. 95-405, 92 Stat. 865 (1978)...............................................10

Futures Trading Act of 1982,
   Pub. L. No. 97-444, 96 Stat. 2294 (1982)................................................11

Futures Trading Practices Act of 1992,
   Pub. L. No. 102-546, 106 Stat. 3590 (1992).........................................11

Grain Futures Act of 1922,
   Pub. L. No. 67-331, 42 Stat. 998 (1922)............................................. 6-7

Regulations

17 C.F.R. § 1.3 ...........................................................................................16

17 C.F.R. § 32.2(a) ....................................................................................16

17 C.F.R. § 38.151(b)................................................................................26

17 C.F.R. § 40.2 .........................................................................................28

CFTC Commodity Options,
   77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ...............................16

CFTC Further Definition of "Swap", "Security Based-Swap", and
"Security-Based Swap Agreement"; Mixed Swaps; Security Based-Swap
Agreement Recordkeeping,
   77 Fed. Reg. 48208, 48209 (Aug. 13, 2012) .....................................18

CFTC Concept Release on the Appropriate Regulatory Treatment of
Event Contracts,
   73 Fed. Reg. 25669, 25671 (May 7, 2008).........................................18

Legislative Materials

H. Rep. No. 67-1095 (1922) (Conf. Rep.) ...............................................7

H.R. Rep. No. 93-975 (1974)......................................................................1

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
   *as reprinted in* 1974 U.S.C.C.A.N. 5894........................................9

H.R. Rep. No. 97-565 (1982), pt 1,
   *as reprinted in* 1982 U.S.C.C.A.N. 3871....................................10, 11

H.R. Rep. No. 102-978 (1992) (Conf. Rep.),
*as reprinted in* 1992 U.S.C.C.A.N. 3179 ............................................................12

S. Rep. No. 67-871 (1922) ...........................................................................................5

S. Rep. No. 93-1131 (1974),
*as reprinted in* 1974 U.S.C.C.A.N. 5843 ..............................................................1

S. Rep. No. 95-850 (1978),
*as reprinted in* 1978 U.S.C.C.A.N. 2087 ............................................................10

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
(statement of Sen. Curtis) ..........................................................................9

156 Cong. Rec. S5923 (daily ed. July 15, 2010)
(statement of Sen. Lincoln)......................................................................18

Review of Commodity Exchange Act and Discussion of Possible Changes:
Hearings Before the H. Comm. on Agric.*,* 93d Cong., 1st Sess. 121 (1973) ........ 7-8

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric.
& Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685
(1974) (statement of Sen. Clark)..............................................................9

<u>Other Authorities</u>

CFTC, Designated Contracts Markets (DCMs),
https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?St
atus=Designated&Date_From=&Date_To=&Show_All=1...............................5, 20

CFTC, Futures Glossary,
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
CFTCGlossary/index.htm ....................................................................16

CFTC, History of the CFTC,
https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html ..................5

*Event*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/event .............................................15

*Contingency*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/contingency .................................15

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*,
  6 Hofstra L. Rev. 1, 6 (1977) ...................................................................6

Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports
Gambling Based on Securities Style Mandatory Disclosure*,
  41 Cardozo L. Rev. 1229, 1247 (2000)...............................................19

William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848
(U.M. Rose ed., 1884)...................................................................................6

## INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1-26. Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the existing patchwork of state-by-state regulation had critically impaired the development and functioning of national commodities markets. *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885. "[T]ransactions subject to [the CEA] are entered into regularly in interstate and international commerce and are affected with a national public interest," including in "liquid, fair, and financially secure trading facilities." 7 U.S.C. § 5.

Congress vested the CFTC with "exclusive jurisdiction" to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). The CFTC's jurisdiction "supersedes State as well as Federal agencies" because commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. *See* S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 5848.

Appellees' views and the district court's decision, if accepted, present a

fundamental threat to Congress's statutory design. As Justice Holmes presciently

noted in 1905:

> People will endeavor to forecast the future, and to make agreements
> according to their prophecy. Speculation of this kind by competent
> men is the self-adjustment of society to the probable. Its value is well
> known as a means of avoiding or mitigating catastrophes, equalizing
> prices, and providing for periods of want. It is true that the success of
> the strong induces imitation by the weak, and that incompetent
> persons bring themselves to ruin by undertaking to speculate in their
> turn. But legislatures and courts generally have recognized that the
> natural evolutions of a complex society are to be touched only with a
> very cautious hand, and that such coarse attempts at a remedy for the
> waste incident to every social function as a simple prohibition and
> laws to stop its being are harmful and vain.

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905).

States cannot invade the CFTC's exclusive jurisdiction over CFTC-regulated

designated contract markets ("DCMs") by re-characterizing swaps trading on

DCMs as illegal gambling. The decision below is inconsistent with the text,

structure, and history of the CEA and, if affirmed, would reintroduce precisely the

regulatory fragmentation Congress deliberately displaced.

It is Appellees' theory of the case that presents a seismic shift in the

longstanding status quo between CFTC and state authority. This court need only

look at many of these same parties' temporary restraining order against Coinbase,

where they requested, and received, an injunction barring the offering of "event-

based contracts relating to sporting *and other events*." Ex Parte Temporary

Restraining Order at 2, 7 *Nevada, et al. v. Coinbase Financial Markets, Inc.*, No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) (emphasis added) (prohibiting Coinbase "from offering or facilitating the offering of event contract[s] in Nevada"). Unable to articulate any limiting principle to their theory, they have upended decades of well-settled and Congressionally-mandated exclusive jurisdiction across the full spectrum of event contracts.

While subsequent litigation may require resolution of complicated follow-on questions, this case presents two narrow, yet exceptionally important, questions: (1) are Appellant's CFTC exchange-traded event contracts swaps, and (2) may such swaps also be regulated, or prohibited, under state law, thereby displacing the CEA's express preemption of state and other federal laws or rules? The CFTC submits this brief to assist the Court in resolving these fundamental issues.

## BACKGROUND

## I. The Commodity Exchange Act Provides the Regulatory Framework for Commodity Derivatives Markets in the United States.

The CEA is a federal statute that provides the comprehensive federal framework governing transactions in United States commodity derivatives markets. A derivative is a financial instrument, the value of which depends on (*i.e.*, is derived from) the value of some underlying asset, index, or other measure. In general, market participants use derivatives to hedge risks or speculate on commodity price movements. The most common derivatives are "futures

contracts" and "swaps."  While derivatives markets are distinct from "cash" or "physical" markets in which the assets themselves are bought and sold, the prices of those assets and derivatives are typically closely linked.  If a price disparity arises, arbitrageurs will take advantage of the difference, and the gap disappears. In the ordinary course, these price movements contribute to "price discovery," the mechanism by which supply and demand set the price of a commodity.

A futures contract is a standardized agreement to purchase or sell a "commodity" at a future date for a price determined at the contract's inception. Although the CEA uses the term of art "contract[] of sale of a commodity for future delivery," most contracts are structured for financial settlement and are discharged by executing a contract that reverses the obligation to purchase or sell. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A).  Under the CEA, a futures contract must be traded on a DCM, the statutory term for a registered derivatives exchange.  7 U.S.C. § 6(a).  A swap includes a broad array of financial instruments, such as "event contracts."  Swap transactions are also traded on CFTC-registered DCMs.

Futures markets originated in the United States at transportation hubs for agricultural products like grain, butter, and eggs.  Over time, exchanges began to offer contracts for other physical commodities like metals, oil, and gas, and later introduced cash-settled futures linked to less tangible measures like interest rates and price indices.  While the range of underlying commodities has expanded (and

4

continues to do so) over time, the fundamental regulatory structure governing futures markets has remained consistent. Today there are 24 exchanges (DCMs) in the United States, including North American Derivatives Exchange d/b/a Crypto.com.[1]

## II.    The Development of Federal Regulation of U.S. Futures and Swaps Markets.

### A. The Origins of Federal Oversight of Derivatives Regulation.

By the mid-nineteenth century, exchanges in major commodity trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation.[2] But there was tension between state regulation of gambling and the growth of futures markets. States and courts often failed to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a

---

[1] *See* CFTC, Designated Contracts Markets (DCMs), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?Status=Designated&Date_From=&Date_To=&Show_All=1 (last visited February 8, 2026).

[2] *See* CFTC, History of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html (last visited February 8, 2026); *see also Regulating Transactions on Grain-Future Exchanges*, S. Rep. No. 67-871, at 3 (1922): "Transactions in grain futures are utilized by the public for speculation and by the grain trade for the purpose of eliminating or reducing, as far as practicable, the hazards in the merchandising of grain and its products and by-products due to price fluctuations. Public speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions."

form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain"); s*ee also Rumsey v. Berry*, 65 Me. 570, 574 (Me. 1876) (finding futures contracts to be void as contrary to public policy). For example, an Arkansas law declared that "[t]he buying or selling or otherwise dealing in what is known as futures . . . with a view to profit, is hereby declared to be gambling" and made dealing in futures illegal. *See* William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848 (U.M. Rose ed., 1884).

Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. A futures contract's "value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want." *Bd. of Trade of Chi.*, 198 U.S. 236 at 247-48.[3] And Congress ultimately centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No.

---

[3] Even after the Supreme Court recognized the legitimacy of futures trading on organized exchanges, states continued to characterize commodity futures markets as illegal gambling. *See* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977).

67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922,

Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act").  In passing these laws,

Congress recognized the importance of uniform federal regulation of futures

markets, despite concerns by some members of Congress who objected to the

proposed law because it would interfere with state police powers.  H.R. Rep. No.

67-1095, at 5 (1922) (Conf. Rep.).

But the Supreme Court found that this preemptive design was not

sufficiently explicit in the statute, which resulted in states continuing to regulate or

even prohibit futures trading.  *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198-

99 (1933) (rejecting "the contention that Congress occupied the field in respect to

contracts for future delivery; and that necessarily all state legislation in any way

dealing with that subject is superseded.")  And when Congress expanded federal

oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L.

No. 74-675, 49 Stat. 1491 (1936), the boundary between federal and state authority

remained unsettled as futures markets expanded beyond their agricultural origins.

Market participants continued to face the persistent threat of state prosecution

through a patchwork of state laws and regulations.

In 1973, futures exchanges recommended that "federal policy . . . be uniform

throughout the United States" and not "subject to the vagaries" of different

obligations in "different jurisdictions."  Review of Commodity Exch. Act and

Discussion of Possible Change: Hearings Before the H. Comm. on Agric., 93d

Cong., 1st Sess. 121 (1973).  And the very next year, Congress explicitly spoke on

the question in the Commodity Futures Trading Commission Act of 1974, Pub. L.

93-463, 88 Stat. 1389 (1974) ("74 Act").

### B. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974.

The 74 Act amendments to the CEA worked a sea change in the regulation

of U.S. derivatives markets in three critical ways.  First, Congress established the

CFTC, vesting in it the authority to administer the CEA.  Second, Congress

expanded the scope of the CEA to cover "all commodities."  Third, Congress

expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures

and options markets.  The 74 Act amended Section 2 of the CEA to provide that

"the Commission shall have exclusive jurisdiction with respect to accounts,

agreements (including any transaction which is of the character of, or is commonly

known to the trade as, an 'option' . . ., and transactions involving contracts of sale

of a commodity for future delivery, traded or executed on a contract market

designated pursuant to section 5 of this Act or any other board of trade, exchange,

or market."  74 Act, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C.

§ 2(a)(1)).

Preemption was an express goal of the 74 Act.  Congress recognized the

need for uniform nationwide regulation of futures and options markets because

concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos."[4]  Potential limiting language was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis).  All commodity futures markets were to be under the CFTC's exclusive jurisdiction.  The 74 Act "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern."  H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.

### C. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974.

Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options.  In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-registered DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated exchanges.  The 78 Act added a section to the CEA authorizing

---

[4] See Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes.  *See* 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978).[5]  Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974.  Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority."  S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.  Just because "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC."  *Id*.  Congress also further added to the list of justifications supporting exclusive jurisdiction citing concerns over "costly duplication and possible conflict of regulation or over-regulation."  *Id*.

The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the states in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the

---

[5] This "Jurisdiction of the States" provision is now found in CEA Section 6d, 7 U.S.C. § 13a-2.  The language of subsection (7) remains the same in the current version of the CEA.

provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep.
No. 97-565, at 44-45 & 102-03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871,
3893-94 & 3951-52. First, the 82 Act clarified the procedures for states to pursue
violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act
clarified the role of states with respect to off-exchange futures transactions.
Language was added to permit "criminal prosecution under any federal criminal
statute" or the application of federal or state laws to *off-exchange* transactions or
*unregistered* market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294,
2318 (1982). The broad preemption of other potentially applicable state or federal
laws remained as to transactions *on* DCMs and as to market participants registered
with the CFTC. *See* H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982
U.S.C.C.A.N. at 3893-94, 3951-52. Adding again to the reasons for exclusive
jurisdiction, the Committee report noted it "was done in recognition of the
somewhat esoteric nature of the commodity futures markets and the desire to have
knowledgeable and uniform enforcement of the Act" before ultimately concluding
that "[t]he Committee . . . continues to support the idea of a single unified program
of regulation and exclusive CFTC jurisdiction over exchange-traded futures."

In 1992, Congress began grappling with the advent of a new type of
derivative financial product, swaps. In the Futures Trading Practices Act of 1992
("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC

authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e) to preempt the application of state gambling and bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC exempted pursuant to its new authority in CEA Section 4(c). While the 82 Act allowed the states authority to apply state and local laws to off-exchange transactions, the 92 Act limited this authority at least as to off-exchange swaps that received an exemption from the CFTC. The goal was to provide "legal certainty under both the Act and state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212.

The next evolution of the scope of the CEA occurred in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000). The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements. However, in so doing, the CFMA also preempted the application of state and local laws to those "excluded" swap transactions. The preemption of state and local laws as to on-exchange transactions remained as is, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

12

### D. *Congress Embraced Preemption as to Swaps Transactions in the Dodd Frank Act.*

In the wake of the 2008 financial crisis, Congress created a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of the previously "OTC" swaps markets.  In the 2010 Dodd-Frank Act, Congress expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps."[6]  The Dodd-Frank Act also added a new subsection, 2(d), which specifies that certain CEA provisions do not apply to swaps.  Section 2(d) eliminated the concurrent jurisdiction of states as to off-exchange swap transactions.  The authority for state regulation of swaps (whether on- or off-exchange) is now based on Section 12(e)(2), which applies to any swap that the CFTC may exempt pursuant to Section 4(c). This new preemption model is consistent with the one originally created in 1974 for commodity futures, *except* this model was even broader.  Congress did not carve out a role for states to regulate off-exchange swaps through a grant of concurrent jurisdiction, despite having done so for off-exchange commodity futures in 1982.

\*        \*        \*

---

[6] *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).

13

## ARGUMENT

I. **Event Contracts Trading on CFTC-Regulated Markets Is Subject to the CFTC's Exclusive Jurisdiction.**

### A. *Under the Plain Language of CEA Section 1(a)(47), Event Contracts Are "Swaps."*

After Dodd-Frank, the statutory definition of "swap" is deliberately broad. As such, it encompasses event contracts within multiple sub-definitions of CEA § 1a(47)(A). CEA § 1a(47)(A)(i) defines the term "swap," in relevant part, to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . quantitative measures, or other financial or economic interests or property of any kind," and CEA § 1a(47)(A)(ii) defines swap to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[7]

Congress's use of the word "any" in multiple sub-definitions of § 1a(47) confirms the statute's breadth. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) (observing that the word "any," read naturally carries an expansive

---

[7] *See also* §§ 1a(47)(A)(iv) (including transactions "commonly known to the trade as swaps") and (vi) ("any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)").

meaning).  The word "*any*" in the swap definition reflects a conscious decision to avoid a narrow construction that could limit the purpose of derivatives markets. Thus, as an example, an event contract that is settled based on the outcome of a sporting event is therefore an agreement providing for a payment dependent on a future occurrence, and nothing in the statutory text excludes such instruments.

The plain meaning of the statute includes event contracts even though the terms "event" and "contingency" are undefined.  Where a statute does not define a term, courts interpret it according to its ordinary meaning.  *Bostock v. Clayton County, Ga.,* 590 U.S. 644, 654-55 (2020).  Dictionary definitions confirm the breadth of the relevant terms "event" and "contingency."  An event is "something that happens: occurrence,"[8] and a "contingency" is an "event that may but is not certain to occur."[9]  The final score of a sporting event is a future occurrence whose outcome is uncertain until the game concludes and falls easily within the broad language of the swap definition as well as the broad definitions of "event" or "contingency."  Moreover, Congress did not limit covered swaps to binary outcomes; instead, it expressly encompassed contracts measured by the *extent* of the occurrence of an event.  This broad language encompasses contracts based on the margin of victory or any other quantifiable result of a sports event.

---

[8] https://www.merriam-webster.com/dictionary/event.
[9] https://www.merriam-webster.com/dictionary/contingency.

An event contract is also a binary option.  See 17 C.F.R. 1.3 (defining commodity option).  A binary option is a "type of option whose payoff is either a fixed amount or zero.  For example, there could be a binary option that pays $100 if a hurricane makes landfall in Florida before a specified date and zero otherwise." CFTC Futures Glossary, https://www.cftc.gov/LearnAndProtect/Advis oriesAndArticles/CFTCGlossary/index.htm#B (last visited Feb. 17, 2026). Commodity option transactions must be conducted in compliance with the CEA and the Commission's regulations related to swaps.  17 C.F.R. 32.2(a); *see also* Commodity Options, 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("the swap definition . . . includes options . . . (whether or not traded on a DCM)").

Importantly, when Congress has limited the Commission's jurisdiction over derivatives it has only done so by expressly embedding narrow exclusions in the statutory commodity definition itself (*i.e.*, onions and movie box office receipts).[10] Here, Congress wrote specific, enumerated exclusions into the definition of swap in § 1a(47)(B), confirming that when it intended to limit the Commission's jurisdiction, it did so expressly, not by inviting courts or states to create additional, atextual carve-outs.[11]

---

[10] *See* 7 U.S.C. § 1a(9).
[11] 7 U.S.C. § 1a(47)(B) (excluding, inter alia, physically settled forward transactions, certain insurance and consumer arrangements, and other ordinary-course commercial agreements).

The CEA's text is designed to account for financial innovation. Futures were novel at one point. But even as financial derivatives markets have developed and grown, Congress has chosen to vest the CFTC with broad jurisdiction. That a derivative is novel or different cannot be an excuse for a Court to re-write existing law. The law should be faithfully applied. And if it needs to be amended, that is the job of Congress, not the Courts.

Excluding event contracts from the definition of swap would leave no principled boundary preventing any other event-based derivatives, including currently listed contracts tied to weather, energy, economic indices, and political outcome contracts, from falling outside the CEA. The consequences of such a ruling would be immediate and substantial. States could characterize any derivative as prohibited gambling, thereby subjecting nationally (and internationally) traded swaps to a patchwork of state restrictions. This concern is not hypothetical. Nevada's cease and desist letter to KalshiEX LLC at issue in a related case orders it to "immediately cease and desist from offering any event-based contracts in Nevada," without limitation to sports. If Nevada's approach were permitted to stand, event contracts referencing agricultural, metal, energy, and financial outcomes could likewise all become subject to state-by-state bans across the country. The resulting market fragmentation would erode the nationally uniform framework Congress established to reduce risk, promote transparency, and

17

safeguard market integrity within the financial system.  *See* Further Definition of

"Swap", "Security-Based Swap", and "Security-Based Swap Agreement"; Mixed

Swaps; Security Based-Swap Agreement Recordkeeping, 77 Fed. Reg. 48208,

48209 (Aug. 13, 2012).

The CFTC has treated event contracts as measuring the level of the outcome

of an event for nearly two decades.[12]  Moreover, Congress deliberately adopted an

expansive definition of "swap" following the 2008 financial crisis to ensure a

comprehensive regulatory oversight of derivatives markets.  *See* 156 Cong. Rec.

S5923 (daily ed. July 15, 2010) (Statement of Sen. Lincoln) ("Section 721 includes

a broad and expansive definition of the term 'swap' that is subject to the new

regulatory regime established in Title VII.").  Nothing in the statutory text or

legislative history suggests that the occurrence of an event, or extent of its

occurrence, excludes an event's outcome.  The swap definition is written broadly to

capture contracts that shift risk based on uncertain future developments.  Event

contracts do exactly that.

---

[12] *See* Concept Release on the Appropriate Regulatory Treatment of Event
Contracts, 73 Fed. Reg. 25669, 25671 (May 7, 2008).

### B. Sports Event Contracts Are Associated with Potential Financial, Economic, and Commercial Consequences.

As the statutory definition makes clear, the relevant inquiry is intentionally broad. The statute is framed in expansive terms, requiring only that the contract be "associated with *potential* financial, economic, or commercial consequence." That definitional framework reflects Congress's recognition that derivatives markets serve a wide spectrum of market participants whose economic exposures are not limited to any specific market participant. *See Alabama Power Co. v Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential . . . will always and inherently exceed actual"). Because the statute does not demand certainty, sports event contracts fall comfortably within the statute's reach.

Broadly speaking, sporting events are economic enterprises that generate billions of dollars in economic activity and materially affect both regional and national markets. *See* Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports Gambling Based on Securities-Style Mandatory Disclosure*, 41 Cardozo L. Rev. 1229, 1247 (2020). Stadiums function as regional economic anchors around a network of businesses, including hotels, restaurants, transportation providers, retailers, and event management firms. *See, e.g.*, *Los Angeles Mem'l Coliseum Comm'n v. NFL,* 726 F.2d 1381, 1397 (9th Cir.1984) (discussing claim that a professional sporting team's presence generates local business activity) and *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp.

19

2d 416, 433 (M.D. Pa. 2013) (summarizing the Commonwealth's allegations that the sanctions would cause a loss of football-related hospitality revenue for surrounding businesses).  For these reasons, hotels likely adjust pricing models, restaurants expand staffing to accommodate increased demand, vendors increase supply orders, and cities allocate resources to accommodate projected crowds.  All of these decisions pose economic risk, which is precisely the type of economic exposure that derivatives markets are designed to mitigate.[13]

The issues presented on appeal do not require this Court to resolve the outer limits of the definition of a swap or engage in line drawing between a swap and a wager.  That line drawing exercise presents complicated fact questions concerning the exact structure and mechanics of the instruments, who is the price maker, the difference between an open exchange and a bilateral arrangement, and unrelated legal questions, including the applicability of the CEA to purely intrastate transactions, among others.  It is sufficient to resolve this case that the transactions conducted on a CFTC-registered DCM qualify as swaps under the CEA.

---

[13] *See, e.g.,* KalshiEx's "February 2026 Sportsbook Hedging Rebate Program" filing with the CFTC, available on the CFTC's website at: https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationRules/59640 (last visited 2/17/2026).

## II. The CEA Preempts Other Federal and State Actors from Exercising Regulatory Authority Over Swaps, Including Event Contracts, on CFTC-Regulated Markets.

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" includes "transactions involving swaps" trading on a CFTC-registered DCM. The "exclusive jurisdiction" provision of 7 U.S.C. § 2(a)(1) preempts application of state gambling laws to event contracts trading on DCMs governed by the CEA, whether the question is evaluated as a matter of field preemption or conflict preemption. Congress intended the CFTC to have exclusive jurisdiction over federally registered DCMs and transactions conducted on those exchanges, displacing state gambling laws that would otherwise apply.

### A. The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges.

Where Congress has declared federal authority to be exclusive, state laws attempting to regulate the same subject matter must give way. *See Arizona v. United States*, 567 U.S. 387, 399 (2012); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Duke Energy Trading & Mktg., L.L.C. v. Davis,* 267 F.3d 1042, 1057 (9th Cir. 2001); *see also Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024) (an "explicit statutory conferral of exclusive jurisdiction . . . withdraws any concurrent jurisdiction"), *Richardson v. Kruchko & Fries,* 966 F.2d 153, 158 (4th Cir. 1992) (state-law claims preempted where they fell within federal agency's "exclusive jurisdiction").

21

The inquiry does not turn on whether Congress anticipated every possible form of state interference; it turns on whether state law intrudes into a field Congress has reserved to federal regulation. While not needed given the explicit statutory language, preemptive intent may be inferred "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" over futures and swaps traded on a DCM "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "Precisely, preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n,* 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Agric. Movement, Inc v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995)). Offering event contracts on a DCM cannot, in and of itself,

be an activity that is unlawful under any state law.  "Congress's intent was to

provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch

exclusive jurisdiction precludes states from exercising supplementary regulatory

authority over commodity transactions."  *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151

(D. Kan. 2001).

This is not a new or novel concept.  For decades courts have recognized that

the CEA preempts application of other federal or state laws to instruments trading

on CFTC-regulated markets.[14]  Again, this is part and parcel of Congress's intent

---

[14] *See Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 544, 548 (7th Cir. 1989)
(recognizing that the CFTC is "the sole lawful regulator" where "its jurisdiction is
exclusive"--i.e., if the at-issue derivative falls within Section 2(a)(1)(A)'s reach);
*Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 422 (5th Cir. 1986),
*aff'd sub nom. Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co*., 484 U.S. 97 (1987)
(finding the CEA preempted private rights of action under securities laws because
"[a]ny other result would frustrate the intent of Congress to preempt the field
insofar as futures regulation is concerned."); *Curran v. Merrill Lynch, Pierce,
Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353
(1982) ("[T]he thrust of the [CEA's exclusive-jurisdiction] provision was to ensure
that regulatory bodies other than the CFTC would not interfere with the orderly
development and enforcement of commodities regulation."); *Paine, Webber,
Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981)
(holding that the CEA preempted private plaintiff's counterclaim under Alabama
gambling statute purporting to void all futures transactions in which delivery of the
commodity is not intended); *Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (1977)
(finding the "vesting of exclusive jurisdiction is a clear indication that Congress
intended no regulation in this field except under the authority of the [A]ct"); *Texas
v. Monex Int'l, Ltd*., 527 S.W.2d 804, 806 (Tex. Civ. App. 1975), *writ refused* (Dec.
17, 1975) (holding the CEA preempted Texas securities laws over margined
commodity transactions).

for the CEA to occupy the field of commodity derivatives, as the very purpose of the 74 Act was to "assure that Federal preemption is complete." 120 Cong. Rec. S. 30,458, 30,464 (daily ed. Sept. 9, 1974) (statement of Sen. Curtis). That the instruments at issue here involve swaps on sports events does not change the preemption framework.[15]

### B. The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify its Field Preemptive Effect; It Preserves Traditional State Powers Over State-Regulated Gambling.

The grant of "exclusive jurisdiction" in § 2(a)(1)(A) does not permit a state to define federally regulated derivatives transactions as illegal under state law. The "savings clause" in § 2(a)(1)(A) does not nullify this conclusion. Specifically, that subsection provides, "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred . . . on . . . other regulatory authorities under the laws of the United States or of any State," or "(II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws," or "supersede or limit the jurisdiction conferred on courts of the United States or any State."

---

[15] Notably, the Unlawful Internet Gambling Enforcement Act of 2006 specifically excludes transactions "conducted on or subject to the rules of a registered entity" under the CEA, reinforcing the field-preemptive effect of the CFTC's exclusive jurisdiction. 31 U.S.C. § 5362(1)(E)(ii).

As a matter of plain language interpretation, this "savings clause" only applies "[e]xcept as hereinabove provided" in CEA § 2(a)(1)(A).  That means other laws that would ordinarily apply outside the field of "accounts, agreements . . . and transactions . . . traded or executed on a contract market" still apply, just not to transactions that are trading on CEA-governed markets.  *FTC v. Ken Roberts Co*., 276 F.3d 583, 591 (D.C. Cir. 2001) (observing that other agencies like the FTC "retain their jurisdiction over all matters beyond the confines" of "accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery") (quoting CEA § 2(a)(1)(A)).  The "savings clause" preserves traditional, non-conflicting state powers, but does not empower states to use state powers against transactions on CEA-governed markets.  *Hunter v. FERC*, 711 F.3d 155, 159 (D.C. Cir. 2013) ("To be clear, there are limits to what comes within CEA section 2(a)(1)(A)'s orbit, but once a scheme crosses the statute's event horizon, the CFTC has exclusive jurisdiction.").  Thus the "savings clause" does not allow states to prohibit the very types of contracts that the CFTC is exclusively empowered to regulate.

Properly interpreted, the "savings clause" means that the CEA does not displace traditional state authority to enforce state criminal or civil antifraud laws, nor does it displace state authority to regulate purely intrastate conduct or transactions.  But the CEA explicitly displaces state attempts to regulate swaps that

25

are conducted on a CFTC-registered contract market.  To the specific question in this case, the CEA expressly bars state laws from regulating or prohibiting these transactions that are conducted on CFTC-regulated DCM.

### C.  *State Gambling Laws Are Conflict Preempted.*

Application of gambling laws is also preempted under the concept of conflict preemption.  State law is pre-empted "to the extent of any conflict with a federal statute."  *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).  Conflict preemption occurs when compliance with both federal and state law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941).  Field preemption can be understood as a type of conflict preemption, because a state law falling within a preempted field conflicts with Congress's intent to exclude state regulation, making the categories not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990).

Here, gambling laws are preempted under both impossibility and obstacle conflict preemption.  As for impossibility, a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide.  17 C.F.R. § 38.151(b).  If a state bans the contract, the DCM cannot fulfill its federal

26

mandate to provide impartial national access.  As for obstacle preemption, gambling laws often require local licensing, fees, and specific hardware (like localized servers).  Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent.

Nor does the presumption against preemption alter this conclusion.  Even accepting arguendo that regulation of gambling is a historic police power of the states, the Court should not apply a presumption against preemption.  The entire purpose of the exclusive jurisdictional provision in CEA § 2(a)(1)(A) is to provide national uniformity for derivatives trading and to prevent 50 different states from undermining this national regulatory structure by claiming derivatives markets are subject to state gambling laws.  Congress's "clear and manifest purpose" was indeed to preempt these historic police powers.  *Altria Grp., Inc.*, 555 U.S. at 77 (noting "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The plain language of the text, underscored by the consistent legislative history to preempt states from applying 50 state requirements on national markets, indicates this "clear and manifest purpose" to preempt state police powers.

### III. Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects.

If this Court holds that sports event contracts listed on CFTC-registered DCMs do not qualify as swaps or are outside the CFTC's exclusive jurisdiction within the meaning of the statute, the consequences would not be confined to a single category of event contracts. The interpretation would redraw the statutory boundary Congress established to ensure a comprehensive federal oversight of derivatives markets, inviting the public to characterize an expanding universe of event contracts as beyond the CEA's reach. At least eight DCMs have collectively self-certified with the CFTC more than 3,000 event based contracts with the CFTC pursuant to CFTC Rule 17 C.F.R. § 40.2, with a notable increase in such filings during the last two years.[16] Importantly, the vast majority of these contracts are tied to non-sport outcomes involving measurable commodity indicators, including cryptocurrency price levels and related indices, GDP releases, benchmark interest-rate decisions, election outcomes, temperature forecasts, electricity usage, and the price movements of precious metals. *Id.* These event contracts rest on objectively measurable outcomes no less than sports event contracts. A finding excluding such

---

[16] *See* CFTC Designated Contact Market Products, *available at* https://www.cftc.gov/IndustryOversight/Industry Filings/TradingOrganizationProducts?Organization=CM (last visited February 13, 2026).

contracts from the definition of swap would therefore risk destabilizing the settled expectations upon which these markets depend, fostering uncertainty in an area where Congress sought uniformity and regulatory clarity. It could introduce the "chaos" Congress sought to prevent by providing the CFTC with exclusive jurisdiction over futures trading in 1974. Because even modest ambiguity in the scope of the CEA can move rapidly through interconnected financial markets, the CFTC respectfully requests that the Court not adopt a construction that could generate systemic consequences for CEA preemption far removed from the case at hand.

## CONCLUSION

For the foregoing reasons, the CFTC respectfully submits that this Court should reverse and remand the judgment of the district court.

Dated: February 17, 2026        Respectfully Submitted,

/s/  Anne Stukes                           
D.C. Bar 469446
Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127

**CERTIFICATE OF COMPLIANCE**

I certify that, pursuant to Fed. R. App. 29(a)(5), the foregoing brief complies with the type-volume limitations, in that it has 6,652 words, excluding the parts of the brief, exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Times New Roman type style.

/s/  Anne Stukes

## CERTIFICATE OF SERVICE

I certify that on February 17, 2026, I electronically filed this Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system.  I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/  Anne Stukes            

Exhibit 3

**Finance and Economics Discussion Series**

Federal Reserve Board, Washington, D.C.
ISSN 1936-2854 (Print)
ISSN 2767-3898 (Online)

# Kalshi and the Rise of Macro Markets

**Anthony M. Diercks, Jared Dean Katz, and Jonathan H. Wright**

**2026-010**

Please cite this paper as:
Diercks, Anthony M., Jared Dean Katz, and Jonathan H. Wright (2026). "Kalshi and the Rise of Macro Markets," Finance and Economics Discussion Series 2026-010. Washington: Board of Governors of the Federal Reserve System, https://doi.org/10.17016/FEDS.2026.010.

NOTE: Staff working papers in the Finance and Economics Discussion Series (FEDS) are preliminary materials circulated to stimulate discussion and critical comment. The analysis and conclusions set forth are those of the authors and do not indicate concurrence by other members of the research staff or the Board of Governors. References in publications to the Finance and Economics Discussion Series (other than acknowledgement) should be cleared with the author(s) to protect the tentative character of these papers.

# Kalshi and the Rise of Macro Markets

Anthony M. Diercks*           Jared Dean Katz [†]

Federal Reserve Board        Northwestern University

Jonathan H. Wright [‡]

Johns Hopkins University and National Bureau of Economic Research

February 12, 2026

## Abstract

Prediction markets offer a new market-based approach to measuring macroeconomic expectations in real-time. We evaluate the accuracy of prediction market-implied forecasts from Kalshi, the largest federally regulated prediction market overseen by the CFTC. We compare Kalshi with more traditional survey and market-implied forecasts, examine how expectations respond to macroeconomic and financial news, and how policy signals are interpreted by market participants. Our results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers.

**JEL Codes:** E3, G1, C5.

**Keywords:** Kalshi, Federal Reserve, prediction markets, expectations, forecasting

---

*The views expressed are those of the authors and do not necessarily reflect those of the Federal Reserve System. We thank Eric Engstrom, Michael Palumbo and members of the Monetary and Financial Market Analysis section in the Division of Monetary Affairs for helpful comments and suggestions. All errors and omissions are the sole responsibility of the authors. Diercks is the corresponding author. Website: www.anthonydiercks.com. Email: anthony.m.diercks@frb.gov.

[†]Email: jared.katz@kellogg.northwestern.edu.

[‡]Email: wrightj@jhu.edu.

# 1 Introduction

Managing expectations is central to modern macroeconomic policy. Yet the tools that are often relied upon—surveys and financial derivatives—have many drawbacks. Surveys can quickly become stale and ask specific questions that often provide point forecasts without any measure of uncertainty. Financial derivatives are also limited to certain contracts and trading may be thin. This paper introduces a new source of real-time, financially-backed expectations data: Kalshi macroeconomic prediction markets. Kalshi is the first federally regulated platform where traders bet directly on economic outcomes such as inflation, payrolls, and Federal Reserve decisions. Using high-frequency trading data, we show that these markets yield well-calibrated, rapidly updating density forecasts on important economic variables, including several for which alternatives are not available. Our study highlights the promise of prediction markets as a new benchmark for measuring expectations and informing monetary policy decisions.

Despite a large literature using surveys, options, and asset prices to infer macroeconomic expectations (e.g., Gürkaynak, Sack and Swanson (2012), Nakamura and Steinsson (2018), Swanson (2021)), real-money prediction markets remain underexplored within macro-finance. This reflects the shortcomings of earlier platforms, which were often thin, unregulated, or focused on non-economic outcomes. The availability of credible, liquid markets for macro variables now enables a direct, incentive-compatible lens on expectations—one that avoids many of the limitations of existing proxies. Our analysis is one of the first to systematically examine this new data source.

Kalshi, the largest CFTC-approved prediction market in the United States, began operating in 2021. Classified as a "Designated Contract Market"—the same category as the Chicago Mercantile Exchange—it is supported by market makers such as Susquehanna. Kalshi contracts are also accessible to retail traders through brokerage platforms like Robinhood and Webull. Each contract is a simple Arrow-Debreu security that pays one dollar if the specified outcome occurs; therefore, the full risk-neutral probability density function (pdf) of an event can be constructed by the set of contracts in the given market. Kalshi provides intradaily trade data for different measures of CPI (MoM, YoY, or calendar year), Core CPI, PCE inflation, unemployment rate, payroll releases, GDP growth, probability of recession, and federal funds rate target rates meeting-by-meeting. Several of these are variables for which there were no previous financial derivatives trading.

We begin by showing that the probability distributions implied by Kalshi markets are well-behaved and broadly consistent with those from more established financial instruments. We find that in several episodes, they allocate probability mass in ways that may reflect the

range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts.

Second, we document rich intraday dynamics in Kalshi markets. These probabilities respond sharply and sensibly to major developments. For example, the implied probability of a rate cut at the July 2025 FOMC rose to 25% following remarks from Governors Waller and Bowman, before falling after a stronger-than-expected June employment report. This pattern is representative of the broader high-frequency responsiveness we observe and is missed with daily data.

Third, we evaluate the forecasting performance of Kalshi markets relative to the Survey of Market Expectations run by the Federal Reserve Bank of New York (FRBNY). For the federal funds rate forecasts 150 days (3 FOMC meetings) ahead, Kalshi's mean absolute error is very similar to that of professional forecasters. But unlike the survey—which provides a snapshot every six weeks of a modal path—Kalshi offers a continuously updating full distribution. We provide a preview of these results in Figure 1. This figure shows the mean absolute prediction error, averaging across all FOMC meetings, plotted against the number of days before the FOMC meeting. We find the Kalshi median and mode have a perfect forecast record on the day before the FOMC meeting, which represents a statistically significant improvement over the fed funds futures forecast.

We also assess CPI and unemployment forecasts relative to the Bloomberg consensus. We find that Kalshi expectations are statistically similar for core CPI and unemployment, with forecast errors that are almost the same as the Bloomberg consensus. In contrast, for headline CPI, we find Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast.

Fourth, we demonstrate that Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable. While option-implied distributions exist for equities, interest rates, and CPI headline inflation swaps, Kalshi uniquely extends this to other headline macro indicators at high frequency while providing a more retail-investor perspective. Moreover, there are no currently trading options that give distributions of the federal funds rate after specific FOMC meetings, another hole that Kalshi fills.

Fifth, with access to full distributions, we uncover new patterns in how macroeconomic news affects the moments of the Federal Funds rate distribution. We study how different kinds of news announcements affect the mean, variance and skewness of interest rate beliefs. We find that, during the 2022-2025 period, the variance of interest rate distributions declines substantially following data announcements, especially inflation releases. We split out the announcements of CPI inflation into ones which were positive surprises, negative surprises



Figure 1: **FOMC Federal Funds Rate Forecast Errors Comparison**

This figure compares the mean absolute errors from 160 days out to each FOMC for the effective federal funds rate since 2022. The vertical bars reflect one-half standard deviation for the forecast errors for the Survey of Market Expectations and correspond to when the surveys were completed.

and zero surprises. We find that the variance of interest rates declines the most following a zero surprise inflation release, but also falls—though to a lesser extent—after both positive and negative surprises, consistent with a general resolution of uncertainty. Furthermore, we uncover an asymmetry with respect to the first moment, where positive shocks to CPI lead to much larger responses in the mean of the fed funds rate when compared to negative CPI shocks. We also examine the effects of macro surprises on the moments of the Federal Funds rate in a standard event-study regression and find many of these moves are statistically significant.

Lastly, we conduct event study regressions for the effects of monetary policy shocks on the distribution of the Federal Funds rate. We find that shocks associated with the release of the FOMC statement have statistically significant impacts on not just the first moment, but also tend to increase the second moment. In contrast, shocks associated with the press conference have limited effect on the first moment but a significant and negative effect on skewness, implying some potential resolution of upside uncertainty to interest rates during this window.

We intend (subject to approval) to make the distributional daily-level data publicly available via an interactive website at EconFutures.com, offering downloadable time series and visualizations for each contract, as well as trade-level data and code to further update prediction market data available on this paper's GitHub. Our goal is to facilitate further research and enable policymakers to easily monitor shifts in investors' beliefs in real-time.

4

Our paper touches upon several strands of the macro-finance literature. A large body of work extracts interest rate beliefs from options prices. Seminal contributions include Aït-Sahalia (1996), who develops nonparametric pricing methods, and Ball and Torous (1999), who highlight the role of stochastic volatility. Subsequent research emphasizes unspanned volatility (Fan, Gupta and Ritchken, 2003; Li and Zhao, 2006) and the pricing implications of volatility smiles (Jarrow, Li and Zhao, 2007; Amin and Ng, 1997). Other studies examine the structure of state price densities (Bakshi and Madan, 2000; Li and Zhao, 2009) and the pricing of caps and swaptions (Longstaff, Santa-Clara and Schwartz, 2001; Miltersen, Sandmann and Sondermann, 1997), while more recent work by Mertens and Williams (2021) uses option prices to derive expectations related to the zero lower bound and Wright (2018) evaluates options for longer-maturity real interest rates. Although informative, many of these approaches rely on complex structural models that infer expectations from instruments indirectly related to the policy rate. In contrast, we use prediction market data explicitly tied to the federal funds rate and other macroeconomic variables, enabling the recovery of risk-neutral probabilities with minimal assumptions at high frequency.

Our work is also closely related to studies of monetary policy expectations, uncertainty, and skewness. Gürkaynak, Sack and Swanson (2012) construct measures of market-based policy expectations, while Beber and Brandt (2006) show that macroeconomic news affects both beliefs and preferences as reflected in options markets. More recent work explores the role of monetary policy uncertainty (Bauer, Lakdawala and Mueller, 2022; Wright, forthcoming) and the pricing of asymmetric policy responses—often labeled the "Fed put" (Cieslak and Vissing-Jorgensen, 2021). Our analysis contributes to this literature by introducing a high-frequency, event-level measure of policy expectations distributions from prediction markets. We show that macroeconomic news significantly shifts not only the mean but also higher moments of the federal funds rate distribution in asymmetric ways. Asymmetries in interest rate distributions have also been explored for longer-dated yields as in Bauer and Chernov (2024), while Diercks, Tanaka and Cordova (2024) focus on skewness in expectations of interest rates coming from the FRBNY's Survey of Primary Dealers.

A related literature examines beliefs about inflation extracted from options markets. Kitsul and Wright (2013) provide an early and influential analysis of risk-neutral inflation density functions, measuring risk of high inflation and deflation, and documenting meaningful variation in higher moments around key macroeconomic events. Fleckenstein, Longstaff and Lustig (2017) use inflation options to quantify market-implied deflation risk, while Hilscher, Raviv and Reis (2022) and Hilscher, Raviv and Reis (2024) explore how the pricing of extreme inflation outcomes informs debates on debt sustainability and macroeconomic fragility. Rich and Tracy (2010) compare market-based and survey-based measures, highlighting differences

5

in expectations, disagreement, and uncertainty. Our analysis contributes to this literature by introducing a new source of market-based inflation expectations—derived from prediction markets—which provides direct, high-frequency measures beliefs about upcoming releases of both headline and core inflation. Whereas the existing inflation swaps and options reference headline inflation over periods of a year or more, Kalshi is different in giving information about upcoming data announcements, and also including information about core inflation.

Also related to our work is a growing literature that highlights the informational value of retail investor behavior. While early research often emphasized behavioral biases, recent studies show that retail trading can enhance market efficiency. Farrell, Green, Jame and Markov (2022) find that the rise of retail trading has increased the informativeness of prices, particularly around earnings announcements. Boehmer, Jones, Zhang and Zhang (2020) show that retail order flow predicts returns, and Kelley and Tetlock (2013) find that aggregated retail trades reflect valuable firm-level information. Kelley and Tetlock (2017) further show that retail short-selling contains predictive content for future stock price movements. Chen, De, Hu and Hwang (2014) also demonstrates that retail opinions shared via social media platforms contribute meaningfully to price discovery. Our use of prediction market data offers a new lens on retail investor expectations, capturing their beliefs directly and in real time, independent of the portfolio constraints and hedging motives that can often shape the positions of institutional investors, potentially generating sizeable risk premiums.

More broadly, we contribute to the forecasting literature that assesses the informativeness of financial market instruments and surveys, along with their distributions (Ang, Bekaert and Wei, 2007; Bakshi, Panayotov and Skoulakis, 2011; Christoffersen, Jacobs and Chang, 2013; Clements, 2018; Goff, Kostka and Masera, 2014; Duffee, 2012; Wright and Faust, 2012). We show that prediction market forecasts are an improvement over fed funds futures and perform as well as those from the Survey of Market Expectations (SME) conducted by the FRBNY. We also show that prediction market-based inflation forecasts have been roughly comparable to the Bloomberg consensus, while updating more frequently.

Lastly, and most importantly, our work builds on a substantial literature examining prediction markets and economic forecasting. Snowberg, Wolfers and Zitzewitz (2013) and Wolfers and Zitzewitz (2004) provide comprehensive reviews of prediction markets in this context. The study closest to ours is Gürkaynak and Wolfers (2005), which analyzed the now-defunct Economics Derivatives market developed by Goldman Sachs and Deutsche Bank. Hanson and Oprea (2009) shows that even in the presence of manipulation, prediction markets can yield reliable forecasts, and Snowberg and Wolfers (2010) examine behavioral biases that may affect pricing. Our contribution builds on this literature by applying prediction markets to the study of monetary policy, inflation, and other macro expectations using newly

6

available contracts with high-frequency, event-level granularity.

We also acknowledge several concurrent studies that complement our findings. Swanson, Wang and Wu (2025) use Kalshi data to evaluate the Fed information effect, confirming that monetary policy shocks reduce expectations for both growth and inflation. Burgi, Deng and Whelan (2025) examine the full range of Kalshi markets and find them to be valuable forecasters for nearly all events, many of which are unrelated to economic variables. Eichengreen, Viswanath-Natraj, Wang and Wang (2025) use Polymarket data to explore questions surrounding Fed independence. We complement these contributions by focusing on extensively validating Kalshi as a forecasting tool and as a source of market-based expectations for key macroeconomic variables that are at the core of the Federal Reserve's mission, while also documenting real-time stagflationary risks and asymmetric responses of fed funds rate distributions to news surprises. In addition, we provide codes and a transparent process for constructing probability distributions from underlying prediction market trades, facilitating future use by both researchers and policymakers.

Our paper is structured as follows. Section 2 reviews institutional details of prediction markets. Section 3 documents how we convert Kalshi options prices to probability distributions. Sections 4 and 5 compare the Kalshi point and density forecasts with alternatives around specific episodes. Section 6 gives a comparison of forecasts by average absolute error. Section 7 examines how Kalshi predictions respond to news announcements, and section 8 concludes.

# 2   Institutional Features and Design of Kalshi Markets

## 2.1   Overview

Prediction markets are financial platforms where users can trade contracts that pay out based on the outcome of real-world events, such as elections, sporting events, or macroeconomic releases. These contracts function similarly to options. A trader can buy or sell an option for a price $x$ that pays off \$1 if a given outcome occurs and nothing otherwise. The exchange naturally takes no position, and so every option has to have a buyer and a seller.

Kalshi, the largest CFTC-approved prediction market, defines a market as a single binary contract (e.g., "CPI exceeds 2.5% YoY in March 2025"), and a series as a group of related markets (e.g., CPI exceeding various thresholds across different months). Kalshi has gained significant traction, with market making provided by firms such as Susquehanna. Retail investors can access Kalshi contracts via platforms like Robinhood and Webull. This growing infrastructure makes prediction markets a viable and valuable subject for economic study.

**Competing Platforms.**   Other platforms offering prediction markets include Polymarket, PredictIt, and Interactive Brokers. Of these, only Kalshi and Interactive Brokers operate under regulatory approval. Polymarket operates in a legal gray area and, along with PredictIt and Interactive Brokers, supports fewer contracts, lower liquidity, and smaller individual position limits. Kalshi's maximum exposure per market currently reaches $7 million.

Given these distinctions, we argue that Kalshi represents the most mature and comprehensive prediction market for economic forecasting. Accordingly, we rely on Kalshi data for the remainder of this paper.

**Forecast Markets on Macroeconomic and Monetary Policy Events.**   We identify a promising new class of prediction markets focused specifically on macroeconomic indicators and monetary policy outcomes. Table 1 lists several key Kalshi series in this space, including CPI, payroll releases, and FOMC decisions—events that typically attract substantial attention from financial markets.

| Series | First Contract | Frequency | Theme |
|---|---|---|---|
| CPI MoM | June 2021 | Monthly | Inflation |
| CPI YoY | November 2022 | Monthly | Inflation |
| CPI for Year | 2022 | Annual | Inflation |
| Core CPI MoM | June 2022 | Monthly | Inflation |
| Core CPI YoY | December 2022 | Monthly | Inflation |
| Core CPI for Year | 2025 | Annual | Inflation |
| Unemployment Rate | July 2021 | Monthly | Labor Market |
| Payroll Release | March 2023 | Monthly | Labor Market |
| GDP Growth | Q2 2021 | Quarterly | Growth |
| GDP Growth | 2025 | Annually | Growth |
| Probability of US Recession | 2022 | Annually | Growth |
| Federal Funds Rate Decision | May 2023 | FOMC | Monetary Policy |
| Federal Funds Rate Target Rate | December 2021 | FOMC | Monetary Policy |

Table 1: **Kalshi Markets of Interest**

There are thousands of Kalshi markets available, but we deem these particular markets to be the most economically relevant.

Prior literature has shown that surprises in these events can significantly move asset prices, elevate market volatility, and contribute to macroeconomic uncertainty. Since central bank decisions depend heavily on incoming data and market expectations, accurate, real-time forecasting of these variables is vital for effective policy implementation.

**Why High-Frequency Forecasts Matter.**   Prediction markets offer high-frequency, continuously updating forecasts that can complement central bank decision-making. High-frequency data let us apply an event study methodology to see how news shapes beliefs

about macroeconomic indicators. For macroeconomic indicators like CPI and unemployment—two pillars of the Federal Reserve's dual mandate—market-based forecasts improve the Fed's ability to communicate policy direction and assess the market's perceived reaction function under various scenarios.

For monetary policy itself, such as upcoming FOMC decisions, prediction markets offer a valuable check on the effectiveness of Fed communication. Importantly, these markets can also reflect the entire distribution of expectations, helping policymakers understand tail risks, asymmetries, and market uncertainty—information that is lost when only modal or median expectations are provided.

## 2.2   Traditional Forecasting Approaches

Table 2 summarizes commonly used forecasting tools for the economic indicators listed in Table 1. These tools fall into two categories: surveys and market-based measures.

### 2.2.1   Survey-Based Forecasts

Surveys offer forecasts without requiring complex models or assumptions and are not subject to risk premia since respondents do not face financial consequences for their predictions. Notable surveys include:

- **Survey of Market Expectations** (SME) by the Federal Reserve Bank of New York (formerly SPD/SMP), which elicits expectations for upcoming FOMC decisions and some year-end macroeconomic variables.

- **Bloomberg Consensus**, which collects modal expectations for macroeconomic announcements shortly before they are released.

- **Blue Chip Economic Indicators**, which gather monthly modal expectations for year-end GDP and CPI.

While surveys have been considered rather accurate on average (Ang, Bekaert and Wei, 2007), they are generally infrequently available and may not reflect updates in real-time. Also, numerous studies have rejected the full information rational expectations hypothesis in survey expectations. Anchoring, inertia, and reputational concerns can distort survey results (see Diercks and Jendoubi (2023) for further discussion).

| Source | Variables | Horizon | Frequency | Type | Format |
|---|---|---|---|---|---|
| Bloomberg Consensus Survey | CPI/Payrolls/GDP releases & Fed decisions | Next release | Once-per-event | Survey | Point-estimates |
| Survey of Market Expectations PDFs | Fed decisions & EoY CPI, GDP | 2 FOMC Meetings | Once-per FOMC cycle | Survey | Distribution |
| Survey of Market Expectations Paths | Fed decisions | 6 FOMC Meetings | Once-per FOMC cycle | Survey | Point-estimates |
| Blue Chip Economic Indicators | GDP/PCE/ Unemployment | Quarterly 2-Years ahead | Once-per-month | Survey | Point-estimates |
| Survey of Professional Forecasters | GDP/CPI/ Unemployment | Annual 2-Years ahead | Once-per-quarter | Survey | Distribution |
| Federal Funds Rate Futures[1] | Fed decisions | Far | Market-based | Market-based | Point-estimates |
| SOFR options | Fed decisions | Far | Market-based | Market-based | Distribution |
| Overnight Interest Rate Swaps | Fed decisions | Far | Market-based | Market-based | Point-estimates |
| CPI Fixings | CPI releases | One year before | Market-based | Market-based | Point-estimates |
| Kalshi | CPI/Payrolls/GDP releases & Fed decisions | Next release & Next 4 FOMC meetings | Market-based | Market-based | Distribution |

Table 2: **Forecast Tools**

This table shows the available forecast tools along with the relevant variables, the horizons, how frequently they are available, and whether or not they provide only point estimates or full distributions.

### 2.2.2   Market-Based Forecasts

Market-based measures offer the advantage of near-instantaneous updating in response to news. For monetary policy, key instruments include:

- **SOFR Options**, which provide liquid estimates of the distribution of SOFR over quarterly horizons. However, while SOFR futures are one of the most heavily traded interest rate derivatives, their options are much less traded. Moreover, these are options on one-month or three-month average repo rates. Translating these into forecasts for specific FOMC meetings requires strong and unreasonable assumptions. Moreover, the basis between SOFR and the effective federal funds rate can be time-varying and, at times, substantial.

- **Federal Funds Futures**, which offer mean rate forecasts by calendar month. Unfortunately, they do not give the entire distribution of outcomes, unless one is willing to assume that there are only two possible outcomes, which can be problematic in times of high uncertainty or when looking beyond the next meeting, While there was a time when Fed Funds futures options were traded (see Emmons, Lakdawala and Neely (2006)), this came to a halt following the financial crisis back in 2008.

Overall, we argue that Kalshi should be used to provide risk-neutral pdfs concerning FOMC decisions at specific meetings because SOFR is too far removed from the monetary policy interest rate decision (both because of the basis and the different time horizon) and these are the only other short-term interest rate options that actually trade.

For inflation, **CPI Fixings** provide mean expectations for specific releases but are primarily institutional products with limited retail accessibility. More broadly, most of the markets described above are dominated by large institutions that use them primarily for hedging purposes. Outside of prediction markets, we are unaware of any market-based forecasts for other important upcoming releases such as payrolls, unemployment, GDP, or core CPI. There are also inflation swaps and options, but these have much longer maturities (see Diercks, Campbell, Sharpe and Soques (2023) for analysis of the relative forecast performance of inflation swaps).

## 2.3   Volume

Given that Kalshi is relatively new when compared to more established markets such as Fed Funds futures, it is natural to wonder about its liquidity. Liquidity is important as it helps to ensure prices reflect real-time information from incoming news. As noted above, in recent

years, quotes on options for Fed Funds futures have been provided on an indicative basis, but are not actually traded.

In contrast, Kalshi contracts for the federal funds rate have relatively large liquidity. Figure 2 shows a volume heatmap for every contract dating back to 2021 for the federal funds rate. In this figure, the darker the shading, the greater the volume. One can see that recent periods have had volumes greater than a million for several strikes.



Figure 2: **Volume Heatmap for Kalshi Federal Funds Rate Forecasts**

This chart shows the volume for each strike price for each meeting as of June 2025. Each box is shaded based on the level of volume, with darker boxes corresponding to greater volume.

The volume over time has been growing in this market. Figure 3 shows that the volume has been frequently above a million in recent years, with the peak recently reaching close to 100 million in volume for the September FOMC. These volumes compare favorably to SOFR options, as well.

# 3   Converting Kalshi into Probability Distributions

Kalshi structures financial and macroeconomic contracts as a series of binary options that pay $1 if the realized outcome exceeds a specified strike. Figure 4 illustrates this structure for the December 2025 FOMC meeting. Each contract allows users to trade "Yes" or "No" positions, depending on whether they believe the event will occur. Our objective is to convert the market prices of these binary contracts into an implied probability distribution, updated daily, to produce high-frequency forecasts for key macroeconomic variables.



Figure 3: **Volume Time Series for Kalshi Federal Funds Rate Markets (Log Scale)**
The chart shows the total volume for each FOMC meeting based on the log scale dating back to 2021. These values reflect the sum of the markets for the Federal Funds Rate Decision and the Federal Funds Target Rate.

**Methodology.** We begin by scraping trade-level data from Kalshi. We then apply a straightforward mapping from market prices to probability mass, treating the price of a "Yes" contract as the market-implied risk-neutral probability that the event occurs. In contracts that cash as long as the outcome exceeds the strike (rather than the outcome falling in a specific bin), we calculate the probability of the outcome by subtracting from the "Yes" price of exceeding the previous strike. For instance, in Figure 4, the 4.0 strike has a last-traded price of $0.40, while the 4.25 strike has a last-traded price of $0.22, so we calculate an 18% probability the Fed Funds rate falls between 4.0 and 4.25[2].

In the event a strike has no traded contracts on a day, we carry over the last-traded strike from a previous day. Sometimes, two strikes have the same price[3], and in that case we assign the probability to the outcome closer to the mode. This simple, model-free approach allows us to construct a daily-updating risk-neutral pdf over the relevant outcome space. Once we have the risk-neutral pdf, we can immediately work out the implied moments, notably the mean. In subsequent sections, we demonstrate that this parsimonious approach improves forecast performance and enhances analytical flexibility over existing forecast tools.

**Caveats and Discussion.** While our approach is straightforward, there are some caveats worth noting. First, as with all options, it is giving risk-neutral probabilities under the **Q** measure, not actual physical probabilities under the **P** measure. In other words, the probabilities may be distorted by risk premia. The retail investor base of Kalshi might alter the risk premia properties. We will return to assessing the risk premia later. Separately, the outermost (tail) contracts often suffer from low trading volume, which can lead to stale prices

---

[2]Kalshi's contract is denoted for the upper bound of the FFR, so in practice the probability allocated between 4.0 and 4.25 being 18% implies a 18% chance on the target range being 4.0-4.25.

[3]This happens mostly near the tails, since prices are bounded between $0.01 and $0.99.



Figure 4: **Fed Funds Rate for December 2025 contract**

The prices shown in this figure were captured on July 22, 2025. The underlying contract is for determining the federal funds rate in December. In this market, the upper bound of the range is considered when evaluating the outcome. The "Above 4.25" outcome corresponds to the target range or no further rate cuts by December 2025, as of the time the image was captured.

and noisy estimates in the tails of the distribution—especially in illiquid markets. However, these issues are not unique to Kalshi. SOFR options also suffer from sparse trading in extreme outcomes and Fed Funds Futures options over the past several years have not traded at all. To mitigate tail-related distortions, we enforce monotonicity in the CDF by constructing the distribution outward from the mode toward the tails. This approach prevents stale or illiquid pricing in the tails from contaminating the rest of the pdf. We find that enforcing monotonicity of our cdf starting from the mode improves the reliability when compared to starting on one side or the other when constructing the distributions. We highlight that constructing complete distributions from Kalshi's economic contracts can have challenges, and we intend to make public complete code packages which do so from trade-level and bid-ask data.

Even with these limitations, the probability distributions implied by Kalshi prices compare favorably to these alternative market-based forecasts when evaluated on predictive accuracy. While refinements—such as inferring probabilities from the midpoint of bid-ask spreads—may further improve precision, we find such enhancements are not necessary to deliver forecasting gains.[4] More importantly, Kalshi provides the fastest-updating distributions currently available for many key macroeconomic indicators, and the only reasonable

---

[4]We find that midpoints of bid-ask spreads seem to introduce additional issues due to occasionally large spreads on tail outcomes. See the Appendix for more discussion.

distributions available for macroeconomic indicators like GDP, Unemployment, or Core CPI. It is also the only financial option with active trading which directly gives beliefs about the Federal Funds rate.

# 4   Time-Series Comparisons to Existing Benchmarks

A natural question is how the time-series evolution of Kalshi-implied forecasts compares to established benchmarks. In this section, we document both the similarities and differences between Kalshi and more traditional market-based measures, such as Federal Funds futures and overnight index swap (OIS) rates.

**Federal Funds Rate Projections.**   Figure 5, left panel, displays the evolution of federal funds rate expectations following the December 2024 FOMC meeting. The Kalshi-implied mean forecast (red line) closely tracks both market-based expectations and the consensus from the Survey of Market Expectations. Notably, the sharp decline in forecasts at the end of July—following the FOMC's signal of a likely rate cut in September—is more pronounced in the OIS and fed funds futures data. In contrast, the Kalshi mean and the SME consensus exhibit a more gradual adjustment, with broadly similar timing and magnitude.



Figure 5: **FOMC Federal Funds Rate Comparisons**

The chart on the left shows the federal funds rate projections for the period following the December 2024 FOMC meeting. OIS YE 2024 corresponds to the overnight index swap rate for the end of 2024. The PDS Median path of modes corresponds to the Survey of Market Expectations median of modal path projection for the federal funds rate. The chart on the right shows similar projections for the June 2025 FOMC meeting.

In the right panel, we see that the projections for June 2025 FOMC are also fairly similar across the different approaches. One slight difference is that the Kalshi mean did not decline

as much in early April, which ended up being prescient given the developments that unfolded during that period.

**Federal Funds Rate Intermeeting Period Dynamics.**    We can also more closely track the time series of probabilities for particular rate outcomes for a given meeting. For instance, in Figure 6, we plot the time series of the probability of the most likely rate outcome for the July 2025 FOMC (blue line). For July 2025, this corresponds to the probability of no rate change. One can see that the probability of no rate change declined following several communications that were interpreted by investors as more accommodative than expected. This led the probability to fall below 80%. It wasn't until the June Nonfarm Payrolls report that the probability of no rate change jumped above 90%.



Figure 6: **Probability of Most Likely Rate Outcome Before July 2025 FOMC**

The chart shows the probability of the most likely outcome for the July 2025 FOMC (blue line), in this case for no rate change. The rest of the historical distribution in terms of the 25th to 75th percentile is shown in gray, with the dashed black line reflecting the median.

**CPI Inflation Projections.**    Kalshi also provides mean forecasts for CPI. The chart on the left of Figure 7 shows that the May 2025 CPI had been drifting down following the release of the April 2025 CPI which came in lower than expected, as shown by the right panel. This chart demonstrates that both the Bloomberg consensus and the Kalshi-implied mean can at times line up closely. However, a key difference is that Bloomberg consensus has no time series and is only available in the months before a release. For instance, we learn that developments around early April caused a spike in expectations for inflation, but

16

this did not persist.  The evolution of these dynamics are not possible to observe for the Bloomberg Consensus.



Figure 7: **Kalshi CPI Comparisons to Bloomberg Consensus**

The chart on the left shows the year-over-year May 2025 CPI projection coming from the Kalshi market and the Bloomberg consensus.  The chart on the right shows the year-over-year April 2025 CPI projection.

**Year-end Projections for CPI and GDP.**   In addition to year-over-year monthly readings, Kalshi also tracks Q4/Q4 projections for CPI and GDP. The chart on the left of Figure 8 shows that the one-year inflation swap (solid black line) lines up fairly closely with the Kalshi-implied mean (red line). The Blue Chip Economic Indicators 2025 inflation, which is available only at lower frequency, also lines up very closely with the other two approaches.

The chart on the right is the one that is unique to Kalshi.  Previously, there did not exist a market-implied forecast of GDP growth.  The right panel shows that the Kalshi-implied mean tracked very closely the Survey of Market expectations. We also include the TIPS 2-year real yield as another proxy for growth.  All of the series show a decline from the beginning of the year by close to one percentage point, with recent dynamics moving roughly sideways.

**Projections for Unemployment.**   Kalshi offers a rare source of market-based forecasts for labor market indicators such as unemployment and payrolls—variables for which no liquid financial markets currently exist.  Aside from prediction markets, forecasts for these releases are primarily derived from surveys.  However, survey-based estimates are not updated in real time and are only available at low frequency.

The chart on the left of Figure 9 shows that both the Bloomberg Consensus and the Kalshi-implied mean accurately anticipated the May 2025 unemployment release. For June 2025, both forecasts overestimated the actual unemployment rate, but the Kalshi mean was closer to the realized value than the Bloomberg Consensus.

17



**Figure 8: Year of 2025 Comparisons**

The chart on the left shows the year of 2025 CPI inflation projection for Kalshi, a one-year inflation swap, and the Blue Chip Economic Indicators consensus expectation for the year 2025. The chart on the right shows the real GDP growth projections for 2025 from Kalshi, the Survey of Market Expectations, and the Blue Chip Economic Indicators. Also included is the TIPS real 2-year yield as a proxy for real growth.

# 5   Distributional Comparisons to Existing Benchmarks

**Kalshi vs Fed Funds Futures.**   A key strength of the Kalshi market is the probability distribution provided by its market structure. In contrast, fed funds futures require binomial tree assumptions which enforce just two possible outcomes.

For instance, Figure 10 provides a comparison for the September 2025 FOMC meeting. The panel on the left shows the implied probabilities based on two outcomes, no rate change and one 25 basis point cut. In contrast, the Kalshi distribution provides a richer set of outcomes as it does not face the same set of restrictions. While the fed funds futures suggests a weight of 0.75 on a 25 basis point cut, this is likely lumping in weight on lower rate outcomes, as shown by the Kalshi chart on the right. Instead, according to the Kalshi chart, there is much greater uncertainty as investors do not put such a large weight on the modal outcome of a quarter-point rate cut.

We can see a similar issue for the October 2025 FOMC meeting shown in Figure 10. The Kalshi market implies there is nonzero weight on seven different outcomes. When we instead use Fed Funds futures, we have to make an assumption of just two possible outcomes, which clearly implies too little uncertainty.

**Kalshi vs SOFR Options.**   While the fed funds futures can be quite restrictive in formulating probabilities, a suitable alternative is one based on SOFR options. SOFR options have been around since January 2020. One issue with SOFR options is that the contracts that are liquid are for three month periods. This makes them difficult to interpret, as they



Figure 9: **Unemployment Comparisons**

The chart on the left shows the unemployment projections for May 2025. The chart on the right shows the unemployment projections for June 2025.

average over multiple FOMC meetings. In contrast, the Kalshi distribution is specific to each meeting.

Another issue is that SOFR contracts settle to the repo rate which has a spread with respect to the effective federal funds rate. This spread has grown over time and is expected to continue to grow amid balance sheet runoff by the Federal Reserve. A several basis point difference may seem small, but this can dramatically affect probabilities.

Figure 11 shows the SOFR option-implied distribution for Q4 2025 (the three months to mid-December) implied a modal outcome of no rate cuts. In contrast, the Kalshi distribution, constructed as the average of the September and October densities, along with fed funds futures, implied greater weight on a 25 basis point rate cut. This is likely driven, in part by the roughly 6 basis point spread between SOFR and the effective federal funds rate. While one could consider a crude lateral shift of the SOFR distribution, there's little evidence to suggest the SOFR-EFFR spread follows a normal distribution, so this adjustment could introduce further noise. The fact that the underlying SOFR rate is meaningfully higher implies an upward bias in the probabilities implied by the SOFR distribution. Since the Kalshi market is directly tied to the federal funds rate, it does not suffer from this issue making it the best available density forecast for the funds rate.

**Kalshi vs SOFR Investors.** Another key distinction between the SOFR market and Kalshi is related to the investors in each market. Kalshi tends to attract the retail investor with its relatively low entry cost. In contrast, the SOFR market tends to have larger institutional investors. It seems plausible that large institutional investors may have greater hedging needs and this could also play a role in the observed upward bias for this period.

The idea is that institutional firms may have large fixed income exposure and may wish



Figure 10: **Fed Funds Futures vs Kalshi Sept. and Oct. 2025 FOMC Meetings**

The upper left panel shows the implied probability from Fed Funds futures for the September FOMC meeting. We use the price of the Fed Funds futures contract for October to determine the probabilities which are assumed to have just two possible outcomes. The upper right panel shows the corresponding Kalshi distribution that does not enforce the assumption of just two outcomes. The lower left panel shows the implied probability from fed funds futures for the October FOMC meeting. For parsimony, we use the price of the fed funds futures contract for November to determine the probabilities. The lower right panel shows the equivalent Kalshi distribution.



Figure 11: **SOFR Options vs Kalshi Q4 2025 FOMC Meeting**

The left panel shows the implied probability from SOFR options for the fourth quarter of 2025. This is defined as mid-September to mid-December 2025. The right panel shows the equivalent Kalshi distribution, which is computed by averaging over the September and October 2025 FOMC meetinigs.

to hedge against a scenario where rates remain elevated or where bond prices may fall. This would push up the demand for options for the no rate change outcome while pushing up the prices of these options, which would increase the implied probability of this outcome. But this would be more indicative of risk premiums rather than expectations. Indeed, survey-based evidence coming from the Survey of Market Expectations (not shown) also suggests greater weight on rate cuts than implied by SOFR options, which is consistent with Kalshi.

**2025 Inflation and GDP Growth Distributions.** As previously noted, a unique aspect of Kalshi is the availability of real-time GDP growth distributions. Figure 12 shows the Kalshi probability distribution for CPI and real GDP Growth over 2025. Interestingly, it suggests that investors are placing greater weight on outcomes for growth below 1% and for CPI inflation to be above 3.5% when compared to the beginning of the year. These moves seem consistent with market commentary highlighting the potential effects of trade policy developments over this past year.

A read from July 3rd, 2025 on the probability of GDP growth being below 1% was close to 0.4. This might seem large, but the July Blue Chip Economic Indicators consensus forecast for 2025 GDP growth is 1.4, which is roughly consistent with the median of the Kalshi distribution. The consensus forecast for 2025 CPI from the Blue Chip survey is 2.9, which is also close to the median of the Kalshi CPI distribution. However, a key difference between Kalshi and the Blue Chip surveys is the availability of the probability distribution rather than just a single point estimate. The Kalshi distribution shows how uncertain investors are about inflation and GDP growth for this year. While the Survey of

21

Professional Forecasters also provides distributions for GDP growth and inflation, they are only available at a quarterly frequency. The advantage of high frequency data allows for analyzing shifts in the distribution of GDP outcomes after large news events (such as trade policy changes as shown in Figure 12).



Figure 12: **End of Year 2025 Distributions for CPI and Real GDP Growth**

This chart shows the probability distributions for CPI and real GDP growth for 2025. These are calculated as December 2024 to December 2025 for CPI, and 2024Q4 to 2024Q5 for real GDP growth.

**Stagflation risks.** Figure 13 shows the evolution of tail risks to CPI and GDP calculated using Kalshi, Survey of Professional Forecasters, and Blue Chip data. Specifically, we plot the daily time series for the weight placed on CPI being greater than 3 percent in the upper left panel and real GDP growth being lower than 1.5 in the upper right panel. We plot the equivalent SPF probabilities based on the first and second quarter readings. We also plot the percent of respondents from Blue Chip Economic Indicators with a modal expectation above 3 percent, though note that this is no way a density forecast. For inflation, we can see that all three series seemed to increase around the beginning of April, consistent with concerns regarding inflation associated with trade developments. We see the probability

come down as news of trade alleviation becomes more prominent later in the sample. We see similar dynamics for real GDP potentially being below 1.5 percent. All of the Kalshi and SPF densities are marginal ones; we have no way of measuring the joint probability of high inflation and low growth.

For the severe stagflation outcomes, with inflation being above 4 percent (lower left panel) or GDP growth being below 0 percent (lower right panel), we see much more weight placed on these outcomes for Kalshi than for the surveys. There are a number of explanations that could explain the difference between Kalshi and the SPF survey, such as the presence of risk premiums or differences in retail investors versus professional forecasters. Nonetheless, the latest probabilities in the Kalshi market seem to be consistent with the second quarter observation coming from SPF (with the exception of the ≥4% inflation panel).



Figure 13: **End of Year 2025 Stagflation Risks**

This chart shows the probability of tail risks for CPI and real GDP growth for 2025 over time. These are calculated as December 2024 to December 2025 for CPI, and 2024Q4 to 2024Q5 for real GDP growth. Probabilities are created by taking the sum of different bins in each period over time.

# 6   Forecast Performance of Kalshi

In this section, we explore the forecast performance of Kalshi forecasts of the fed funds rate for each FOMC meeting along with the year-over-year CPI inflation for each month since 2022.

**Federal Funds Rate.**   The Kalshi distribution provides a mean, median, and modal forecast based on its distribution. A natural question relates to how well these elements forecast the federal funds rate after each FOMC meeting.

Earlier, in Figure 1, we showed the mean absolute prediction error, averaging across all FOMC meetings, plotted against the number of days before the FOMC meeting. That figure also shows some comparisons. The forecast performance of Kalshi is roughly consistent with professional forecasters such as those from FRBNY's Survey of Market Expectations. We plot one-half standard deviations of forecast errors for the survey and one can see overlap with the Kalshi-implied moments. We also plot mean absolute forecast errors coming from fed funds futures (purple line), and note the slight improvement with about 60 days to go for Kalshi. Also of note, the mode coming from Kalshi's distribution has had a zero absolute average error by the day of the FOMC, which is in contrast to the survey and fed funds futures. The observation that drives this distinction was the September 2024 FOMC, in which there was probability on both a 25 and 50 basis point cut, and Kalshi put greater weight on the 50 basis points that turned out to be correct.

**CPI.**   In Figure 14, we see a similar decline in the average absolute error for CPI annualized inflation forecasts as we get closer to the release date. In contrast to Kalshi, we only observe the Bloomberg Consensus forecast just before the data release and thus cannot evaluate its evolution over time. Thus, the Kalshi can provide a read of expectations for these monthly releases well in advance of the Bloomberg consensus.

For headline CPI, the mean absolute error from Kalshi as of the day of the release is about 7 basis points, while the Bloomberg consensus is about 8 basis points.

**Unemployment.**   Kalshi also provides real-time distributions for expectations of the unemployment rate. As with real GDP growth, options markets do not exist for unemployment, which makes Kalshi unique in terms of providing a distribution for unemployment expectations. Figure 14 shows that the average absolute error for the mean coming from Kalshi is fairly close to the Bloomberg consensus forecast, while the mode tends to jump around as it must take values in increments of 0.1.

24



Figure 14: **Headline, Core CPI and Unemployment Forecast Errors Comparison**

This figure compares the mean absolute errors from 50 days out to each headline CPI, core CPI, and unemployment release since 2022.

**Significance of differences in forecast accuracy**   Table 3 compares the mean absolute error and the root mean square error on the day of the release for the Kalshi mean, median and mode forecasts with that from the Bloomberg consensus. Statistical significance from Diebold-Mariano statistics (Diebold and Mariano, 1995) comparing each of the Kalshi forecasts to the Bloomberg consensus is also noted. In some cases, the Kalshi forecast is a significant improvement over the Bloomberg consensus. For example, the Kalshi median and mode have significantly smaller mean absolute error than the Bloomberg consensus for headline CPI. In other cases, there is no statistically significant difference between Kalshi and Bloomberg forecast accuracy. In no case is Kalshi significantly worse than the Bloomberg consensus.

**Panel A: Macro Variables**

|  | Bloomberg | Kalshi Mean | Kalshi Median | Kalshi Mode |
|---|---|---|---|---|
| **Headline CPI** | | | | |
| MAE | 0.081 | 0.069 | **0.063**$^*$ | **0.063**$^*$ |
| RMSE | 0.100 | **0.080**$^{**}$ | 0.083 | 0.087 |
| **Core CPI** | | | | |
| MAE | 0.070 | 0.070 | 0.080 | 0.070 |
| RMSE | 0.100 | 0.090 | 0.110 | 0.100 |
| **Unemployment Rate** | | | | |
| MAE | 0.109 | 0.117 | 0.107 | 0.107 |
| RMSE | 0.132 | 0.136 | 0.132 | 0.135 |

**Panel B: Federal Funds Rate**

|  | FF Futures | Kalshi Mean | Kalshi Median | Kalshi Mode |
|---|---|---|---|---|
| MAE | 0.010 | 0.010 | **0.000**$^{**}$ | **0.000**$^{**}$ |
| RMSE | 0.020 | 0.030 | **0.000**$^{**}$ | **0.000**$^{**}$ |

Table 3: **Forecast Accuracy: Benchmark Forecasts versus Kalshi**

Panel A reports forecast accuracy relative to the Bloomberg consensus forecast on the day of the release. Panel B reports forecast accuracy relative to fed funds futures on the day of the FOMC. Stars indicate statistically significant differences in forecast accuracy relative to the benchmark based on Diebold–Mariano tests. Stars denote significance levels: $^*p < 0.10$, $^{**}p < 0.05$, $^{***}p < 0.01$.

## 6.1   Probability Integral Transform

As noted earlier, the Kalshi-implied density is under the risk-neutral **Q** measure which, given risk premia, is not necessarily the same as the physical **P** measure. The extent to

which Kalshi-implied pdfs are distorted by risk premia is an empirical question. If the Kalshi-implied density were indeed the physical density of the future variable, then it is well known that the cumulative distribution function, evaluated at the realized value, should be uniform on the unit interval (see, for example, Diebold et al. (1998)). We assess this in Figure 15 for forecasts for monthly releases of unemployment, CPI (headline and core) and FOMC decisions on the target federal funds rate. These are constructed both 28 days before the release and on the day of the release, but before it. The probability integral transforms generally seem close to uniform. We can test the hypothesis that they are uniform in population using the test statistics:

$$K = \sup_{0 \leq r \leq 1} \Psi(r) \tag{1}$$

and

$$C = \int_0^1 \Psi(r)^2 dr. \tag{2}$$

where $\hat{F}(r)$ is the empirical cdf of the PIT and $\Psi(r) = T^{-1/2}(\hat{F}(r) - r)$, $0 \leq r \leq 1$ (Darling, 1957). The bootstrap $p$-values using the bootstrap of (Rossi and Sekhposyan, 2019) are also shown in Figure 15. In some cases, uniformity is borderline rejected, mostly because low values of inflation and unemployment occur a little too frequently. In other cases, the null of uniformity is not rejected. Overall, while there is some evidence of risk premia overstating the odds of higher inflation and higher unemployment, these probability density functions appear to be fairly well calibrated.

# 7 Distributional Responses to News

## 7.1 Fed Funds Rate Responses to Macro News

With access to full distributions, we can uncover new patterns in how macroeconomic news affects higher moments of expectations of the federal funds rate at the next FOMC. Figure 16 shows the average daily response to news for the mean, mode, variance, and skewness coming from the distribution of the federal funds rate for the next FOMC. The news releases we focus on are CPI, PCE inflation, Non-farm payrolls, ISM manufacturing, FOMC statement, and FOMC minutes. We denote all other days as Other.

**Fed funds rate mean and mode responses to news.** Based on responses since 2022, we see that CPI days tend to have the largest positive effects on the first moment of the federal funds rate distribution. This could be a reflection of the sample period, as there



Figure 15: **Probability Integral Transform**

This figure show the empirical cumulative distribution function as of 0 and 28 days before unemployment, CPI (headline and core) and FOMC scheduled federal funds rate announcements, all evaluated at the realized value. If the options-implied distribution were equal to the physical distribution, then this probability integral transform would be uniform in population, as shown by the lines. Each panel also reports the $p$-values from the test statistics $k$ and $C$, defined in the text, using the bootstrap of Rossi and Sekhposyan (2019)

were several announcements of higher-than-expected inflation in this particular period and is consistent with the importance of inflation for rate setting in the post-pandemic period. We also see that CPI, Non-farm Payrolls, and FOMC Minutes/Statement days on average result in the largest changes in central moments of the distribution of Federal Funds Rates, coinciding with market commentary typically placing the largest emphasis on these events. We are assured that our constructed distributions move signficantly more on news release days than other days.

**Fed funds rate variance and skewness responses to news.**   We can also see the effects of news on the variance and skewness of the fed funds rate distributions in panel B of Figure 16.  Intuitively, nearly all of the news announcements lower the variance.  While variance typically decreases on any day (consistent with a general resolution of uncertainty over time), news days result in larger variance declines than other days, consistent with the idea that news days are informative for understanding future Federal Funds Rate distributions.  As one might expect, the largest decline in the variance of the fed funds rate distributions comes on FOMC days, with CPI days generating the second largest decline.

In terms of skewness, we see that nonfarm payrolls days and FOMC days tend to have the largest positive effect.  While the mode and mean seem to tend to decline on NFP days, the rise in skewness suggests that Kalshi investors seem to also place relatively more weight on the upper tail of the fed funds rate distributions.  In the next sections, instead of just examining the responses associated with particular news days, we will sharpen our focus on the effects of surprises for each news release.

**CPI surprise effects on fed funds rate distributions.**   We also can evaluate how the distribution of the federal funds rate responds to the surprises released in each news announcement.  Surprises are computed by taking the difference between the Bloomberg consensus forecast and the realized print.  We first consider CPI inflation, split based on how the moments of the Federal Funds rate respond on days of positive and negative surprises, and days of zero surprise (expectations are measured to the nearest tenth of a percentage point).  The results are shown in Figure 17.

As expected, the mean of the fed funds rate distribution (left panel) moves positively with inflation shocks.  However, the magnitude is asymmetric:  the response to positive CPI shocks is four times that of negative shocks.  The variance of the distribution declines across all outcomes—reflecting the resolution of uncertainty—but the drop is sharpest when the release meets expectations (zero surprise).  Additionally, skewness falls and kurtosis rises independent of the shock's direction.  To establish the statistical significance of these

29

patterns, we turn to the regression analysis in the next section.

**A. Modal and Mean Responses**



**B. Variance and Skew Responses**



Figure 16: **Federal Funds Rate Distribution Responses to Economic News**

This figure shows the average responses of the distribution of the federal funds rate for the next several FOMC meetings following news releases for CPI, PCE inflation, Non-farm payrolls, ISM Manufacturing, FOMC, and FOMC minutes. Other corresponds to all other days which do not fall into these categories.



Figure 17: **Federal Funds Rate Distribution Responses to CPI Inflation Surprises**

This figure shows the average responses of the distribution of the federal funds rate for the next several FOMC meetings following positive, negative and zero news from the CPI inflation release.

## 7.2   Event-study regressions for fed funds rate beliefs

### 7.2.1   Macro news surprises

We next turn to a more systematic analysis of the effects of surprises on the probability density of the federal funds rate. We consider event-study regressions of the form:

$$\Delta y_t = \beta_0 + \beta_1 S_t + \varepsilon_t \tag{3}$$

where $\Delta y_t$ denotes the one day change in a moment of the federal funds distribution for the next FOMC meeting on day $t$ and $S_t$ denotes the surprise component of an announcement coming out on that day. The regression is run over all days of a particular announcement type. The announcement types considered are CPI, PCE and nonfarm payrolls. The constant measures the effect of the announcement in the absence of any surprise.

**CPI significant effect on fed funds rate.**   The results are shown in Panel A of Table 4. The mean, median and mode of the funds rate all respond significantly to a CPI surprise with a 10 basis point surprise resulting in a 3 to 4 basis point rise in the central moments of the federal funds rate. We also see that independent of the surprise, the variance tends to fall, as the constant is negative and significant.

**PCE less significant effect.**   Likewise, PCE surprises also have significant effects, but to a much lesser extent, as shown in Panel B of Table 4. This is consistent with market participants and investors paying more attention to CPI, which is more timely. Moreover, much of PCE inflation can be computed based on existing releases of CPI which could explain the smaller effects.

**Nonfarm payrolls, no significance.**   In Panel C of Table 4, nonfarm payrolls show a positive relationship with the first moments of the fed funds rate distribution, but there is no statistical significance beyond the constant for the mean. This seems consistent with investors placing much greater emphasis on monetary policy's potential response to inflation over the 2022-2025 period when compared to jobs, with the unemployment rate being historically low.

### 7.2.2   Monetary policy surprises

Table 5 presents the response of the federal funds rate distribution to the monetary policy shocks of Acosta et al. (2025). This separately identifies shocks in two communication

31

### Panel A. CPI Headline YoY

| | Kalshi Fed Funds Rate Distribution | | | | | |
|---|---|---|---|---|---|---|
| | Mean | Median | Mode | Variance | Skewness | Kurtosis |
| CPI Surprise | **0.320**\*\*\* | **0.388**\*\*\* | **0.413**\*\*\* | -0.002 | -0.183 | 3.666 |
| | (0.052) | (0.079) | (0.079) | (0.011) | (0.448) | (4.676) |
| Constant | 0.007 | 0.012 | 0.017\* | **-0.004**\*\*\* | -0.028 | **1.853**\*\*\* |
| | (0.005) | (0.008) | (0.009) | (0.001) | (0.048) | (0.540) |
| Observations | 113 | 113 | 113 | 113 | 113 | 113 |
| $R^2$ | 0.379 | 0.255 | 0.256 | 0.001 | 0.002 | 0.006 |

### Panel B. PCE Headline YoY

| | Kalshi Fed Funds Rate Distribution | | | | | |
|---|---|---|---|---|---|---|
| | Mean | Median | Mode | Variance | Skewness | Kurtosis |
| PCE Surprise | **0.012**\*\* | **0.015**\* | **0.012**\* | -0.001 | 0.001 | **-0.438**\* |
| | (0.004) | (0.008) | (0.007) | (0.001) | (0.040) | (0.257) |
| Constant | -0.003 | **-0.014**\* | **-0.017**\* | **-0.002**\* | 0.068 | **1.827**\*\*\* |
| | (0.006) | (0.008) | (0.009) | (0.001) | (0.043) | (0.573) |
| Observations | 113 | 113 | 113 | 113 | 113 | 113 |
| $R^2$ | 0.060 | 0.040 | 0.023 | 0.007 | 0.000 | 0.007 |

### Panel C. Nonfarm Payrolls

| | Kalshi Fed Funds Rate Distribution | | | | | |
|---|---|---|---|---|---|---|
| | Mean | Median | Mode | Variance | Skewness | Kurtosis |
| NFP Surprise | 0.053 | 0.045 | 0.045 | 0.010 | -0.061 | -4.946 |
| | (0.032) | (0.051) | (0.051) | (0.009) | (0.455) | (3.440) |
| Constant | **0.005**\*\* | 0.004 | 0.004 | -0.001 | 0.037 | -0.156 |
| | (0.002) | (0.005) | (0.005) | (0.001) | (0.030) | (0.550) |
| Observations | 108 | 108 | 108 | 108 | 108 | 108 |
| $R^2$ | 0.056 | 0.008 | 0.008 | 0.011 | 0.000 | 0.007 |

Table 4: **Kalshi Fed Funds Rate Distribution Responses to Macro Surprises**

*Notes:* This table reports estimates of equation (3) using robust standard errors (HC3). Columns represent the change in moments of the Federal Funds Rate distribution on the day of the news release (end of previous day to end of day of release). Surprises are measured as the actual released value minus the Bloomberg survey expectation. Units are percentage points for CPI and PCE (year-over-year) and 100,000s of payrolls for Nonfarm Payrolls. Stars denote significance levels: \*$p < 0.10$, \*\*$p < 0.05$, \*\*\*$p < 0.01$.

windows: the statement window and the press conference window. We study the effects of both monetary policy shocks on the Kalshi-implied federal funds rate distribution at horizons out to about 6 months jointly. The results highlight a clear distinction between the two communication windows. During the statement window, the shock primarily shifts the level of rates: the mean, median, and mode all respond positively and significantly. This is not surprising as of course the statement includes the announcement about the current target for the federal funds rate. We also observe a significant rise in variance, indicating that the tighter policy generates some immediate dispersion in market views.

**Press conference effect on skewness.**   Conversely, we find that the press conference shock has a positive, albeit statistically insignificant, effect on the central tendency (mean, median, or mode). This lack of significance may stem from the short maturity of the Kalshi Fed funds contracts, which limits the sample to a six-month horizon and the press conference obviously does not make announcements about the current funds rate target. However, the press conference significantly alters the shape of the distribution, causing a sharp decline in skewness. This negative shift could possibly reflect that more restrictive than expected communication during the press conference effectively truncates the "right tail" of the distribution. Tighter monetary policy in the press conference could be resolving upside uncertainty—capping the risk of higher rates—while leaving downside risks intact.

|  | Kalshi Fed Funds Rate Distribution | | | | | |
|  | Mean | Median | Mode | Variance | Skewness | Kurtosis |
|---|---|---|---|---|---|---|
| MP Statement Shock | **0.872**[***] | **1.098**[**] | **1.233**[*] | **0.249**[*] | -0.763 | -6.609 |
|  | (0.236) | (0.427) | (0.681) | (0.144) | (2.344) | (7.603) |
| MP Press Conference Shock | 0.011 | 0.502 | 0.339 | -0.032 | **-2.875**[**] | -7.807 |
|  | (0.319) | (0.318) | (0.905) | (0.159) | (1.285) | (7.299) |
| Constant | 0.003 | -0.004 | -0.002 | **-0.007**[**] | 0.050 | 0.384 |
|  | (0.004) | (0.010) | (0.013) | (0.003) | (0.053) | (0.320) |
| Observations | 94 | 94 | 94 | 94 | 94 | 94 |
| $R^2$ | 0.165 | 0.106 | 0.041 | 0.054 | 0.050 | 0.013 |

Table 5: **Kalshi Fed Funds Rate Distribution Responses to MP Shocks**

Notes: Robust standard errors (HC3) in parentheses. Columns report changes in moments of the federal funds rate distribution on the day of the news release for meetings more than one month ahead (end of previous day to end of release day). Monetary policy shocks are measured using the San Francisco Fed USMPD database. $^*p < 0.10$, $^{**}p < 0.05$, $^{***}p < 0.01$.

# 8   Conclusions

This paper has introduced Kalshi macroeconomic prediction markets as a novel, high-frequency, and distributionally rich source of expectations data. Using newly available contracts across a broad set of macroeconomic indicators, we have shown that Kalshi-implied distributions are well-behaved, responsive to news, and comparable in forecasting accuracy to established benchmarks such as the Survey of Market Expectations and the Bloomberg consensus. In several cases, they provide unique insights—particularly for variables like GDP growth, core inflation, unemployment, and payrolls, for which no other market-based distributions currently exist. We have also argued that they provide the only credible measures of distributional beliefs about decisions at specific FOMC meetings.

Our results highlight several key advantages. First, Kalshi's forecasts for the federal funds rate and CPI provide statistically significant improvements over fed funds futures and professional forecasters, all while providing continuously updated full distributions rather than infrequent point estimates. The mode of the Kalshi distribution, for example, has perfectly matched the realized federal funds rate by the day of each meeting since 2022, a feat not achieved by either surveys or futures. Second, these markets capture rich distributional dynamics—such as tail risks and asymmetries in higher moments—that are unavailable from traditional sources. For instance, we find that monetary policy press conference shocks tend to significantly reduce skewness in the Federal Funds rate distribution. Third, the accessibility of Kalshi to retail traders introduces a perspective distinct from institutionally dominated markets, potentially offering a complementary lens on expectations formation.

Together, these findings suggest that prediction markets can serve as a valuable complement to existing forecast tools in both research and policy settings. By providing transparent, continuously updated, and economically interpretable measures of expectations with competitive forecast performance, they open new avenues for studying monetary policy transmission, market sentiment, and macroeconomic uncertainty. As these markets mature and liquidity deepens, their potential to enhance real-time policy analysis and academic research will only grow over time.

# References

Acosta, Miguel, Andrea Ajellp, Michael Bauer, Francesca Loria, and Silvia Miranda-Agrippino (2025) 'Financial market effects of FOMC communication: Evidence from a new event-study database.' Federal Reserve Bank of San Francisco Working Paper 2025-30

Aït-Sahalia, Yacine (1996) 'Nonparametric pricing of interest rate derivative securities.' *Econometrica* 64(3), 527–560

Amin, Kaushik, and Victor K Ng (1997) 'Inferring future volatility from the information in implied volatility in eurodollar options: A new approach.' *Review of Financial Studies* 10(2), 333–367

Ang, Andrew, Geert Bekaert, and Min Wei (2007) 'Do macro variables, asset markets, or surveys forecast inflation better?' *Journal of Monetary Economics* 54(4), 1163–1212

Bakshi, Gurdip, and Dilip B Madan (2000) 'Spanning and derivative-security valuation.' *Journal of Financial Economics* 55(2), 205–238

Bakshi, Gurdip, George Panayotov, and George Skoulakis (2011) 'Improving the predictability of real economic activity and asset returns with forward variances inferred from option portfolios.' *Journal of Financial Economics* 100(2), 340–357

Ball, Clifford A, and Walter N Torous (1999) 'The stochastic volatility of short-term interest rates: Some international evidence.' *Journal of Finance* 54(1), 233–252

Bauer, Michael D, Aeimit Lakdawala, and Philippe Mueller (2022) 'Market-based monetary policy uncertainty.' *The Economic Journal* 132(647), 1291–1316

Bauer, Michael D, and Mikhail Chernov (2024) 'Interest rate skewness and biased beliefs.' *Journal of Finance* 79, 173–217

Beber, Alessandro, and Michael W Brandt (2006) 'The effects of macroeconomic news on beliefs and preferences: Evidence from the options market.' *Journal of Monetary Economics* 53(8), 1997–2039

Boehmer, Ekkehart, Charles M Jones, Xiaoyan Zhang, and Xi Zhang (2020) 'Tracking retail investor activity.' *Journal of Finance* 75(5), 2249–2300

Burgi, Constantin, Wanying Deng, and Karl Whelan (2025) 'Makers and takers: The economics of the kalshi prediction market.' Working Paper

Chen, Hailiang, Prabuddha De, Yu Jeffrey Hu, and Byoung-Hyoun Hwang (2014) 'Wisdom of the crowds: The value of stock opinions transmitted through social media.' *Review of Financial Studies* 27(5), 1367–1403

Christoffersen, Peter, Kris Jacobs, and Bin Chang (2013) 'Forecasting with option-implied information.' In 'Handbook of Economic Forecasting,' vol. 2 (Elsevier) pp. 581–656

Cieslak, Anna, and Annette Vissing-Jorgensen (2021) 'The economics of the fed put.' *Review of Financial Studies* 34(11), 5228–5265

Clements, Michael P (2018) 'Are macroeconomic density forecasts informative?' *International Journal of Forecasting* 34(2), 197–206

Darling, Donald A. (1957) 'The Kolmogorov-Smirnov, Cramer-von Mises tests.' *The Annals of Mathematical Statistics* 28, 823–838

Diebold, Francis X, and Robert S Mariano (1995) 'Comparing predictive accuracy.' *Journal of Business & Economic Statistics* 13, 253–263

Diebold, Francis X, Todd A Gunther, and Anthony S Tay (1998) 'Evaluating density forecasts, with applications to financial risk management.' *International Economic Review* 39, 863–883

Diercks, Anthony M, and Haitham Jendoubi (2023) 'Expectations of financial market participants.' In 'Handbook of Economic Expectations' (Elsevier) pp. 385–410

Diercks, Anthony M, Colin Campbell, Steven A Sharpe, and Daniel Soques (2023) 'The swaps strike back: Evaluating expectations of one-year inflation'

Diercks, Anthony M., Hiroatsu Tanaka, and Paul Cordova (2024) 'Asymmetric monetary policy expectations.' SSRN Working Paper

Duffee, Gregory R (2012) 'Forecasting interest rates.' In 'Handbook of Economic Forecasting,' vol. 2 (Elsevier) pp. 105–140

Eichengreen, Barry, Ganesh Viswanath-Natraj, Junxuan Wang, and Zijie Wang (2025) 'Under pressure? Central bank independence meets blockchain prediction markets.' Working Paper

Emmons, William R, Aeimit K Lakdawala, and Christopher J Neely (2006) 'What are the odds? Option-based forecasts of FOMC target changes.' *Federal Reserve Bank of St. Louis Review* 88, 543–562

Fan, Rongrong, Anurag Gupta, and Peter Ritchken (2003) 'Hedging in the possible presence of unspanned stochastic volatility: Evidence from swaption markets.' *Journal of Finance* 58(5), 2219–2248

Farrell, Matthew, Jeremiah Green, Russell Jame, and Stanimir Markov (2022) 'The democratization of investment research and the informativeness of retail investor trading.' *Journal of Financial Economics* 143(2), 697–720

Fleckenstein, Matthias, Francis A Longstaff, and Hanno Lustig (2017) 'Deflation risk.' *Review of Financial Studies* 30(8), 2719–2760

Goff, Stephen, Thomas Kostka, and Federico Masera (2014) 'How informative are the subjective density forecasts of macroeconomists?' *Journal of Forecasting* 33(8), 622–636

Gürkaynak, Refet S, and Justin Wolfers (2005) 'Macroeconomic derivatives: An initial analysis of market-based macro forecasts, uncertainty, and risk.' In 'NBER International Seminar on Macroeconomics' University of Chicago Press pp. 11–50

Gürkaynak, Refet S, Brian Sack, and Eric T Swanson (2012) 'Market-based measures of monetary policy expectations.' *Journal of Business & Economic Statistics* 30(2), 175–188

Hanson, Robin, and Ryan Oprea (2009) 'A manipulator can aid prediction market accuracy.' *Economica* 76(302), 304–314

Hilscher, Jens, Alon Raviv, and Ricardo Reis (2022) 'Inflating away the public debt? An empirical assessment.' *Review of Financial Studies* 35(2), 805–852

_ (2024) 'How likely is an inflation disaster?' Working paper

Jarrow, Robert A, Hao Li, and Feng Zhao (2007) 'Interest rate caps "smile" too! but can the libor market models capture the smile?' *Journal of Finance* 62(1), 345–382

Kelley, Eric, and Paul C Tetlock (2013) 'How wise are crowds? insights from retail orders and stock returns.' *Journal of Finance* 68(3), 1229–1275

_ (2017) 'Retail short selling and stock prices.' *Review of Financial Studies* 30(3), 801–834

Kitsul, Yuriy, and Jonathan H Wright (2013) 'The economics of options-implied inflation probability density functions.' *Journal of Financial Economics* 110(3), 696–710

Li, Hao, and Feng Zhao (2006) 'Unspanned stochastic volatility: Evidence from hedging interest rate derivatives.' *Journal of Finance* 61(5), 2213–2230

_ (2009) 'Nonparametric estimation of state-price densities implicit in interest rate cap prices.' *Review of Financial Studies* 22(10), 4335–4376

Longstaff, Francis A, Pedro Santa-Clara, and Eduardo S Schwartz (2001) 'The relative valuation of caps and swaptions: Theory and empirical evidence.' *Journal of Finance* 56(5), 2067–2109

Mertens, Thomas M, and John C Williams (2021) 'What to expect from the lower bound on interest rates: Evidence from derivatives prices.' *American Economic Review* 111(6), 1616–1665

Miltersen, Kristian R, Klaus Sandmann, and Dieter Sondermann (1997) 'Closed-form solutions for term structure derivatives with lognormal interest rates.' *Journal of Finance* 52(1), 409–430

Nakamura, Emi, and Jón Steinsson (2018) 'High-frequency identification of monetary non-neutrality: the information effect.' *Quarterly Journal of Economics* 133(3), 1283–1330

Rich, Robert, and Joseph Tracy (2010) 'The relationships among expected inflation, disagreement, and uncertainty: Evidence from matched point and density forecasts.' *Review of Economics and Statistics* 92(1), 200–207

Rossi, Barbara, and Tatevik Sekhposyan (2019) 'Alternative tests for correct specification of conditional predictive densities.' *Journal of Econometrics* 208, 638–657

Snowberg, Erik, and Justin Wolfers (2010) 'Explaining the favorite–longshot bias: Is it risk-love or misperceptions?' *Journal of Political Economy* 118(4), 723–746

Snowberg, Erik, Justin Wolfers, and Eric Zitzewitz (2013) 'Prediction markets for economic forecasting.' In 'Handbook of Economic Forecasting' (Elsevier)

Swanson, Eric T (2021) 'Measuring the effects of federal reserve forward guidance and asset purchases on financial markets.' *Journal of Monetary Economics* 118, 32–53

Swanson, Eric T, Renxuan Wang, and Yanbin Wu (2025) 'The effects of monetary policy on macroeconomic expectations: High-frequency evidence from traded event contracts.' Working Paper

Wolfers, Justin, and Eric Zitzewitz (2004) 'Prediction markets.' *Journal of Economic Perspectives* 18(2), 107–126

Wright, Jonathan H (2018) 'Options-implied probability density functions for real interest rates.' *International Journal of Central Banking* 12, 129–149

_ (forthcoming) 'Event-day options.' *Journal of Time Series Analysis*

Wright, Jonathan H, and Jon Faust (2012) 'Forecasting inflation.' In 'Handbook of Economic Forecasting,' vol. 2 (Elsevier) pp. 2–56

# Appendix

# A    Midpoint of Bid-Ask Spreads

Another approach to constructing the PDFs for the federal funds rate expectations is to take the midpoint of the bid-ask spread, as opposed to using the prices based on the last trade. Our forecast error results are shown in Figure A.1 based on this approach. One can see that the forecast errors spike quite a bit more, indicating some reliability issues, most likely due to issues surrounding the tails of the distribution. Because of these issues, we maintain focus on the last trade for our main results.



Figure A.1: **Midpoint of Bid-Ask Spread: Fed Funds Rate Forecast Errors**
This figure compares the mean absolute errors from 160 days out to each FOMC for the effective federal funds rate since 2022. Both the last trade and bid-ask midpoints are plotted.