UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COINBASE FINANCIAL
MARKETS, Inc.,

Plaintiff,

v.

DANA NESSEL, et al.,

Defendants.

Case No. 25-14092
Honorable Shalina D. Kumar
Magistrate Judge Kimberly G. Altman

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 13)

## I.   Introduction

Plaintiff Coinbase Financial Markets, Inc. ("Coinbase" or "Plaintiff"), a financial platform, initiated this action on December 17, 2025. ECF No. 1. In addition to seeking declaratory relief, Plaintiff seeks to permanently enjoin the Michigan Gaming Control Board ("MGCB"), its members in their official capacities, and the Michigan Attorney General in her official capacity (collectively, "Defendants") from pursuing civil or criminal enforcement against it under Michigan's gambling laws for facilitating access to "sports event contracts" in Michigan. *Id.* at PageID.2–8. Coinbase argues that because these sports event contracts are a type of derivative regulated by

Page **1** of **47**

the federal Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. § 1 *et seq.*, concurrent regulation of these contracts under Michigan law is preempted, thereby precluding the Defendants from taking enforcement action against Coinbase. *Id.*

Coinbase moves for a preliminary injunction. ECF No. 13. In addition to the parties' briefs, the Court received amicus briefing from 33 federally recognized Indian Tribes and the City of Detroit; it heard oral arguments on June 24, 2026. ECF Nos. 13, 27, 30, 32, 41–42, 44, 47. For the reasons discussed below, Plaintiff's motion for a preliminary injunction is denied.

## II.   Background

Derivatives are a class of financial instruments or contracts that derive their price from " 'the value of one or more underlying assets–for example, commodities (like corn and wheat), securities, or debt instruments.' " *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (quoting *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024)). "Derivatives take several forms, including futures contracts, options, and swap agreements." *Inv. Co. Inst. v. U.S. Commodity*

*Futures Trading Comm'n*, 891 F. Supp. 2d 162, 168 n.3 (D.D.C. 2012), *as amended* (Jan. 2, 2013), *aff'd sub nom.*, 720 F.3d 370 (D.C. Cir. 2013).

A "future" is "an agreement to purchase or sell a commodity for delivery in the future[,]" and an "option" is a "contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of a commodity or other instrument at a specific price within a specified period of time, regardless of the market price of that instrument." *Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *1 n.1 (quoting CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*, https://perma.cc/63HY-DD7E). "Unless the parties cancel their obligations" under a future or option "by buying or selling offsetting positions, the [buyer] must pay the price stated in the contract (e.g., $1.00 per gallon for 1,000 gallons of orange juice) and the [seller] must deliver; usually, however, they settle in cash, with the payment based on changes in the market. If the market price, say, rose to $1.50 per gallon, the [seller] would pay $500 (50¢ per gallon); if the price fell, the [buyer] would pay." *Chicago Mercantile Exch. v. S.E.C.*, 883 F.2d 537, 542 (7th Cir. 1989) (Easterbrook, J.).

"Contrary to futures and traditional options, which contemplate delivery of or performance related to a commodity at some future time,

Page **3** of **47**

swaps are 'pure financial instrument[s] . . . based on the difference between two fluctuating values.' " *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (alteration in original) (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 243 (5th Cir. 2010)). Thus, performance under a swap contract does not contemplate delivery by the seller, and the settlement "price is fixed by mechanical computation from the instruments [or other variables] on which the contracts are based." *Chicago Mercantile Exch.*, 883 F.2d at 542.

Congress originally enacted the CEA in 1936 to regulate a select group of agricultural commodity futures offered on futures exchanges. *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026) (*per curiam*); Derek Fischer, Note, *Dodd-Frank's Failure to Address CFTC Oversight of Self-Regulatory Organization Rulemaking*, 115 COLUM. L. REV. 69, 69 (2015). In its early days, the Act merely required "registration of futures commission merchants and floor brokers[,]" it prohibited "member[s] of a contract market from defrauding any person in connection with the making of a futures contract[,]" and it authorized a rudimentary "commission composed of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General to fix limits on the amount of

permissible speculative trading in a futures contract." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 361–62 (1982) (internal citations and quotations omitted).

"After considerable deliberation, [in 1974] Congress enacted the Commodity Future Trading Commission Act ('CFTCA'), an extensive overhaul of the CEA that both expanded the statute's coverage and dramatically altered its enforcement scheme." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). More precisely, this 1974 CEA amendment brought essentially *all* commodities under federal regulation,[1] created the Commodity Futures Trading Commission ("CFTC"), and gave the nascent CFTC "exclusive jurisdiction" over these commodities under a new "comprehensive regulatory structure . . . ." *Id.*; *Curran*, 456 U.S. at 356. To achieve these ends, the Act amended the term "commodity" to "include everything from corn to copper to currencies," *Phillips*, 155 F.4th at 112, and it made it a felony for anyone to "enter into, or offer to enter into, a transaction involving the sale of a" commodity future or option, "unless it is conducted on or through a board of trade designated and regulated by the"

---

[1] The only commodities excluded under the terms of the Act are "onions . . . and motion picture box office receipts." 7 U.S.C. § 1a(9).

CFTC as a designated contract market ("DCM"), *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993) (citing 7 U.S.C. §§ 2, 6).

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), PL 111-203, 124 Stat. 1376 (July 21, 2010), expanded the scope of the CEA in two ways relevant here. First, "Congress expanded the [CEA]'s reach to include so-called" swaps. *Schuler*, 2026 WL 1295806, at *1. The CEA specifically provides the CFTC with "exclusive jurisdiction" over most swaps traded on DCMs. 7 U.S.C. § 2(a)(1)(A). Under the Act, a swap is, in its broadest configuration, any agreement, contract, or transaction

> (ii) that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(A)(ii). Moreover, and like the regulatory structure for commodity futures and options, by criminalizing non-compliance, the "Act requires 'swap dealers' and 'major swap participants' to register with the CFTC, centralizes risk management of certain swaps, and imposes extensive reporting requirements on swap market participants." *Phillips*, 155 F.4th at 113.

Second, Dodd-Frank implemented a "special rule" with regard to the CFTC's review and approval of, among other things, instruments termed "event contracts." 7 U.S.C. § 7a-2(c)(5)(C). Event contracts have been defined as "a derivative contract for which the 'payoff is based on a specified event, occurrence, or value'—for example, the level of snowfall from a certain storm or the dollar amount of hurricane damage." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 61 (D.C. Cir. 2024) (quoting CFTC, *Contracts & Products: Event Contracts*, https://perma.cc/4FPT-L2SN). These contracts "usually pose a yes-or-no question[,]" with the buyer taking the "yes" position and the seller taking the "no" position. *Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *2. The contract's price fluctuates with the event's perceived probability of occurrence, and it may be purchased or sold at any time before the contract's expiration date. *Id.* "When the contract expires, the seller must pay the buyer if the underlying event on which the buyer took a 'yes' position occurs, but the buyer gets paid nothing if it does not." *Id.*

Despite their recent popularity as derivative instruments,[2] event contracts are not well defined under the CEA. Rather than expound on the statutory basis or definition of event contracts, the Act instead declares, without elaboration, that under its "special rule" it covers those event contracts that include "agreements, contracts, transactions, or swaps in *excluded commodities* that are based upon the occurrence, extent of an occurrence, or contingency[]" which are listed for sale on DCMs. 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). Further confounding this lack of statutory clarity, the CEA's definition of "excluded commodity" at least partially "resembles the relevant definition for swaps: 'an occurrence, extent of an occurrence, or contingency' that is both 'beyond the control of the parties to the relevant contract' and 'associated with a financial, commercial, or economic consequence.' " *Schuler*, 2026 WL 1295806, at *2 (quoting 7 U.S.C. § 1a(19)(iv)). This impenetrable drafting leaves open the question: do the range of event contracts offered on derivative exchanges qualify as swaps under the terms of the statute? *Compare N.*

---

[2] *See* Prediction Markets, 91 Fed. Reg. 12516, 12527 (proposed March 16, 2026) (to be codified at 17 C.F.R. chapter I) (stating that "[s]ince 2021, the Commission has observed a significant increase in the number of event contracts listed for trading on prediction markets[.]").

*Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1179–87 (D. Nev. 2025) (concluding that sports related event contracts are not swaps under the CEA); *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *6–7 (S.D. Ohio Mar. 9, 2026) (same); *QCX, LLC v. Dana Nessel*, 2026 WL 1166362, at *3 (W.D. Mich. Mar. 10, 2026) (same), *with KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 226 (3d Cir. 2026) (concluding that all event contracts are swaps under the CEA); *KalshiEX LLC v. Johnson*, ___F. Supp. 3d___, 2026 WL 1223373, at *4–5 (D. Ariz. May 5, 2026) (same); *Kalshiex LLC v. Orgel*, 2026 WL 474869, at *7–8 (M.D. Tenn. Feb. 19, 2026) (concluding that sports related event contracts are swaps); *United States v. Minnesota*, ___F. Supp. 3d___, 2026 WL 2150211, at *12–16 (D. Minn. 2026) (concluding, at least preliminarily, that the broad statutory definition of swap under § 1a(47)(A)(ii) covers *some* of the event contracts listed on predictions markets).

Whatever the correct categorization of event contracts under the CEA, § 7a-2(c)(5)(C)'s special rule empowers the CFTC to prohibit registered markets from listing event contracts if certain conditions are met. That is, the CFTC may prohibit a registered market from listing an event contract if it concludes that the contract is "contrary to the public interest"

and it involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I)–(VI). Under this rule, the CFTC promulgated 17 C.F.R. § 40.11, a regulation that prohibits "registered entities" from, among other things, offering for trading "[a]n agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law[.]" *See id.* § 40.11(a)(1).

Since August 16, 2023, Coinbase has been "a CFTC-registered" futures commission merchant ("FCM"). ECF No. 1, PageID.4, 9. Practically speaking, an FCM "is an agent of its customers; it takes money that customers deposit with it and uses those funds to facilitate trades in [derivative] contracts through" DCMs. *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 169 (S.D.N.Y. 2014), *aff'd sub nom.*, 611 F. App'x 34 (2d Cir. 2015); *see also* 7 U.S.C. § 1a(28). And because this facilitation ultimately concerns derivative trading on DCMs, "FCMs are subject to the CEA and the regulations promulgated thereunder by the

CFTC." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d at 169. Thus, as an FCM, Coinbase must adhere to CFTC "reporting rules, public disclosure obligations, financial requirements, and record keeping demands[,]" as well as establish and enforce "a system of risk management policies and procedures," including conflict of interest rules and trading standards. ECF No. 1, PageID.26, ¶ 51 (citing 17 C.F.R. §§ 1.10, 1.11, 1.12, 1.14, 1.17, 1.18, 1.55, 1.71, 17.00, 155.3).

Coinbase seeks to leverage its FCM status to imminently provide its "customers access to the array of contracts listed on" DCMs "while using Coinbase's simple, familiar, and user-friendly interface[.]" ECF No. 13, PageID.17. Starting in 2026, Coinbase specifically seeks to use its platform to provide customers, including those in Michigan, access to event contracts offered by KalshiEx, LLC ("Kalshi"), a CFTC regulated DCM. *Id.*; *see also* ECF No. 13-2, PageID.317–18. These event contracts "run the gamut from politics to music to climate to movies to sports." ECF No. 13, PageID.245. Moreover, Coinbase's event contract arrangement with Kalshi purportedly complies "with the comprehensive framework of federal laws and regulations that govern derivative trading on federal exchanges." ECF No. 1, PageID.3.

Nevertheless, Coinbase alleges that several actions by the Defendants cast doubt on its ability to facilitate access to event contracts to its Michigan customers without risk of liability. While Coinbase does not point to actions taken against it individually, it does cite evidence of MGCB's 2025 threats against and investigations into those in Michigan who "operate, offer, or facilitate access to prediction markets, where individuals can buy, sell, and trade event contracts that are based on a future event, occurrence, or value." *See* ECF No. 13-2, PageID.300–03, 314–15. It additionally cites 2025 correspondence sent from the Executive Director of the MGCB to the CFTC that raises concerns about the risks of sports-related event contracts offered in Michigan on unlicensed prediction markets. *Id.* at PageID.305–10. Finally, Coinbase cites an amicus brief joined by the state of Michigan that argues "the CEA 'does not preempt States from regulating sport betting via event contracts.' " ECF No. 13, PageID.254 (quoting Brief of Nevada et al. as *Amici Curiae* Supporting Appellants at 14, 43, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026)).

Michigan's authority to potentially regulate Coinbase's activities in this area is derived from the Lawful Sports Betting Act ("LSBA"), which the

Michigan Legislature passed in 2019 in response to the Supreme Court striking down the federal prohibition on state-approved sports betting in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). ECF No. 27, PageID.440–41 (citing Mich. Comp. Laws § 432.401 *et seq*.). Under the LSBA, internet sports betting is defined as " 'operating, conducting, or offering for play sports betting through the internet.' " *Id.* at PageID.442 (quoting Mich. Comp. Laws § 432.403(s)). The statute provides, in turn, that " '[s]ports betting means to operate, conduct, or offer for play wagering conducted under this act on athletic events and other events approved by the board. Sports betting includes, but is not limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in game betting, proposition bets, and straight bets.' " *Id.* (quoting Mich. Comp. Laws § 432.403(bb)). The LSBA further provides that "internet sports betting may only be offered by a sports betting operator, which must be a licensed commercial casino or a federally recognized tribe (operating independently or in partnership with an internet sports betting platform provider)." *Id.* at PageID.443 (citing Mich. Comp. Laws §§ 432.404(7) and 432.406(1)).

Coinbase, facing the specter of enforcement under the LSBA if it offers unlicensed sports event contracts to its Michigan customers, initiated this suit seeking prospective relief against the Defendants. Coinbase specifically seeks declaratory and permanent injunctive relief against the Defendants pursuant to the Declaratory Judgment Act and the U.S. Constitution. ECF No. 1, PageID.6. In support, Coinbase argues that application of Michigan's gambling laws to the sports event contracts at issue is preempted pursuant to the U.S. Constitution's Supremacy Clause, because these contracts are allegedly federally regulated swaps listed on federal exchanges that fall under the exclusive jurisdiction of the CFTC. *Id.* at PageID.16–28, 31–50. Coinbase's motion for preliminary injunction contends, among other things, that it is likely to succeed on the merits of its preemption argument. ECF No. 13, PageID.249–53, 255–79.

In opposition to Coinbase's motion, the Defendants contend, inter alia, that sports event contracts are not swaps under the CEA, and that even if they were, application of Michigan gambling laws to them is not preempted. *Id.* at PageID.448–65. In addition, 33 federally recognized Indian tribes and the City of Detroit filed amicus briefs in support of the Defendants, respectively arguing, among other things, that a decision in

favor of Coinbase would undermine tribal sovereignty over gaming on Indian lands, and that the lost income for Detroit area casinos would negatively impact the City's tax revenue. ECF No. 30, PageID.531–43; ECF No. 42, PageID.870–77.

## III. Analysis

### A. Jurisdictional Barriers

"[T]he Eleventh Amendment is a true jurisdictional bar that courts can—but are not required to—raise *sua sponte* at any stage in litigation, and, once raised as a jurisdictional defect, must be decided before the merits." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). The Court now analyzes the issue of Eleventh Amendment sovereign immunity *sua sponte*.

Unless a State waives the sovereign immunity provided to it under the Eleventh Amendment, or Congress abrogates it, in most circumstances federal courts lack subject matter jurisdiction over suits brought against States. *Id.* This immunity extends to suits against state officials in their official capacities, because " '[a] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against

the official's office.' " *Id.* (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

"That said, one 'important exception' exists for suits 'challenging the constitutionality of a state official's *action*.' " *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019) (emphasis in original) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984)). However, this exception, which falls under the doctrine announced in *Ex parte Young*, 209 U.S. 123 (1908), is narrow, and it applies to suits seeking prospective relief to end continuing violations of federal law perpetrated by state officials. *Russell*, 784 F.3d at 1048. Furthermore, "[t]here must be 'a realistic possibility the official will take legal or administrative actions against the plaintiff's interests.' " *Id.* (quoting *Russell*, 784 F.3d at 1048).

Here, Michigan has not waived its sovereign immunity, and there is no indication that Congress abrogated State immunity in this area. Thus, because the Defendants are all official proxies for the State of Michigan, Coinbase's suit must fit within the narrow bounds of the *Ex parte Young* exception.

The subject matter of Coinbase's suit falls squarely within the exception, as it seeks prospective relief to end what it alleges is a continuing violation of federal law—namely, Michigan gambling law supplanting the jurisdiction of the CFTC—by the Defendants. ECF No. 1, PageID.16–28, 31–50. However, although the MGCB directors and the Michigan Attorney General arguably have a "realistic possibility" of taking legal or administrative actions against Coinbase under Michigan gambling law if Coinbase offers sports event contracts to Michigan customers, the MGCB does not, because it is not a state official. *See Harris v. Sec'y of State for Tennessee*, 2024 WL 4225713, at *3 (6th Cir. May 29, 2024), *cert. denied sub nom.*, 145 S. Ct. 594 (2024) ("The *Ex parte Young* exception does not apply to the APD because it is a state agency, not a state official."). As such, the MGCB is immune from suit, and the Court will dismiss it for lack of jurisdiction.

But even if the MGCB's directors and the Michigan Attorney General (together, the "remaining Defendants") are amenable to suit in their official capacities, the Court must still determine, as a threshold matter, whether Coinbase has Article III standing to sue them. *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019). In the

Page **17** of **47**

case of pre-enforcement challenges to a statute, standing determinations generally focus on whether the plaintiff has shown that they are " 'under threat of suffering [an] injury in fact.' " *Russell*, 784 F.3d at 1049 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (alteration in original) (some internal quotations omitted).

Under such circumstances, "the Supreme Court has 'held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' " *Block v. Canepa*, 74 F.4th 400, 409 (6th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)) (some internal quotations omitted). For a threat of prosecution to be credible, it must be "founded in fact," which a plaintiff may "demonstrate . . . by pointing to 'past enforcement against the same conduct . . . .' " *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 164).

At this preliminary stage, Coinbase has credibly demonstrated a fear of prosecution by the remaining Defendants. It has provided the Court with materials establishing that: Michigan recently pursued enforcement of its gambling laws against those, like Coinbase, who offer or facilitate access to

Page **18** of **47**

event contracts without state licensing (ECF No. 13-2, PageID.300–03, 314–15); Michigan is concerned about the consequences of unlicensed sports betting via event contracts (*id.* at PageID.305–10); and Michigan is disinclined to agree with the argument that state-level regulation of sports event contracts is largely preempted under the CEA, (ECF No. 13, PageID.254). All told, these facts show that Coinbase is subject to a credible threat of prosecution under Michigan gambling laws for offering unlicensed event contracts, and that this may implicate constitutional interests. *Block*, 74 F.4th at 409–11. Thus, Coinbase has Article III standing to sue the remaining Defendants on this basis.

### B. Legal Standard

A preliminary injunction under Fed. R. Civ. P. 65 "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). **"To secure a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' "** *EOG Res., Inc. v. Lucky*

*Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.' " *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). This is because "when constitutional rights are threatened or impaired, irreparable injury is presumed, no cognizable harm results from stopping the conduct, and it's always in the public interest to prevent constitutional violations." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 642 (6th Cir. 2025) (internal quotations omitted).

### 1.  Likelihood of Success on the Merits

In support of its motion, Coinbase contends that it is likely to succeed on the merits of its argument that sports event contracts are swaps under the CEA, and that, consequently, Michigan is preempted from regulating sports event contracts offered on federally regulated exchanges. ECF No. 13, PageID.255–76. The Defendants contend in opposition that sports event contracts are not swaps under the CEA, and that even if they were,

Michigan is not preempted from regulating sports event contracts under its gambling laws. ECF No. 27, PageID.448–65. The Court finds that Coinbase has failed to clearly establish this factor.

### a. Sports Event Contracts are not "Swaps"

To reach its conclusion that sports event contracts are swaps as defined under § 1a(47)(A)(ii) of the CEA, Coinbase relies on the phrases "occurrence . . . of an event or contingency," and "associated with potential financial, economic, or commercial consequence." ECF No. 13, PageID.261, 266–68. However, the CEA does not define those two phrases, and the Defendants dispute the notion that sports event contracts are correctly viewed as swaps under the CEA. ECF No. 27, PageID.449–57. Thus, the Court must start its analysis " 'with the language of the statute.' " *United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000)).

As outlined earlier, the CEA provides the CFTC with "exclusive jurisdiction" over most swaps traded on DCMs. 7 U.S.C. § 2(a)(1)(A). The Act, under one definition, broadly defines a "swap" as any agreement, contract, or transaction

> (ii) that provides for . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an

event or contingency associated with a potential financial, economic, or commercial consequence[.]

7 U.S.C. § 1a(47)(A)(ii). However, under two surrounding definitions, the Act more narrowly defines a "swap" as any agreement, contract, or transaction

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

. . . .

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred[.]

7 U.S.C. § 1a(47)(A)(i), (iii).

When interpreting a statute, courts do not interpret statutory phrases "in isolation" or based "on the broadest imaginable definitions of [their] component words." *Dubin v. United States,* 599 U.S. 110, 120 (2023).

Page **22** of **47**

Instead, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).

To these ends, where, as here, a contested term is left undefined in a statute, it must first "be given 'its ordinary or natural meaning.' " *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018) (quoting *United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013)). Second, "[i]f a word in isolation is susceptible of multiple meanings," courts then consider the term's "placement and purpose in the statutory scheme." *Id*. Third, "working only within the range of 'textually permissible meanings,' [courts] consider which of those interpretations would serve, rather than frustrate, the statute's manifest purpose." *Id.* at 442–43 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 57 (2012)).

Coinbase's argument that sports event contracts are swaps relies on a broad interpretation of two phrases from § 1a(47)(A)(ii): "occurrence . . . of an event or contingency," and "associated with potential financial, economic, or commercial consequence." With respect to the phrase "occurrence . . . of an event or contingency," Coinbase argues that "the

ordinary meaning of 'event' includes 'outcome,' " such that "event contracts, including sports event contracts, can be phrased to turn on either the occurrence or the outcome of an event[.]" ECF No. 32, PageID.565; *see also* ECF No. 13, PageID.247–48 (describing event contracts that ask whether "the [Detroit] Lions will win their next game" and "will the [Michigan] Wolverines host a College Football playoff game?"). Likewise, with respect to the phrase "associated with potential financial, economic, or commercial consequence," Coinbase argues that it naturally covers all "economic ramifications" tied to sporting events. *Id.* at PageID.267–68 ("Coinbase's event contracts . . . plainly track events with significant, predictable, and measurable economic ramifications. Whether a team makes the College Football Playoff, for example, can make all the difference for a college town's economy. . . . [as] gamedays keep many retail stores or hotels in the area afloat for the whole year.").

The Defendants counsel a narrower interpretation of these phrases. Echoing analysis from *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025), the Defendants first argue that because sports event contracts do not concern just the occurrence of the underlying sporting event, and instead largely

Page **24** of **47**

focus on things like outcomes, that they go beyond the ordinary meaning of the phrase "occurrence . . . of an event or contingency." ECF No. 27, PageID.453–55. They additionally argue that sports event contracts are not covered under a natural reading of the phrase "associated with potential financial, economic, or commercial consequence," because "the only people who benefit from the outcome of a sporting event are the participants." *Id.* at PageID.455.

Arguably, both Coinbase's and the Defendants' interpretation of these phrases are textually permissible, because the words and phrases at issue are highly ambiguous and subject to multiple meanings when read in isolation. *See N. Am. Derivatives Exch., Inc.*, 815 F. Supp. 3d at 1182–83 ("Dictionaries define 'event' in various ways, . . . . [m]ost indicate that an event is an occurrence 'of some importance' . . . . [but] some dictionaries suggest 'event' could mean 'outcome[.]' "); *Flaherty*, 172 F.4th at 227 ("[A] plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition. . . . [as] [t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence."); *QCX LLC*, 2026 WL 1166362, at *3 ("One potential limit on Plaintiff's necessarily implied vision

of *events* and *contingencies* is the statutory requirement that they be *associated with a potential financial, economic, or commercial consequence*. . . . Plaintiff puts forward evidence that individual happenings within a sporting event, such as the number of points scored, can have economic ramifications in terms of the team's valuation, retailers' sales of team merchandise, and the hometown economy. [But] [t]hese are all potential consequences dependent on the reactions of parties outside the game.") (emphasis in original) (internal citations and quotations omitted). Where Coinbase's broad interpretation begins to falter, however, is in its disregard of the context of the statute.

Although "occurrence . . . of an event or contingency" and "associated with potential financial, economic, or commercial consequence" are expansive phrases, they must be read in context. Surrounding § 1a(47)(A)(ii) are subsections (i) and (iii), and the definitions of "swap" contained in these two subsections "refer almost exclusively to financial measures, indices, or instruments." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025). But if § 1a(47)(A)(ii) is read so expansively that it can "run the gamut from politics to music to climate to movies to sports[,]" ECF No. 13, PageID.245, then it presumably also

Page **26** of **47**

covers all financial measures, indices, and instruments, thus meaning that it displaces the definitions in subsections (i) and (iii) and renders them superfluous.

The above helps demonstrate that Coinbase's interpretation of § 1a(47)(A)(ii) and its attendant phrases would frustrate the manifest purpose of the CEA. First, from a structural perspective, by rendering subsections (i) and (iii) superfluous, Coinbase's interpretation of § 1a(47)(A)(ii) undermines the textual coherence of the CEA by failing to fit "all [of its] parts into a harmonious whole[.]" *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Moreover, this expansive interpretation risks violating the "maxim *noscitur a sociis*, that a word is known by the company it keeps," *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961), because, by reaching into the area of sports, Coinbase's interpretation carries § 1a(47)(A)(ii)'s terms far beyond the financial subject matter covered in surrounding subsections (i) and (iii).

Second, Coinbase's read of § 1a(47)(A)(ii) does not comport with the goals of the CEA. The CEA is specifically focused on securing commodity-related derivative markets through deterring and preventing price manipulation; ensuring financial integrity in transactions; avoiding systemic

Page **27** of **47**

risks; protecting market participants from fraud and abuse; and promoting responsible innovation and fair competition. *See* 7 U.S.C. § 5. Commodities are the key component here, meaning that these specific goals are best served when "a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly <u>affect commodity prices</u>." *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026) (emphasis in original). By contrast, the overall goal of securing and stabilizing commodity-related derivative markets is not as well served when a sports event contract, something with *zero* direct affect on commodity prices, is considered a "swap."

The statutory canon against absurdity buttresses this conclusion. "Congress[] . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). Thus, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Based on Coinbase's construction of § 1a(47)(A)(ii)'s terms, all contracts or transactions centered

Page **28** of **47**

around the occurrence or outcome of a sports event potentially qualify as swaps. ECF No. 13, PageID.247–48, 267–68; ECF No. 32, PageID.565. But "because the trading of swaps outside DCMs is illegal under 7 U.S.C. § 2(e)," Coinbase's interpretation also means that "any individual who engages in [sports] gambling outside of a DCM [might] commit a felony . . . ." *Flaherty*, 172 F.4th at 233 (Roth, J., dissenting). However, "[i]n the absence of congressional intent to effect such a sea change, that result is absurd." *Schuler*, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026).

In sum, Coinbase fails to show that sports event contracts qualify as swaps under the CEA. Accordingly, Coinbase fails to clearly establish that it is likely to succeed on the merits.

### b. Even if Sports Event Contracts are "Swaps," the CEA does not Preempt State Gambling Laws

Coinbase, building on its previous argument, additionally contends that Michigan's gambling laws are expressly and impliedly preempted under the CEA as applied to its sports event contracts. ECF No. 13, PageID.255–60, 268–76. In opposition, the Defendants argue that the text of the CEA does not expressly preempt Michigan's gambling laws, and that Congress did not communicate implied preemptive intent through

occupying the field of gambling regulation or by creating direct conflict with state legislation. ECF No. 27, PageID.458–65.

" 'Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.' " *Churchill Downs.*, 162 F.4th at 637 (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012)). But when federal and state law sufficiently overlap, "the Supremacy Clause 'provides a clear rule' that federal law wins out." *Id.* (quoting *Arizona*, 567 U.S. at 399). Therefore, Congress " 'has the power to preempt state law.' " *Id.* (quoting *Arizona*, 567 U.S. at 399).

### i.  Express Preemption

"Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. However, even where "Congress may indicate pre-emptive intent through a statute's express language . . . . [courts] begin [their] analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76–77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S.

Page **30** of **47**

218, 230 (1947)) (third alteration in original). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.' " *Id.* (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005)).

Coinbase's express preemption argument relies on 7 U.S.C. § 2(a)(1)(A). That provision of the CEA, subject to two savings clauses, provides the CFTC with "exclusive jurisdiction" over "transactions involving swaps" "executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Coinbase specifically argues that, "[m]ost naturally read," this language "precludes State interference" over transactions involving swaps executed on DCMs, including its sports event contracts. ECF No. 13, PageID.257. For their part, the Defendants argue that if Congress had expressly intended the CEA to preempt state gambling regulations, "it would have done so explicitly[,]" and it would not have included savings clauses in § 2(a)(1)(A). ECF No. 27, PageID.460–62.

The text of § 2(a)(1)(A) fails to rebut the presumption that the CEA does not supersede state gambling laws.

Page **31** of **47**

One, § 2(a)(1)(A)'s "exclusive jurisdiction" language "would represent an unusual express-preemption provision." *Kalshiex LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026). Indeed, in contrast to other federal statutes like 29 U.S.C. § 1144(a) where courts have found express preemption, § 2(a)(1)(A)'s grant of "exclusive jurisdiction" "identifies the governing *agency* (the CFTC rather than the SEC or a state regulator), not the governing *law* (whether federal or state)." *Id.* Not only that, but expressly preemptive federal statutes typically contain "language that uses words like 'preempt' or 'supersede' when it comes to [preempted] state law[,]" whereas § 2(a)(1)(A) instead uses the phrase "exclusive jurisdiction." *Id.* (first citing 29 U.S.C. § 1144(a); then citing 8 U.S.C. § 1324a(h)(2); then citing 21 U.S.C. § 360k(a); and then citing 49 U.S.C. § 41713(b)).

Two, § 2(a)(1)(A) contains savings clauses. The first savings clause provides that "[e]xcept as hereinabove provided, nothing contained in this section shall [] supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State[.]" 7 U.S.C. § 2(a)(1)(A). At a minimum, this clause indicates that the CFTC's jurisdiction is qualified, not absolute, and that it yields to state law in certain instances, thus casting

Page **32** of **47**

doubt on Coinbase's maximalist argument that § 2(a)(1)(A) must operate to expressly preempt state gambling laws. *Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026). Section 2(a)(1)(A)'s second savings clause provides that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). Again, this clause clearly restricts the CFTC's jurisdiction to some extent with respect to States, and it therefore cuts against Coinbase's argument that § 2(a)(1)(A) must operate to expressly displace state gambling laws. *Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026).

Three, "the [CEA] elsewhere contains *express* preemption provisions." *Id.* (emphasis in original). For instance, one of the Act's provisions says that it "shall *supersede* and *preempt* the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" in the case of electronic trading facilities and agreements excluded or exempted from the CEA under enumerated provisions. 7 U.S.C. § 16(e)(2) (emphasis added). "And under basic interpretive principles, [courts] presume that Congress's choice to expressly preempt *only* certain categories of state laws shows that it did not mean to 'withdraw' the States'

power to enact *all* such laws in other circumstances." *Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026) (emphases in original) (quoting *Arizona*, 567 U.S. at 399). Thus, these contrasting and explicitly preemptive provisions, provisions that Coinbase does not argue its sports event contracts fall under, militate against a finding that § 2(a)(1)(A) is itself expressly preemptive.

The textual evidence points to the contrary of Coinbase's position, and Coinbase fails to rebut the presumption that the CEA does not supersede state gambling laws. Accordingly, Coinbase fails to clearly establish a likelihood of success on its express preemption theory.

### ii.    Field Preemption

In addition to being express, preemption may also be implied. One variety of implied preemption is called field preemption, and it represents "the principle that States may not regulate conduct 'in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.' " *Churchill Downs.*, 162 F.4th at 638 (quoting *Arizona*, 567 U.S. at 399). "[I]n the context of field preemption, the Supreme Court has noted 'the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted.' "

Page **34** of **47**

*Id.* (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015))

(emphases in original). And as with all other species of preemption, there is

a presumption against it, "one that operates with special force in cases 'in

which Congress has legislated . . . in a field which the States have

traditionally occupied.' " *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d

685, 694 (6th Cir. 2015) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485

(1996)).

Coinbase argues that "the CEA's text, structure, and history[,]"

"evinces Congress's intent to oust the States from" the field of derivatives,

thereby impliedly preempting any state law that may regulate event

contracts. ECF No. 13, PageID.269–72. The Defendants respond that "[t]he

great weight of the evidence shows that the CEA is not meant as a vehicle

to legalize sports betting nationwide or to displace the individual states'

ability to regulate it." ECF No. 27, PageID.463.

In support of its argument, Coinbase first points to 7 U.S.C. §

2(a)(1)(A)'s grant of "exclusive jurisdiction" to the CFTC. ECF No. 13,

PageID.269. It further cites to three other provisions within the CEA,

arguing that they indicate preemptive intent. *Id.* PageID.269–70 (citing 7

U.S.C. §§ 2(a)(1)(A), 13a-2(1), 16(e)(1)). Likewise, it points to the extensive

regulatory regime that DCMs and FCMs are subject to, arguing these regimes are evidence that there is not enough remaining space in the field of derivatives regulation "for assistance or supplementation by state law." *Id.* at PageID.271. Finally, Coinbase cites to evidence suggesting that Congress intended for the 1974 amendments to the CEA to " 'preempt the field insofar as futures regulation is concerned.' " *Id.* at PageID.272 (citing H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.)) (emphasis omitted).

There is some truth to Coinbase's argument. For example, the CEA does erect a comprehensive regulatory regime over DCMs and FCMs. *See, e.g.,* 7 U.S.C. §§ 6f, 7; 17 C.F.R. §§ 1.10(b), 1.10(d), 1.12, 1.14, 1.17, 1.18, 1.55, 17.00, 38. There is also evidence that Congress, through the 1974 amendments to the CEA, at least partly intended for "the CFTC's jurisdiction . . . 'to be exclusive with regard to the trading of futures *on organized contract markets.*' " *Ken Roberts Co.*, 276 F.3d at 590–91 (emphasis in original) (quoting S. Rep. No. 93-1131, at 23 (1974)). It is also certainly true that the 1974 Congress "conveyed some intent for the CEA to displace *some* state laws; a state presumably lacks authority to have a parallel regulatory regime" directly over certain derivatives, such as commodity futures, based on 7 U.S.C. § 2(a)(1)(A)'s conferral of "exclusive

jurisdiction" to the CFTC and its savings clause "providing that state laws are not superseded or limited *other than* as 'hereinabove provided.' " *Martin*, 793 F. Supp. 3d at 678 (quoting 7 U.S.C. § 2(a)(1)(A)) (emphases in original).

That said, Coinbase's argument still fails. First, Coinbase overstates the preemptive effect of the provisions at issue. With respect to 7 U.S.C. §§ 2(a)(1)(A) and 16(e)(1), both contain savings clauses, the presence of which "usually signals that Congress does not mean to preempt *the* [*whole*] *field.*" *Schuler*, 2026 WL 1295806, at \*5 (6th Cir. Apr. 24, 2026) (first and third emphasis in original). In fact, despite 7 U.S.C. § 2(a)(1)(A)'s grant of "exclusive jurisdiction" to the CFTC, the Seventh Circuit previously relied on § 2(a)(1)(A)'s savings clauses to hold that " 'Congress did not intend [the CEA] to preempt the field of futures trading.' " *Id.* (quoting *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.,* 977 F.2d 1147, 1155 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle,* 66 F.3d 867, 875 n.7 (7th Cir. 1995)). And with respect to § 13a-2(1), the only correct and modest conclusion that can be drawn from the excerpts cited by Coinbase is that the CFTC is the lone arbiter over violations *of the CEA* committed by registered exchanges. *See* 7 U.S.C. § 13a-2(1) ("Whenever it

Page **37** of **47**

shall appear to the attorney general . . . that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (*other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader*) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity . . . .") (emphasis added).

Second, notwithstanding the CEA's comprehensive regulatory regime over DCMs and FCMs, the Act's reliance on and incorporation of state law suggests that the Act was not intended to occupy an entire field. In this regard, the Act's "special rule" provides that the CFTC may prohibit the offering of event contracts on DCMs that it determines are contrary to the public interest and that involve, among other things, "activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). Given this provision, it simply cannot be said that the CEA leaves no room for supplemental state law in this area, because it is explicitly supplemented by state law. *See Martin*, 793 F. Supp. 3d at 680 ("Congress leaves room for supplementary

state legislation where it expressly relies on and incorporates state laws.")
(quotations omitted).

Third, Coinbase's evidence of preemptive intent in the overarching field of derivatives regulation is largely unsuitable for this context. Determination of the governing field in preemption cases is narrowly tailored to "the *target* at which the state law *aims*[,]" *Churchill Downs*, 162 F.4th at 638, and the state law in controversy, section 432.404 of Michigan's LSBA, is aimed at the regulation of *sports gambling*. *See* Mich. Comp. Laws § 432.404. Moreover, Coinbase's prospective injury extends only to those sports event contracts that Michigan views as subject to the LSBA—contracts which Coinbase contends are swaps—meaning that the lone overlapping portion of the CEA allegedly at issue is that which covers swaps. Thus, properly framed, the question is not whether Congress intended the CEA to preempt the field of derivatives regulation; the question is instead whether Congress intended the 2010 amendment to the CEA, which added swaps, to preempt the field of sports gambling regulation.

On this score, Coinbase's evidence is plainly insufficient. Coinbase offers evidence that the 1974 amendments to the CEA were enacted to

partially preempt the field of futures regulation and to " 'avoid unnecessary, overlapping and duplicative regulation.' " ECF No. 13, PageID.272 (quoting 120 Cong. Rec. H34,736 (Oct. 9, 1974)). But this only tells half the story, because there is also evidence showing that the 1974 Congress was concerned with preempting only directly "incompatible state laws." *See* 120 Cong. Rec. 30,464 (Sep. 9, 1974) (statement of Senator Curtis noting that the Act would only preempt state law if it "were contrary to or inconsistent with Federal law"). Furthermore, evidence of Congressional intent from 1974 is not particularly germane to the question before the Court, because 2010, not 1974, was the year Congress amended the CEA to include swaps.

Congress's intent in amending the CEA to cover swaps in 2010 was ultimately to bring "risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic ripple effects on the U.S. and world economies during the financial crisis of 2007-2008." *Hendrick*, 817 F. Supp. 3d at 1031. However, this Congressional intent, to which Coinbase offers no contemporaneous alternative, is not remotely connected to preempting the field of sports gambling regulation. *Id.* at 1031–32 ("It is absurd to think that Congress

Page **40** of **47**

intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation . . . without ever mentioning that was the goal when Congress added swaps to the CEA in 2010."); *Flaherty*, 172 F.4th at 240 (Roth, J., dissenting) ("When Congress gave the CFTC jurisdiction over swaps, there was no clear and manifest purpose for federal law to supersede states' historic police powers over gambling regulation.") (internal quotations omitted); *Martin*, 793 F. Supp. 3d at 683 ("[W]hen Congress enacted and amended the CEA, it was highly unlikely to have intended to override state laws that regulate sports betting such as Maryland's gaming laws[.]"). What is more, in 2010 "the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701, *et seq.*, largely prohibited states from authorizing sports betting," meaning that Congress had no reason to preempt an already preempted field when it amended the CEA. *Schuler*, 2026 WL 657004, at *8 (S.D. Ohio Mar. 9, 2026).

In conclusion, the evidence does not favor field preemption, and thus Coinbase fails to rebut the presumption that the CEA does not supersede state law. Accordingly, Coinbase fails to clearly establish that it is likely to succeed on the merits of its field preemption theory.

### iii.    Conflict Preemption

Preemption may also be implied where state and federal law " 'directly conflict.' " *Churchill Downs*, 162 F.4th at 638 (quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011)). Direct conflict between state and federal law "occurs when compliance with both is impossible, or when[] . . . state law 'stand[s] as an obstacle to the accomplishment' of Congress's objectives." *Id.* (quoting *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020)).

Coinbase argues that Michigan's gambling laws are conflict preempted because they frustrate Congress's efforts to create a uniform federal regulatory scheme and because complying with both the CEA and LSBA would be impossible. ECF No. 13, PageID.272–74. The Defendants counter that compliance with both the CEA and LSBA is not impossible, and that the LSBA compliments the objectives of the CEA instead of frustrating them. ECF No. 27, PageID.464.

Coinbase offers three arguments in support of its position. First, that the application of state gambling laws to sports event contracts will require futures market participants to "either navigate varying and potentially contradictory legal standards or leave the market altogether[,]" thus standing as an obstacle to Congress's intent to bring futures markets under

a uniform set of regulations. ECF No. 13, PageID.273. Second, Coinbase contends that complying with both its LSBA licensure requirements and its FCM obligations would be impossible, because it would have to restrict what it offers or seek additional licensing in other states, either of which would be impractical and expensive. *Id.* at PageID.273–74. Third, it contends that because the LSBA employs "the blunt hammer of blanket prohibition" to regulate sports event contracts, instead of the "scalpel of case-by-case review" used under the CEA's "special rule," that the LSBA is preempted for using a "different method of enforcement than the" CEA. *Id.* at PageID.275–76.

Coinbase's averments are, in a word, applesauce. For one, Coinbase's contention that Congress endeavored to bring uniformity to futures markets through the CEA is not, as discussed in the previous section, enough to demonstrate that Congress therefore intended to completely preempt state gambling laws from tangentially regulating purported swaps. *See supra* pp. 38–40. For another thing, it is not impossible for Coinbase to comply with the LSBA simply because it is costly and challenging. *Schuler*, 2026 WL 1295806, at *6 (6th Cir. Apr. 24, 2026) ("True, geofencing may be challenging, time-consuming, and

expensive. But expensive does not mean impossible.") (internal citations and quotations omitted).

Finally, Coinbase misconstrues the extent to which enforcement of the LSBA and CEA conflict in this matter. Even if Coinbase is correct that the LSBA and CEA use different methods of enforcement—and it is not clear that is the case—enforcement of the LSBA still does not stand as an obstacle to the objectives of the CEA. Indeed, as Coinbase concedes, the sports event contracts here involve gaming. *See* ECF No. 13, PageID.275 ("Here, enforcing Michigan's gambling laws against Coinbase would topple the careful balance struck by Congress with respect to enforcement of the applicable regulations governing gaming event contracts.") (internal quotations omitted). However, pursuant to 17 C.F.R. § 40.11(a)(1), a regulation promulgated by the CFTC under § 7a-2(c)(5)(C)(i)'s "special rule," registered entities are prohibited "from trading, or accepting for clearing, event contracts that involve, relate to, or reference gaming." *Flaherty*, 172 F.4th at 240 (Roth, J., dissenting). And notwithstanding the fact that the CFTC has currently proposed to amend this regulation, if Coinbase were to offer these sports event contracts today, based on a plain reading of § 40.11(a)(1) it would more than likely violate federal law.

Page **44** of **47**

Thus, "state gambling laws as applied to such [sports event] contracts cannot be conflict preempted[,] [because] [f]ar from undermining congressional objectives, [Michigan]'s gambling laws arguably complement them." *Id.*

Therefore, the evidence does not favor conflict preemption, and Coinbase once again fails to rebut the presumption that the CEA does not supersede state law. Accordingly, Coinbase fails to clearly establish that it is likely to succeed on the merits of its conflict preemption theory.

### iv.    Irreparable Harm

Coinbase contends that it will face several potentially irreparable injuries if Michigan is not preliminarily enjoined. ECF No. 13, PageID.276–78. This includes reputational harm, lost opportunity costs, and adverse state action against its constitutional rights. *Id.* Although these alleged harms are serious, because Coinbase fails to succeed on the other three preliminary injunction factors, it is unnecessary to analyze this factor. *See Schuler*, 2026 WL 657004, at *10 (S.D. Ohio Mar. 9, 2026).

### v.    Balance of the Equities and Public Interest

When, as here, a preliminary injunction is sought against a state government, the last two factors merge. *Churchill Downs*, 162 F.4th at 643.

Page **45** of **47**

With respect to these factors, Coinbase essentially argues that it is in the public interest to block the application of unconstitutional laws and that state officials have no legitimate interest in enforcing unconstitutional laws. ECF No. 13, PageID.278–79. But as discussed in the previous sections, it is far from clear that the enforcement activity in dispute is unconstitutional. *See supra* pp. 20–44. Further still, "a State 'suffers a form of irreparable injury' any time a court enjoins it 'from effectuating statutes enacted by representatives of its people.' " *Schuler*, 2026 WL 1295806, at *7 (6th Cir. Apr. 24, 2026) (quoting *Maryland v. King,* 567 U.S. 1301, 1303 (2012)). And this is particularly true under the circumstances, because Michigan is seeking to enforce one of its traditional police powers: gambling regulation. *Id.* Considering these things, factors three and four heavily favor the Defendants.

## VI.    Conclusion

For the reasons discussed, Coinbase has not carried its burden to establish the factors required for a preliminary injunction against the Defendants. The Court therefore **DENIES** Coinbase's motion for a preliminary injunction (ECF No. 13). Additionally, the Michigan Gaming Control Board is **DISMISSED** as a defendant from this action.

**IT IS SO ORDERED.**

Dated: August 6, 2026

s/ Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge